1  Mark L. Whitaker (pro hac vice pending)
   MWhitaker@mofo.com
2  Daniel P. Muino (CA BAR NO. 209624)
   DMuino@mofo.com
3  G. Brian Busey (pro hac vice pending)
   GBusey@mofo.com
4  Mary Prendergast (CA BAR NO. 272737)
   MPrendergast@mofo.com
5  Fahd H. Patel (pro hac vice pending)
   FPatel@mofo.com
6  Corinna J. Alanis (CA BAR NO. 287164)
   CAlanis@mofo.com
7  MORRISON & FOERSTER LLP
   2000 Pennsylvania Avenue, NW
8  Washington, District of Columbia 20006-1888
   Telephone:    (202) 887-1500
9  Facsimile:    (202) 887-0763

10 Bryan Wilson (CA BAR NO. 138842)
   BWilson@mofo.com
11 MORRISON & FOERSTER LLP
   755 Page Mill Road
12 Palo Alto, California 94304-1018
   Telephone:    (650) 813-5600
13 Facsimile:    (650) 494-0792

14 Attorneys for Plaintiffs
   TERADATA CORPORATION, TERADATA
15 US, INC., and TERADATA OPERATIONS, INC.

16

17                  UNITED STATES DISTRICT COURT

18                 NORTHERN DISTRICT OF CALIFORNIA

19

| | |
|---|---|
| 20 TERADATA CORPORATION, TERADATA US, INC., and TERADATA OPERATIONS, INC. | Case No. |
| 22  Plaintiffs, | **COMPLAINT FOR TRADE SECRET MISAPPROPRIATION, COPYRIGHT INFRINGEMENT, VIOLATION OF SHERMAN ACT § 1, VIOLATION OF CLAYTON ACT § 3, VIOLATION OF SHERMAN ACT § 2** |
| 23  v. | |
| 24 SAP SE, SAP AMERICA, INC., and SAP LABS, LLC | **DEMAND FOR JURY TRIAL** |
| 25  Defendants. | |

26

27

28

Plaintiffs Teradata Corporation, Teradata US, Inc., and Teradata Operations, Inc. (collectively, "Teradata") complain and allege as follows against Defendants SAP SE, SAP America, Inc., and SAP Labs, LLC (collectively, "SAP").

**THE NATURE OF THE ACTION**

1.      This case is about SAP's campaign of anticompetitive conduct directed at Teradata.  Over at least the last decade, SAP has used its powerful position in Enterprise Resource Planning ("ERP") Applications to gain entrance to and quickly grab market share in the Enterprise Data Analytics and Warehousing ("EDAW") market, in which it previously had essentially no presence.  SAP's strategy began in 2008, when SAP leveraged its position in ERP Applications to lure Teradata into a purported joint venture in order to gain access to Teradata's valuable intellectual property.  The purpose of the joint venture—a purpose which Teradata now knows was a false one on SAP's part—was to combine SAP's ERP Applications suite and Business Warehouse reporting tool (SAP BW) with Teradata's industry-leading "massively parallel processing" (MPP) architecture for EDAW.  SAP then stole Teradata's trade secrets (accumulated by Teradata over the course of four decades in the EDAW space), and used them to quickly develop and introduce a competing (though inferior) product: SAP HANA.

2.      Upon release of its new product, SAP promptly terminated the parties' joint venture, and it is now attempting to coerce its customers into using HANA only, to the exclusion of Teradata, by forcing its customers to adopt HANA in exchange for upgrading their ERP Applications.  Moreover, and on information and belief, SAP has begun significantly restricting Teradata's ability to access customers' SAP-derived data.  Through this conduct, SAP has deliberately sought to exploit its large, existing ERP customer base to the detriment of Teradata and its customers.  Given the extremely high costs of switching ERP providers, SAP's ERP customers are effectively locked-in to using SAP's ERP Applications, and SAP is now attempting to lock them into using only HANA in the EDAW market as well.

3.      SAP could not have so quickly developed and marketed HANA in the first place without its theft of Teradata's trade secrets.  Now, using the fruits of that theft and its position in ERP Applications, SAP is attempting to foreclose Teradata from supplying EDAW solutions to

1    many of the largest corporations in the world.  SAP's anticompetitive strategy has resulted in

2    irreparable and ongoing harm to Teradata in the form of lost customer relationships and

3    opportunities, lost profits, and continued erosion of market share in the very industry Teradata

4    pioneered.  Teradata therefore is entitled to an injunction barring SAP's illegal conduct, monetary

5    damages, and all other legal and equitable relief available under law and which the court may

6    deem proper.

7                                            **PARTIES**

8           4.      Teradata Corporation is organized under the laws of Delaware.  Its global

9    headquarters is currently located at 10000 Innovation Drive, Miamisburg, Ohio 45342, with an

10   announced move to 17095 Via del Campo, San Diego, California 92127, in late 2018.  Teradata

11   Corporation, either itself or through one or more of its subsidiaries, conducts research,

12   development, engineering, and other technical operations related to its EDAW products at its

13   facilities at 17095 Via del Campo, San Diego, California 92127.

14          5.      Teradata US, Inc., a wholly-owned subsidiary of Teradata Corporation, is a

15   corporation organized under the laws of Delaware, with its current headquarters at 10000

16   Innovation Drive, Miamisburg, Ohio 45342.  Teradata US, Inc. will also be moving its

17   headquarters to San Diego in late 2018.  Teradata US, Inc. is the owner of all Teradata intellectual

18   property worldwide.

19          6.      Teradata Operations, Inc., a wholly-owned subsidiary of Teradata Corporation, is a

20   corporation organized under the laws of Delaware, with its current headquarters at 10000

21   Innovation Drive, Miamisburg, Ohio 45342.  Teradata Operations, Inc. will also be moving its

22   headquarters to San Diego in late 2018.  Teradata Operations, Inc. is responsible for conducting

23   all of Teradata's business operations in the United States, including product development and

24   sales.

25          7.      Defendant SAP SE is a European company.  Its principal place of business is

26   located at Dietmar-Hopp-Allee 16, Walldorf, Germany, 69190.  SAP SE converted from a

27   German "AG" corporation to an "SE" European company in 2014.

28

8. Defendant SAP America, Inc. ("SAP America"), a wholly-owned subsidiary of SAP SE, is a Delaware corporation. Its principal place of business is 3999 West Chester Pike, Newtown Square, PA 19073, and it also has a place of business located in this District, at 1999 Harrison Street, Suite 675, Oakland, CA 94612. SAP America is responsible for sales, marketing, distribution, technical support, and customer service related to SAP HANA occurring in the United States, including throughout this District.

9. Defendant SAP Labs, LLC ("SAP Labs"), a wholly owned subsidiary of SAP America, is a Delaware limited liability company. SAP Labs has places of business in Palo Alto and San Francisco, California, including its Co-Innovation Lab ("COIL") facility located at 3410 Hillview Avenue, Palo Alto, CA 94304. COIL housed a development, analysis, and testing environment for the SAP-Teradata joint venture discussed herein (known as the "Bridge Project") and featured customer demonstrations of the integrated solution jointly developed by SAP and Teradata (referred to as "Teradata Foundation"). SAP Labs conducts research, development, and engineering activities related to SAP HANA.

## JURISDICTION

10. This Court has subject matter jurisdiction under 18 U.S.C. § 1836(c) and 28 U.S.C. §§ 1331, 1337(a), 1338(a), and 1367.

11. This Court has personal jurisdiction over SAP SE, SAP America, and SAP Labs (collectively, "SAP"). This Court has personal jurisdiction over SAP SE because it has committed acts of misappropriation and infringement within this District. SAP SE used its power in the ERP Applications market to enter into agreements with Teradata and gain access to Teradata's technology and know-how, including through installation of Teradata software at the COIL facility in this District. SAP SE then used these activities to misappropriate Teradata's trade secrets and infringe Teradata's copyrighted software in this District. In addition, SAP SE, directly or through intermediaries, sells or offers for sale infringing products and services in this District. This Court also has personal jurisdiction over SAP SE, SAP America, and SAP Labs for the purpose of Teradata's antitrust claims pursuant to 15 U.S.C. § 22.

12.     This Court has personal jurisdiction over SAP America because it has committed acts of infringement and misappropriation in this District.  SAP America has sufficient minimum contacts with this District because, for example, SAP America's wholly owned subsidiary, SAP Labs, is located within this District.  SAP America also has a place of business in this district.  In addition, SAP America, directly or through intermediaries, sells or offers for sale infringing products and services in this District.

13.     This Court has personal jurisdiction over SAP Labs because it has a place of business located within this District.  Further, SAP's misappropriation and infringement of Teradata's intellectual property was carried out, at least in part, at SAP Labs' COIL facility in this District.

## VENUE AND INTRADISTRICT ASSIGNMENT

14.     Venue is proper under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred or a substantial part of property that is the subject of the action is situated in this District.  Additionally, venue is proper under 28 U.S.C. § 1400(a) and 15 U.S.C. § 22 for the copyright and antitrust claims, respectively, because SAP Labs and SAP America (and SAP SE, through its subsidiaries) may be found and transact business in this district.

15.     This is an Intellectual Property and Antitrust Action to be assigned on a district-wide basis pursuant to Local Rule 3-2(c).

## BACKGROUND

**A.      Teradata Is One of the World's Leading Technology Companies and a Pioneer of EDAW Products, Including MPP Database Systems.**

16.     Teradata's flagship product, and the cornerstone of all of its enterprise-analytics offerings, is Teradata Database.  Teradata Database is a massively parallel relational database management system (RDBMS) specifically designed for Enterprise Data Analytics and Warehousing (EDAW).  EDAW involves the centralized storage and integration of vast amounts of data collected from numerous sources across an entire business enterprise in its day-to-day operations, giving the business a complete "enterprise view" of its operational activities.  In

addition to data storage, EDAW is especially valuable in helping the world's largest companies (most of whom serve millions or even billions of customers and/or process millions or billions of transactions or data-generating events every day) analyze and fully understand the entirety of their business operations, including how events happening in one area of the business impact operations in other areas.  EDAW also assists these companies in making the strategic and tactical decisions, often in real-time, which allow them to operate as efficiently and profitably as possible.

17.     Teradata has been a leading provider of EDAW products for nearly 40 years. Teradata pioneered and was the first commercial EDAW vendor to employ the highly scalable computing architecture known as "massively parallel processing" (MPP).  Teradata's MPP architecture is designed specifically for executing high volumes of complex analytical queries (tens of thousands at a time) on the massive amounts of data generated by EDAW customers.  As the term MPP suggests, Teradata's architecture accomplishes this by dividing equally both the data and the analytical workload across dozens, hundreds, or (in many cases) thousands of parallel processor units, and executing the analytical tasks concurrently across these parallel units.

18.     A Teradata system does this with "linear-performance scalability," meaning that the system can grow to fit each customer's needs, taking on as many additional parallel processor units and data-storage devices as necessary to accommodate whatever amount of data and whatever type of analytics workload the customer can throw at it.  As the customer's data volumes and workload demands increase, the Teradata system can grow to accommodate them with the simple addition of parallel units and (if necessary) redistribution of data and workload across the expanded system. The Teradata system is unique in its ability to accommodate this type of growth without diminishing the returns or sacrificing the processing power or efficiency of any of its parallel units.

19.     Teradata's MPP technology grew out of research conducted at the California Institute of Technology.  After starting the company in a garage in Marina Del Rey, California, the founders obtained funding in mid-1979 and Teradata was born on July 13, 1979.  The founders chose the name "Teradata" to symbolize the ability of their flagship database to manage trillions of bytes of data, an unimaginable amount of data at that time.

20.     Teradata released the first commercial system incorporating its MPP architecture in the early 1980s and has spent the last *four decades* expanding and improving its technology, generating substantial trade secrets and other intellectual property in the process.  In 1983, Teradata received the seminal patent on first-generation MPP design for data analytics (hardware-based parallelism; U.S. No. 4,412,285, "Multiprocessor Interconnection System and Method").  Eleven years later it also received the seminal patent on second-generation MPP design (software-based parallelism; U.S. No. 5,640,584, "Virtual Processor Method and Apparatus for Enhancing Parallelism and Availability in Computer Systems"), technology that continues to distinguish Teradata's systems from those of its competitors today.  It is access to this experience and innovation that SAP sought and received through the joint venture with Teradata and then ultimately unlawfully used to Teradata's detriment, both through its development and release of HANA and through its subsequent attempts to monopolize the EDAW Market, which encompasses SAP's customers in the Top-Tier ERP Applications Market (defined below).

21.     In the 25 years since its early breakthroughs, Teradata has continued in its role as the pioneer for massively parallel analytics, developing and patenting technologies that remain the gold standard in a wide variety of technology areas.  For example, in 2012, Teradata released its Unified Data Architecture (UDA), which allows a customer to collect and analyze all of its data no matter the type (including, *e.g.*, traditional "structured" data along with "unstructured" data like audio and video content) in a single analytical environment.  In 2017, Teradata released IntelliCloud, which provides EDAW capabilities in a secured cloud-services environment.  Today, Teradata has over 10,000 employees globally, including over 1450 employees based in California at Teradata's San Diego, Santa Clara, San Francisco, and El Segundo facilities.  On June 6, 2018, Teradata announced that it will be moving its headquarters from Miamisburg, Ohio, to its campus in San Diego.

22.     Teradata serves the world's largest enterprise customers operating in a diverse range of industries.  Its customers include all 17 of the top telecommunications companies, 17 of the top 20 global and commercial savings banks, 16 of the top 20 travel and transportation companies, 15 of the top 20 global retailers, 10 of the top 15 pharmaceutical companies, and 12

of the top 20 manufacturing companies, among others.  Teradata also serves a variety of customers in the nonprofit and public sectors.  Teradata's customer base primarily consists of companies with data collected from millions of daily transactions from many data sources across a wide variety of enterprise applications, business lines, and geographic locations. These companies present the most complex data-analytics challenges and require the scalability and sophistication for which Teradata's EDAW technologies were specifically designed.

23.     Since the release of its first database product in the early 1980s, Teradata and its products repeatedly have been recognized as standouts in the high-tech industry and within the business community in general.  Fortune magazine named Teradata's database system its "Product of the Year" in 1986, and Gartner named Teradata the "Leader in Commercial Parallel Processing" in 1994.  Intelligent Enterprise magazine named Teradata the best global data warehouse and business intelligence appliance vendor in 2007, and Forrester Research rated Teradata number one in its first-ever enterprise data warehousing report in 2009.  Forbes named Teradata one of the world's 100 most innovative companies in 2013, and just a few months ago Thompson Reuters named Teradata a Top 100 Global Technology Leader.  Finally, the Ethisphere Institute consistently has recognized Teradata as one of the World's Most Ethical Companies, awarding this distinction to Teradata in 2018 for the ninth consecutive time.

**B.     Teradata Scrupulously Protects Its Intellectual Property.**

24.     Over its nearly 40-year history of innovation, Teradata has developed extensive intellectual property related to its database and data-analytics technologies, obtaining more than 1000 patents.  Teradata's intellectual property includes confidential techniques related to the ingestion and management of massive amounts of data and the concurrent execution of large numbers of highly complex analytical queries against that data.  Teradata safeguards these optimization techniques, which provide Teradata a significant advantage over its competitors, as among its most valuable and confidential information.

25.     Teradata's proprietary and highly valuable data-analytics techniques are not known outside the company except under strict duties of non-disclosure, and Teradata scrupulously maintains these techniques in confidence through many safeguards, including but

not limited to non-disclosure agreements, confidentiality provisions, password protection, express licenses for end users, and secure infrastructure.

26.     When Teradata was initially spun-off from its parent company NCR in 2007, each employee was required to sign a contract containing a strict non-disclosure provision.  When any new employee joins Teradata, that employee is required to sign an agreement acknowledging the duty to keep strictly confidential and treat as trade secret any information learned during the course of employment related to the business or activities of Teradata.  The employment agreement also states that, upon termination, the employee will comply with this non-disclosure agreement, and will surrender any Teradata information in the employee's possession upon leaving the company.  Additionally, upon their departure from Teradata, employees are required to sign exit agreements reminding them they have a continuing obligation not to use or disclose, or directly or indirectly aid others in using or disclosing, any of the proprietary information or data they may have learned while employed at Teradata.

27.     Teradata also requires third-party contractors, distributors, vendors, and development partners to enter into non-disclosure agreements that strictly limit the use and disclosure of any confidential information obtained in the course of their relationships with Teradata.  In those agreements, Teradata controls what resources a given partner or contractor can access, how they can be accessed (often via specific passwords), and which specific personnel can access those resources.

28.     Any time Teradata is considering joint development with a third party, it requires an NDA be signed before any confidential information can be exchanged as part of those initial discussions.  With respect to end users, Teradata protects its intellectual property by providing access to its software tools and technical information only to persons who agree to the terms of Teradata's end-user license agreements.  Teradata also employs secure computing infrastructure for its source code, design documents, and other proprietary and confidential information.

29.     Teradata owns the copyright in the software associated with Teradata Database. Teradata has applications for registration pending for Teradata Database in the United States Copyright Office, as follows:

| Work | Case Number | Date Submitted |
|------|-------------|----------------|
| Teradata Database 12.0 | 1-6668876091 | June 19, 2018 |
| Teradata Database 13.0 | 1-6668993302 | June 19, 2018 |
| Teradata Database 13.1 | 1-6668993339 | June 19, 2018 |
| Teradata Database 14.0 | 1-6668993374 | June 19, 2018 |
| Teradata Database 14.1 | 1-6668993409 | June 19, 2018 |
| Teradata Database 15.0 | 1-6668993464 | June 19, 2018 |
| Teradata Database 15.1 | 1-6668983602 | June 19, 2018 |

C.     **Teradata and SAP Enter into the Bridge Project.**

30.     SAP is the dominant provider of ERP (Enterprise Resource Planning) software ("ERP Applications") in the market comprised of the world's most complex, large-scale business enterprises (the "Top-Tier ERP Applications Market"). This market is more fully defined in Paragraphs 56 through 58 below. ERP Applications allow companies to gather and manage the data required to conduct their day-to-day operations across many aspects of the business enterprise, including sales and inventory transactions, financial and accounting transactions, human-resource transactions, and the like. ERP Applications typically are designed around a relational database that acts as a common repository for all the data used and managed by the ERP Applications in carrying out the entity's business transactions. This database, known as a "transactional database," ensures that all users of the entity's ERP Applications have access to a uniform and current set of data, so that a given transaction will yield the same result no matter which of the users performs the transaction. Examples of commonly used transactional databases are the Oracle Database, IBM Db2, and Microsoft SQL Server.

31.     Teradata traditionally has focused its development activities on the EDAW products and services consumed by the same complex, large-scale enterprises that form the Top-Tier ERP Applications Market (the "EDAW Market"). SAP, on the other hand, has traditionally focused on ERP Applications and, to a lesser extent, "business intelligence" (BI) tools (including the SAP BW tool) that allow ERP users to generate reports using their ERP-derived data. In the mid-2000s, SAP's Top-Tier ERP Applications customers were fully reliant on third parties like Teradata to provide the analytical database and data-analytics backbone necessary to meet their EDAW needs. Recognizing the potential synergies in integrating and marketing their

technologies to a common customer base, in 2008 Teradata and SAP entered into a partnership to develop a solution that would "bridge" SAP's Top-Tier ERP Applications customers to an analytic solution based on Teradata's market-leading EDAW product, which would be accessed through the interface of the SAP BW tool (the "Bridge Project").

32.     A key challenge of the Bridge Project was to ensure fast and efficient interoperation between SAP's front-end systems and Teradata's EDAW product.  Subject to strict non-disclosure agreements that limited the use of any confidential Teradata information to the Bridge Project only, Teradata shared its valuable trade secret and proprietary techniques for optimizing the integration and analysis of massive amounts of data at an enterprise-wide scale. Using those techniques, Teradata and SAP succeeded in jointly developing and putting into production an integrated solution called "Teradata Foundation," which would enable SAP's Top-Tier ERP Applications customers to use Teradata as the underlying analytical database for EDAW activities.

33.     Teradata sharply limited SAP's use of information, software, tools, and other materials that it provided during the Bridge Project.  The parties entered into a mutual non-disclosure agreement (MNDA) in December 2008 and a further MNDA in June 2009.  These NDAs limited the disclosure and use of the parties' "Confidential Information," including both parties' "software and related documentation," stating that such information "shall not be reproduced in any form except as required to accomplish the intent of this Agreement."  On February 27, 2009, SAP and Teradata entered into a Software Development Cooperation Agreement (SDCA) and a Technology Partner Agreement (TPA) related to the Bridge Project. These agreements restricted disclosure of the parties' confidential information and included prohibitions on reverse engineering.

34.     During the Bridge Project, subject to the terms of the parties' agreements, Teradata provided to SAP proprietary, confidential, and trade secret information acquired through decades of research and development.  Teradata conducted training sessions on Teradata's database solutions for SAP developers working on the Bridge Project.  The parties collaborated on testing, evaluation, and development related to the creation of the integrated solution, during which time

Teradata's engineers provided extensive trade secret information on the design and optimization of Teradata's MPP systems and the execution of analytical queries in such systems.

35.     For example, during the Bridge Project, Teradata identified certain inefficiencies in SAP's software that prevented it from leveraging the power and parallel-processing capabilities of the Teradata Database.  In a series of emails from 2008 to 2010 between SAP and Teradata employees, Teradata identified the causes of these inefficiencies and suggested solutions based on its own decades-long experience with MPP databases and the confidential solutions it implemented in its own product offerings.  In addition, Teradata conveyed numerous other trade secrets to SAP during the Bridge Project, including innovative techniques for optimizing the speed and efficiency of (a) the concurrent execution of many analytical queries and (b) the distribution of vast amounts of data and complex analytical workloads across massively parallel processing units.

36.     In addition, Teradata provided SAP with access to its database systems for experimental and research purposes in connection with the Bridge Project.  For example, Teradata installed its database system at SAP's COIL facility in Palo Alto, California, and at SAP's research center in Walldorf, Germany.  Teradata also provided SAP's developers with access to Teradata Express, a fully functional trial version of Teradata Database, pursuant to Teradata's standard end user license.  Among other things, SAP's use of the Teradata Database installations at COIL and in Walldorf and its use of Teradata Express were conditioned on SAP's agreement not to perform any reverse-engineering or to disclose any test or evaluation results without Teradata's prior written consent.

37.     The parties' efforts in the Bridge Project bore fruit.  Teradata and SAP successfully developed Teradata Foundation, a jointly engineered solution that allowed SAP's Top-Tier ERP Applications customers to use Teradata as the underlying database and data-analytics engine for their EDAW needs.  SAP and Teradata brought Teradata Foundation to market, as they installed and finalized Foundation on site at one major customer's facilities and developed business opportunities for numerous other potential customers, a business projected at hundreds of millions of dollars annually.

1

D.      **SAP Quickly Develops and Releases HANA, SAP's Flagship Database Offering, by Misappropriating Teradata's Intellectual Property.**

2

3        38.     While it was actively partnering with Teradata on the Bridge Project, SAP also

4    was developing its own competing database solution—SAP HANA.  In the summer of 2009, just

5    months after the Bridge Project formally began, SAP co-founder Hasso Plattner and then-CTO

6    Dr. Vishal Sikka announced their goal of revitalizing SAP's lackluster and outdated product

7    offerings by developing a new, faster database architecture.  Dr. Sikka quickly restructured SAP's

8    engineering teams to develop and deploy SAP HANA in less than a year, an extremely short time

9    frame for a project of such magnitude.

10       39.     In November 2010, Dr. Sikka announced at SAP's annual user conference,

11   SAPPHIRE, that SAP had begun shipping its HANA product.  In May 2011, again at SAP's

12   SAPPHIRE conference, an SAP customer demonstrated HANA for SAP BW to create what

13   purported to be an EDAW-type environment.  SAP's CTO described this version of SAP HANA

14   as incorporating a "massively parallel" database "with various data processing engines"—a

15   similar type of database architecture as that pioneered by Teradata and used in Teradata Database.

16   SAP announced general availability of SAP HANA in June 2011.

17       40.     Two months later, on August 19, 2011, after the parties had been working on the

18   Bridge Project for nearly three years, SAP unilaterally terminated the project and stopped

19   supporting, selling, or marketing Teradata Foundation.  Just days later in September 2011, SAP

20   announced HANA for SAP BW, which combined front-end software with the back-end database

21   engine (HANA) for the purpose of creating an EDAW solution—the same thing Teradata

22   Foundation was intended to achieve.

23       41.     Initial success of HANA (including HANA for SAP BW) was limited, in part

24   because, despite SAP's statements to the contrary, BW was ill-equipped to generate reports using

25   data from any other source besides SAP's ERP Applications.  Nonetheless, SAP HANA use

26   eventually took off (aided by SAP's anticompetitive conduct discussed below), with HANA

27   revenue reaching $2 billion by 2016.  SAP HANA has also led to hundreds of millions of dollars

28

in additional licensing sales.  Dr. Sikka was lauded in the industry as the "father" and "mastermind" of SAP HANA, and was credited with reversing SAP's stagnant product offerings.

42.     Like SAP and Teradata's jointly developed solution, SAP's HANA product combines a database solution with integrated software to perform data analytics.  HANA purports to serve as both types of database required by the large-scale, complex enterprises that make up the Top-Tier ERP Applications Market and the EDAW Market: (1) a transactional database that allows for the processing of transactional data in real-time; and (2) EDAW functionality that SAP claims can enable enterprise analytics similar to those offered by Teradata.  Thus, with HANA (and BW on HANA), SAP now positions itself as a direct competitor in the EDAW market, which Teradata essentially created, and in which Teradata has operated for almost forty years.

43.     In developing HANA, SAP faced the same challenges which Teradata and SAP faced during the Bridge Project and which Teradata engineers solved — the speed, efficiency, and effectiveness of interoperation between SAP's front-end software and an MPP database engine as it attempted to store and analyze massive amounts of data.  On information and belief, to overcome this challenge during HANA development, the HANA developers, at the direction of Dr. Sikka, utilized the same solution developed by Teradata's engineers and developers during the Bridge Project — using Teradata's trade-secret techniques for optimizing the execution of analytical queries and the speed of data storage and retrieval in large-scale databases.

44.     Among other instances of misappropriation, SAP used Teradata trade secrets to optimize the processing of certain Open SQL queries for large volumes of data, enabling improved performance speed and opportunities for parallel processing and other enhancements on SAP's HANA.  On information and belief, key SAP employees, including Dr. Sikka, the so-called "mastermind" of HANA, were aware of and supported SAP's misappropriation of Teradata's trade secrets during the development of HANA.

45.     SAP also was able to carry out this repurposing because it staffed its HANA development team with veterans of the Bridge Project.  In some cases, SAP engineers were working on both HANA development and the Bridge Project simultaneously, despite the requirements in SAP and Teradata's agreements that confidential Teradata information provided

to SAP for the Bridge Project was to be used only for that purpose.  In addition, a number of Teradata employees working on the Bridge Project left Teradata and went to SAP, where they worked on HANA, despite agreeing not to disclose any confidential and trade secret information learned during their time at Teradata.  At the time, Teradata was not aware of this cross-pollination between SAP's Bridge Project and HANA development teams.

46.     In addition, on information and belief, SAP developers further infringed Teradata's copyrighted software, Teradata Express, which includes a fully functional copy of Teradata Database, by reverse engineering the software in violation of Teradata's end-user license.  Specifically, Teradata has reason to believe that SAP engineers downloaded Teradata Express and ran debugging or other tools against the software to circumvent Teradata's protections and uncover Teradata confidential and proprietary techniques for database processing and analytics.

### E.     Teradata Discovers SAP's Theft of Teradata's IP.

47.     As Teradata would later learn (well after SAP's termination of the Bridge Project), SAP was able to develop and bring HANA to market so quickly because SAP stole and misused Teradata's intellectual property.  On September 4, 2015, *Der Spiegel* published an article reporting that an internal SAP auditor (later identified as Dr. Thomas Waldbaum) concluded that SAP misappropriated proprietary and confidential information from Teradata that SAP engineers obtained during the Bridge Project.

48.     The article explained that the auditor dug deep "into the evolutionary history of HANA" and "focuse[d] on the Bridge Project."  In October 2012, according to *Der Spiegel*, Dr. Waldbaum conducted interviews with SAP developers who worked with Teradata on the Bridge Project.  Although SAP executives initially met with Dr. Waldbaum to hear his allegations, SAP's attorneys terminated their investigation by May 2013.

49.     In January 2014, Dr. Waldbaum drew renewed attention to the issue, sending an email to SAP's supervisory board stating that SAP improperly used the intellectual property of a number of competitors, including Teradata, in its HANA product, and demanding that SAP take action.  On February 12, 2014, SAP fired Dr. Waldbaum.  Teradata has reason to believe Dr.

Waldbaum has knowledge of additional information demonstrating SAP's theft of Teradata's intellectual property.

50.     In May 2014, less than two months after Dr. Waldbaum's termination, Dr. Sikka left SAP for "personal reasons." Various media outlets noted that Dr. Sikka's departure was sudden and unexpected, as the industry considered him a "star executive" who had been the "face of SAP" and "a potential future leader of the company." Neither SAP nor Dr. Sikka has explained the reasons for his departure.

51.     Despite being in possession of Dr. Waldbaum's audit reports for nearly three years, SAP concealed the investigation and its findings from Teradata and the public until it was exposed by *Der Spiegel* in September 2015. As a result of *Der Spiegel*'s probe and the resulting article, Teradata began investigating these allegations, which led to the discoveries culminating in this lawsuit. For example, Teradata learned that several SAP employees working on the Bridge Project, who therefore had access to and used confidential Teradata information, were simultaneously working on HANA. Later, many of these employees would be assigned to HANA full-time. Teradata also learned that SAP had incorporated Teradata's proprietary and confidential information into HANA, solving HANA's speed and efficiency problems using the same solutions that Teradata employees developed using Teradata's trade-secret techniques during the Bridge Project.

52.     Unbeknownst to Teradata at the time, SAP stole Teradata's trade secrets related to optimizing data storage and retrieval (including query execution) in an MPP environment, without authority incorporated them into HANA, and otherwise used them to aid development of HANA, which has become SAP's flagship database product. Unlike Teradata, which has spent four decades developing its EDAW technologies, SAP managed an initial release of its competing HANA product after spending mere months in development. It has become clear to Teradata that SAP was able to go to market so quickly only because SAP entered into an agreement with Teradata under the false pretense of integrating the two companies' technologies, stole key Teradata trade secrets, and then incorporated them into and used them to develop HANA.

1    Despite SAP's public statements denying any wrongdoing, SAP's misuse has continued unabated
2    to the present.

3    53.    SAP's theft of Teradata's intellectual property has irretrievably harmed Teradata.
4    By unilaterally terminating the Bridge Project and ceasing support for Teradata Foundation in
5    favor of HANA, SAP killed an important line of business for Teradata—one in which Teradata
6    had invested considerable time, effort, and resources.  SAP's actions also have effectively
7    blocked Teradata from developing relationships with the SAP customers that could most benefit
8    from Teradata's EDAW products, and have otherwise hampered Teradata's ability to sell and
9    market its own database management and business analytics technologies.  The harm to Teradata
10   has only increased as a result of SAP's exploitation of its dominance in the market for Top-Tier
11   ERP Applications and its improper use of HANA in an attempt to eliminate Teradata as a
12   competitor (discussed below).

13   54.    SAP, on the other hand, has capitalized on its unlawful use of Teradata's IP and its
14   anticompetitive conduct to the tune of billions of dollars in revenue.  Just two years after the
15   launch of HANA, SAP's estimated annual revenue for HANA alone was over $1 billion, and SAP
16   estimates it had over 18,000 HANA customers in 2017.  In February 2018, SAP estimated that
17   over 50% of its ERP client base would be using HANA by 2020.  Recent industry research
18   indicates that 60% of SAP's Top-Tier ERP Applications customers, and perhaps in excess of
19   80%, are employing or preparing to employ HANA.  Furthermore, SAP has generated billions of
20   dollars in additional revenue from the SAP applications that HANA users have also purchased.

21   **F.    SAP's Unlawful Efforts to Restrain Competition.**

22   55.    As outlined above, HANA is the product of theft.  However, rather than merely
23   attempting to compete on the merits with a tainted product, SAP has engaged in conduct designed
24   to eliminate competition in the EDAW market for SAP Top-Tier ERP Applications customers.
25   The growth and revenue information cited above is not the result of SAP's business acumen,
26   innovation, or skill, but instead is the direct result of SAP's anticompetitive efforts.  SAP has
27   carried out its plan through a previously undisclosed change to its long-standing sales practices
28   that leaves its locked-in Top-Tier ERP Applications customers with little choice but to adopt

HANA to the exclusion of Teradata's EDAW products: tying upgrades of customers' ERP Applications to customers' adoption of HANA (while ending support for older versions of ERP Applications).  On information and belief, SAP has also begun significantly restricting Teradata's ability to access customers' SAP ERP data stored in HANA (which is necessary for the functional use of Teradata's EDAW products), thereby ensuring the success of its tying arrangement in coercing customers to adopt HANA.

**1.      Relevant Markets and SAP's Market Power.**

56.     As outlined above, there is a separate, relevant product market for ERP Applications, such as SAP's S/4HANA and SAP's predecessor ERP programs, used by large-scale, complex enterprises (the "Top-Tier ERP Applications Market").

57.     Market participants recognize the distinct needs of these types of customers and may refer to ERP Applications for customers with the above characteristics as "Tier 1" ERP Applications.  As it is understood in the industry, the customer base for "Tier 1" ERP Applications generally consists of the largest companies in the world, such as Fortune 1000 companies in the United States, FTSE 100 companies in Europe, and similarly-sized privately-held entities.

58.     Top-Tier ERP Applications constitute a relevant product market because these products provide unique, specialized tools and functionality at a scale that is designed to meet the needs of customers with extremely high data volumes and complex sources of data.  These customers possess some or all of the following characteristics: (1) millions of transactions and/or data-generating events on a daily basis; (2) multiple and distinct business lines; (3) diverse geographic locations for operations; (4) multiple and disparate sources and formats of data related to distributors, suppliers, competitors, customers, and/or employees; and (5) revenues typically exceeding $1 billion.  These characteristics result in customer demand for highly customizable and flexible software that is readily scalable.

59.     Given the critical importance of a customer's ERP Applications to its business, customers of Top-Tier ERP Applications will migrate to the most recent version of their provider's ERP Applications to have access to the latest features and functionality, most robust

support, and most recent security and software updates.  Where, as here, a Top-Tier ERP

Applications vendor announces the end, or "sunset," of prior versions of its ERP Applications,

Top-Tier ERP Applications customers have no choice but to upgrade.

60.     There are no reasonable or adequate economic substitutes for upgrades of SAP

ERP Applications for the vast majority of Top-Tier ERP Applications customers because they are

locked-in to their current ERP application provider as a result of the information disparity at the

time of purchase and enormously high costs of switching, as set forth below.

61.     Customers are unable to perform detailed cost analyses for the lifecycle of their

ERP Applications at the time of purchase.  It is difficult for customers to obtain the necessary

information among competing ERP Applications with respect to maintenance costs, upgrade

timelines (or the costs of such upgrades), as well as any disruption in service that may occur over

the life of the product.  Such pre-purchase analyses also cannot account for any post-sale changes

in policy or practice such as SAP's changes set forth below.  This creates an information disparity

between Top-Tier ERP Applications customers and providers.

62.     Severe switching costs associated with changing a customers' Top-Tier ERP

Applications provider effectively preclude the vast majority of customers from changing their

ERP Applications.  These switching costs include both direct financial costs and indirect costs at

every stage of the switching process.  Initially, Top-Tier ERP Application customers devote

substantial resources to evaluating ERP Applications.  This process can take several years to

complete, given the need to thoroughly examine the functionality of ERP Applications and

measure that functionality against the unique needs of a particular customer.

63.     After the evaluation process, customers spend significant sums on the actual

licensing, development, and implementation of ERP Applications within their specific business

environments.  An individual customer may spend tens of millions of dollars on its ERP

Applications in a given year, depending upon the complexity and customization of its ERP

Applications, the number of users, and other factors.

64.     Implementing ERP Applications involves extensive costs and substantial devotion

of resources, including but not limited to training employees on how to properly use those ERP

Applications, troubleshooting problems, and realigning business practices with the selected

provider.  In addition to employee-focused change management, implementation involves major

costs associated with migrating data, testing and deployment of specific software developed for

each customer, and technical implementation that occurs during this time period.

65.    Accordingly, changing Top-Tier ERP Applications providers is not a task

completed in days or weeks but over a period of months or years, from the date a license

agreement is signed, through development, testing, and training, to the actual deployment.

66.    These switching costs, coupled with the information disparity between provider

and customer as to future changes in policy or practice, mean that Top-Tier ERP Applications

customers are locked-in to their current providers and thus may be exploited by a change in

policy or practice from their provider that was not known at the time customers made their initial

choice of ERP Applications provider.

67.    SAP has held and continues to hold a dominant position in the Top-Tier ERP

Applications Market, and possesses a market share that ranges, on information and belief, from

60% to 90% depending on the industry in which the customer operates.  Oracle is the only other

significant competitor for these Top-Tier customers, but industry research indicates that Oracle's

market share has historically been less than SAP's with respect to the number of installed Top-

Tier ERP Applications customers.

68.    As outlined above, there is also a separate relevant product market for EDAW

products (the "EDAW Market"), which enable Top-Tier ERP Applications customers to retain,

and more importantly to perform complex analytical operations on, vast amounts of data from a

wide variety of data streams (*i.e.*, the companies' ERP Applications and numerous other sources).

69.    EDAW products are separate and distinct products from ERP Applications.

EDAW products are also separate and distinct products from transactional databases, which are

used primarily for the storage and processing of transactional data.  EDAW products have

historically been designed for their specialized purpose and sold separately from ERP

Applications and transactional databases, and each of these three products serves different

functions for customers.

70.     Teradata's EDAW products include tools that were developed to copy a customer's ERP Applications data from the customer's transactional database for incorporation into Teradata's EDAW system, where a customer can run complex analytical functions against all the data the customer collects from its business enterprise, including its ERP data and data from other sources. Teradata's EDAW tools also allow for extraction of historical data from the customer's transactional system and storage of that historical data in the EDAW system. As a general rule, ERP Applications like SAP's do not perform well when historical data is kept in the underlying transactional database, and use of an EDAW system allows the customer to purge the data from the transactional system and warehouse it elsewhere.

71.     For all Teradata customers, regardless of the transactional database a customer is using, Teradata's tools copy ERP Application data from the transactional database by reading the transaction-log files maintained in that database. The Teradata tools do this with a read-only operation from the transaction log and do not manipulate the actual data within the transactional database in any way. These tools are designed to understand the structure of the stored data and copy it in a way that is accurate/consistent with the customer's ERP Applications but without the risk of corrupting the integrity of the ERP data. Teradata then incorporates a customer's ERP data with data from other sources in its EDAW system to perform a wide variety of analytical functions. Teradata utilizes its software on a variety of transactional databases deployed with a variety of ERP Applications.

72.     Most Top-Tier ERP Applications customers also use EDAW products. Multinational companies with diverse product lines, complex supply chains, and large workforces require the ability to quickly analyze and understand historical and incoming real-time data to inform current and future business decisions. EDAW products are indispensable for these companies. SAP itself has recognized the evolving analytic needs of these companies, which influenced SAP to engage Teradata, under the guise of a partnership, in order to steal Teradata's intellectual property and develop a competing EDAW product.

73.     SAP developed HANA to function as both a transactional database for managing ERP Applications data and an analytical database with EDAW functionality. Teradata Database

is designed primarily for use as an EDAW product but can also process analytical workloads with transactional components.  Thus, SAP has positioned itself as a direct competitor to Teradata in the EDAW Market within its Top-Tier ERP Applications customer base.  However, HANA also serves as a potential source of data (specifically, a customer's SAP ERP data) for its Top-Tier ERP Applications customers who want the performance and linear-scalability offered only by Teradata's EDAW products.

74.     As discussed above, to copy the data generated by a specific application (such as an ERP Application), EDAW products require software specifically designed for and tailored to that application.  Providers of EDAW products make substantial investments in developing products that can successfully and reliably copy a customer's data derived from a specific ERP Application.  The software used to accurately replicate data derived from a provider's ERP Applications, such as SAP's ERP Applications, is not reasonably interchangeable with software used to copy data derived from another provider's ERP Application absent significant development work.

75.     Because EDAW products serve as "back-end" systems for the storage and analysis of data from various streams across the entire business enterprise, these products are dependent upon other sources, such as ERP Applications, to obtain the data that is then uploaded and analyzed.  EDAW products providers, such as Teradata, must be able to access these data sources in a way that permits the efficient and accurate copying of data in order to serve as a viable option for their customers.  This dependence of EDAW products upon other sources of data and the need to develop the ability to efficiently and accurately obtain that data constitute barriers to entry, and are particularly acute here, where SAP's anticompetitive conduct effectively prevents other companies from offering viable EDAW products for SAP's Top-Tier ERP Applications customers.

76.     The relevant geographic markets are the sale of Top-Tier ERP Applications and EDAW products on a worldwide basis, given the multi-national nature of the market participants, as further described herein.

1

2

  **2.**  **Historically, SAP's Top-Tier ERP Applications Customers Could**
      **Freely Select Their EDAW Product of Choice.**

3

  77.  SAP's Top-Tier ERP Applications customers historically were able to use the

4

EDAW products of their choosing, knowing that their EDAW product could access and obtain

5

data that was created in their SAP ERP Applications and then stored in a transactional database.

6

SAP previously did not offer a competitive EDAW product or transactional database with the

7

requisite functionality and scalability for SAP's Top-Tier ERP Applications customers.  Thus, a

8

Top-Tier ERP SAP Applications customer could select a separate transactional database vendor

9

other than SAP and select a separate EDAW product vendor, such as Teradata.

10

  78.  This arrangement permitted SAP's Top-Tier ERP Applications customers to create

11

ecosystems that best fit their needs.  For example, historically, nearly all of the customers who

12

used SAP's ERP Applications would run the applications on an Oracle, IBM, or Microsoft

13

transactional database, and a very high percentage of those Top-Tier ERP Applications customers

14

would use Teradata for their EDAW needs.

15

  79.  Teradata made substantial investments to create software that could reliably and

16

accurately take extremely large amounts of a customer's SAP-derived data and copy it into

17

Teradata's systems to perform data analytics within this ecosystem.  For example, after SAP

18

ended the Bridge Project in 2011, Teradata was forced to find other ways to meet consumer

19

demand for accessing SAP-derived data for use in Teradata's EDAW systems.  Teradata spent

20

tens of millions of dollars to acquire a company with existing technology in this area, and

21

invested additional millions annually to develop and optimize that solution for Teradata and bring

22

it to market.

23

  80.  SAP was aware of and supported this arrangement.  SAP knew that Teradata was

24

obtaining customers' SAP-derived data for use in Teradata's EDAW products via the replication

25

method described above.  This arrangement between SAP and Teradata was mutually beneficial

26

for both parties: Teradata's ability to efficiently access a customer's SAP-derived data increased

27

the marketability and desirability of Teradata's EDAW products, and the ability of SAP's ERP-

28

derived data to be integrated into Teradata's EDAW products increased the marketability and desirability of SAP's ERP Applications.

81.     At the time HANA was first released in 2010, and up through the introduction of S/4HANA in February 2015, SAP continued to allow its ERP customers to choose their own database solutions, including their transactional databases and EDAW products.  Teradata did not actively attempt to integrate with HANA during this time period because there was little to no demand for integration among its customers, who, because of the size and complexity of their database needs, were not in a position to adopt HANA.

82.     Thus, Teradata continued to serve its SAP customers by accessing log files of customers' SAP-derived data and importing them into Teradata's systems for storage and analysis.  SAP customers made their ERP Application choices with the understanding that they would be able to use the EDAW providers that best suited their needs.

### 3.     SAP Ties Upgrades of its ERP Application Product to HANA.

83.     Notwithstanding SAP's theft of Teradata's intellectual property, early iterations of HANA did not have widespread success among SAP's large-scale ERP Applications customers because of HANA's deficiencies in functionality and lack of true linear-performance scalability, and because (even when operating with SAP's BW reporting tool) it was ill-suited for integration of enterprise data from third-party sources.

84.     Following the release of HANA, mutual SAP-Teradata customers still overwhelmingly preferred Teradata's EDAW products to HANA.  Even as customers began evaluating whether to adopt HANA for their transactional database functionality, customers also approached Teradata and encouraged it to develop an integration for HANA.

85.     It stands to reason that SAP was well-aware that its largest SAP ERP customers would likely maintain their current software ecosystems rather than adopt HANA.  Thus, SAP concluded the only possible way to gain widespread acceptance of HANA among its largest ERP Applications customers was to exert control over its locked-in ERP Applications customers and force them to adopt HANA.

86.     SAP first carried out this plan by tying SAP ERP upgrades to the adoption of HANA.  Specifically, SAP launched the latest version of its ERP Application, SAP S/4HANA, in February 2015.  SAP describes S/4HANA as being "built on" and "natively written" for HANA.  This marketing language attempts to conceal the fact that, in an abrupt change to past practice, SAP S/4HANA is wholly incompatible with other transactional databases and can only run on HANA.  Thus, in order to upgrade to SAP's newest ERP Application, customers must now also adopt HANA.

87.     In addition to making S/4HANA incompatible with any other transactional database (unlike prior versions of its ERP Applications), SAP has combined the two distinct products, its ERP Application and HANA, into a single offering (in contrast to its prior sales practice of offering both products separately).  Moreover, and on information and belief, SAP's licensing agreements further restrict the ability of customers to read and copy S/4HANA ERP data to any other database.

88.     The facts demonstrate SAP's decision to combine these two products as a single product offering was done for the sole purpose of forcing its locked-in, Top-Tier ERP Applications customers to adopt HANA and to restrain competition.  There is no technological or other justification for SAP's drastic change in sales practice, and any such justification is greatly outweighed by the anticompetitive effect of SAP's actions on both customers and competitors.

89.     SAP has also announced that it is ending support for prior versions of its ERP Applications by 2025.  SAP has thus forced its current customers into upgrading to S/4HANA, and, by extension, adopting HANA as their database solution, by setting a deadline on the support of their non-HANA-based SAP ERP Applications.  On information and belief, SAP knows that the vast majority of its customers will not be able to evaluate, select, and implement an alternative ERP provider in this time period.  These customers therefore will be forced to adopt HANA when they upgrade their ERP Application.

90.     SAP's conditioning ERP upgrades on customers' adoption of HANA as the database underlying their ERP Applications is a previously undisclosed reversal in its sales practices.  HANA had been on the market for approximately five years before the release of

S/4HANA.  SAP had not previously conditioned customers' use of SAP's ERP Applications on their adoption of HANA.  SAP's ERP customers could not have reasonably anticipated when they entered into their license agreements with SAP that they would be subject to such an undisclosed, future reversal of practice.

91.     On information and belief, SAP has made substantial efforts to force its customers to adopt HANA sooner rather than later by limiting updates for legacy SAP Applications and limiting the release of new features to S/4HANA.

92.     The purpose and impact of SAP's change in practice is clear: whereas previously SAP's Top-Tier ERP Applications customers were free to choose how to manage their data needs, those locked-in customers will now be forced to adopt HANA.  Given the costs of licensing, implementing, and maintaining EDAW products, the vast majority of large-scale customers will have no choice but to abandon their prior EDAW providers because they cannot support dual EDAW providers.  Thus, because HANA purports to offer some or all of the functionality offered by Teradata, SAP is effectively coercing its customers into leaving Teradata and adopting the full stack of SAP products (including HANA).

93.     On information and belief, SAP has also more recently begun significantly restricting Teradata's ability to access customers' SAP ERP data stored in HANA for use in Teradata's EDAW products, thereby ensuring that SAP's Top-Tier ERP Applications customers utilize HANA (and only HANA) for all of their database needs.

94.      SAP's unreasonable restrictions and limitations on Teradata's ability to access customers' SAP-derived data have heightened the success of SAP's unlawful tie at the expense of SAP's Top-Tier ERP Applications customers and Teradata.

95.     A number of existing Teradata customers have threatened to terminate their relationship with Teradata if Teradata cannot properly access their SAP ERP data from HANA.  Moreover, prospective SAP Top-Tier ERP Applications customers will not license Teradata's EDAW products if Teradata cannot properly access their SAP ERP data from HANA or will otherwise be limited in its ability to incorporate SAP ERP data into its EDAW products.

96.     As a direct consequence of this calculated anticompetitive conduct, Teradata has been harmed and continues to be harmed in its business and in its ability to provide products to its SAP Top-Tier ERP Applications customers and prospective customers who are already utilizing SAP ERP Applications.

97.     SAP's conduct has no legitimate business rationale and is directly contrary to the practices of other ERP Applications and database solutions providers.  These providers understand the value-add of allowing customers to choose the software components that best suit their needs.  For example, Teradata currently provides EDAW products to customers using other ERP Applications (including those who also offer EDAW products).  As the market operates under a more open environment, SAP is conspicuously moving in the other direction.

98.     As the above demonstrates, after stealing Teradata's intellectual property to create HANA, SAP has used HANA as a weapon to eliminate competition for EDAW products among its locked-in ERP customers by forcing customers to use HANA in order to upgrade their ERP Applications (which customers must do) while simultaneously tightening restrictions on Teradata's ability to access customers' SAP data stored in HANA.

99.     SAP's intentional, unfair, and unlawful attempts to eliminate competition create a dangerous probability that SAP will succeed and, as a result, will be in a position to raise prices, reduce innovation, unreasonably restrain customer choice, and reduce innovation and output among its locked-in customer base.

## COUNT I
### (Trade Secret Misappropriation Under the Defend Trade Secrets Act
### (18 U.S.C. § 1836, *et seq.*))

100.     Teradata hereby restates and re-alleges the allegations set forth in paragraphs 1 through 99 above and incorporates them by reference.

101.     Teradata's confidential information relating to Teradata Database, including Teradata's proprietary and confidential techniques for optimizing the speed of data storage and retrieval in large-scale, massively parallel databases, constitutes information that has independent economic value because it is not generally known to, and is not readily ascertainable through proper means, by individuals or entities outside of Teradata.  This confidential information is

crucial to the operation of Teradata's business, and, if available to others, would enable them to compete with Teradata to Teradata's detriment.  Teradata has taken reasonable measures to keep such information secret.  Confidential information related to Teradata Database therefore qualifies as a trade secret within the meaning of 18 U.S.C. § 1839.

102.   SAP disclosed, used and continues to use Teradata's trade secrets without express or implied consent, and SAP knew or had reason to know at the time of such disclosure and use that the knowledge of the trade secrets was acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secrets or limit the use of the trade secrets.

103.   Additionally, without consent, authorization, approval, or license, SAP knowingly, willingly, and unlawfully acquired, disclosed, and/or used or intended to use Teradata's trade secrets through improper means and continues to use Teradata's trade secrets without consent.

104.   SAP's misappropriation of Teradata's trade secrets is and has been willful and malicious, such that Teradata is entitled to exemplary damages and its reasonable attorney's fees.

105.   SAP has realized unjust profits, gains, and advantages as a proximate result of its trade secret misappropriation.

106.   SAP will continue to realize unjust profits, gains, and advantages as a proximate result of its trade secret misappropriation as long as such misappropriation is permitted to continue.

107.   Teradata is entitled to an injunction restraining SAP from engaging in continuing and further acts of trade secret misappropriation.  Unless SAP is enjoined and prohibited from disclosing or using Teradata's trade secrets and all materials disclosing or derived from the misappropriated information are seized, SAP will continue to misappropriate Teradata's trade secrets.

108.   As a direct and proximate result of SAP's misappropriation of Teradata's trade secrets, Teradata has suffered, and will continue to suffer, monetary loss to its business, reputation, and goodwill.  Teradata is entitled to recover from SAP, in an amount to be determined at trial, the damages Teradata has sustained and will sustain, for its actual losses and

any unjust enrichment obtained by SAP as a result of its misappropriation of Teradata's trade secrets.

## COUNT II
**(Trade Secret Misappropriation Under the California Uniform Trade Secrets Act (Cal. Civil Code § 3426, *et seq.*))**

109.    Teradata hereby restates and re-alleges the allegations set forth in paragraphs 1 through 108 above and incorporates them by reference.

110.    Teradata's confidential information relating to Teradata Database, including Teradata's proprietary and confidential techniques for optimizing the speed of data storage and retrieval in large-scale databases, constitutes information that has independent economic value because it is unknown to others and is the subject of reasonable efforts to maintain its secrecy or limit its use.  It therefore qualifies as a trade secret within the meaning of California Civil Code Section 3426, *et seq*.

111.    SAP disclosed, used and continues to use Teradata's trade secrets without express or implied consent, and SAP knew or had reason to know at the time of such disclosure and use that the knowledge of the trade secrets was acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secrets or limit the use of the trade secrets.

112.    Additionally, without consent, authorization, approval, or license, SAP knowingly, willingly, and unlawfully acquired, disclosed, and/or used or intended to use Teradata's trade secrets through improper means and continues to use Teradata's trade secrets without consent.

113.    SAP's misappropriation of Teradata's trade secrets is and has been willful and malicious, such that Teradata is entitled to exemplary damages and its reasonable attorney's fees and costs.

114.    SAP has realized unjust profits, gains, and advantages as a proximate result of its trade secret misappropriation.

115.    SAP will continue to realize unjust profits, gains, and advantages as a proximate result of its trade secret misappropriation as long as such misappropriation is permitted to continue.

116.    Teradata is entitled to an injunction restraining SAP from engaging in further acts of trade secret misappropriation.  Unless SAP is enjoined and prohibited from disclosing or using Teradata's trade secrets and all materials disclosing or derived from the misappropriated information are seized, SAP will continue to misappropriate Teradata's trade secrets.

117.    As a direct and proximate result of SAP's misappropriation of Teradata's trade secrets, Teradata has suffered, and will continue to suffer, monetary loss to its business, reputation, and goodwill.  Teradata is entitled to recover from SAP, in an amount to be determined at trial, the damages Teradata has sustained and will sustain, for its actual losses and any unjust enrichment obtained by SAP as a result of its misappropriation of Teradata's trade secrets.

## COUNT III
### (Copyright Infringement (17 U.S.C. § 501))

118.    Teradata hereby restates and re-alleges the allegations set forth in paragraphs 1 through 117 above and incorporates them by reference.

119.    Teradata has applications for registration pending for Teradata Database products as follows:

| Work | Case Number | Date Submitted |
| --- | --- | --- |
| Teradata Database 12.0 | 1-6668876091 | June 19, 2018 |
| Teradata Database 13.0 | 1-6668993302 | June 19, 2018 |
| Teradata Database 13.1 | 1-6668993339 | June 19, 2018 |
| Teradata Database 14.0 | 1-6668993374 | June 19, 2018 |
| Teradata Database 14.1 | 1-6668993409 | June 19, 2018 |
| Teradata Database 15.0 | 1-6668993464 | June 19, 2018 |
| Teradata Database 15.1 | 1-6668983602 | June 19, 2018 |

120.    The Teradata Express simulator, which contains a fully functional version of Teradata Database, contains a substantial amount of original material that is copyrightable subject matter under the Copyright Act, 17 U.S.C. § 101 *et seq*.

121.    Without consent, authorization, approval, or license, SAP knowingly, willingly, and unlawfully copied Teradata's copyrighted work, including by loading unauthorized copies of

Teradata Express into RAM for reverse-engineering and other purposes prohibited by Teradata's end-user license.

122. SAP was aware of Teradata's copyrights of its Teradata Database (and therefore its Teradata Express) software. SAP's infringement therefore was knowing and willful.

123. By its unlawful copying and distribution, SAP has violated Teradata's exclusive rights under 17 U.S.C. § 106.

124. SAP has realized unjust profits, gains, and advantages as a proximate result of its infringement.

125. SAP will continue to realize unjust profits, gains, and advantages as a proximate result of its infringement as long as such infringement is permitted to continue.

126. Teradata is entitled to an injunction restraining SAP from engaging in any further acts in violation of the United States copyright laws. Unless SAP is enjoined and prohibited from infringing Teradata's copyrights and unless all infringing products and advertising materials are seized, SAP will continue to intentionally infringe Teradata's copyrights.

127. As a direct and proximate result of SAP's direct willful copyright infringement, Teradata has suffered, and will continue to suffer, monetary loss to its business. Teradata is entitled to recover from SAP, in an amount to be determined at trial, the damages it has sustained and will sustain, and any gains, profits, and advantages obtained by SAP as a result of its acts of infringement and use of the copied materials. Alternatively, Teradata is entitled to an award of statutory damages for SAP's infringement of Teradata's registered copyrights.

## COUNT IV
### (Unlawful Tying, SAP Top-Tier ERP Applications and EDAW Products for SAP Top-Tier ERP Applications Customers (15 U.S.C. §§ 1, 14))

128. Teradata hereby restates and re-alleges the allegations set forth in paragraphs 1 through 127 above and incorporates them by reference.

129. SAP's Top-Tier ERP Applications (the tying product) are a separate and distinct product and market from the market for SAP's HANA product (the tied product) and the overall market for EDAW products for SAP Top-Tier ERP Applications, including Teradata EDAW

products.  HANA unquestionably possesses EDAW product functionality, which is largely the result of SAP's theft of Teradata's intellectual property.

130.     SAP is coercing its current Top-Tier ERP Application customers into adopting HANA, to the exclusion of other EDAW products, through a previously undisclosed reversal in practice, that is, conditioning upgrades of SAP's ERP Applications on customers' adoption of HANA.

131.     As set forth above, SAP has sufficient economic power in the market for Top-Tier ERP Applications to (a) coerce its current Top-Tier ERP Applications customers into adopting HANA through its previously undisclosed reversal in practice and (2) effectively preclude customers from purchasing competitive EDAW products (including Teradata's EDAW products), given the fact that these customers know they must adopt SAP's HANA in order to upgrade their mission-critical ERP Applications.  Further, SAP's economic power is derived from severe information and switching costs.  SAP Top-Tier ERP Applications customers are locked-in to their SAP ERP Applications and are now being exploited by SAP.

132.     SAP has effectively entered into arrangements with current and prospective Teradata customers in order to restrain a not insubstantial amount of interstate commerce.

133.     SAP's unlawful tying is economically irrational conduct that has no legitimate business justification and only serves to foreclose competition in the EDAW Market for SAP's Top-Tier ERP Applications customers.  Any justification SAP could offer is either pretextual or is else far outweighed by the anticompetitive effects.

134.     By reason of the foregoing, SAP's arrangements with its current Top-Tier ERP Applications customers constitute unlawful agreements or combinations in restraint of trade, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 3 of the Clayton Act, 15 U.S.C. § 14.

135.     SAP's tying is per se unlawful given the high degree of market power SAP possesses in the market for Top-Tier ERP Applications and the power it exercises over its current Top-Tier ERP Applications customers.  Competition in the EDAW Market has been and is appreciably restrained as a consequence of SAP's conduct.

136.     Alternatively, even if SAP's tying is not a per se violation, SAP's tying unreasonably restrains competition in the tied product market and constitutes a rule of reason violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 3 of the Clayton Act, 15 U.S.C. § 14.

137.     SAP's conduct affects far more than a not insubstantial amount of commerce in the EDAW Market.  The amount of business affected by SAP's tying arrangement is in the millions and will only continue to increase.

138.     Teradata has been harmed and will continue to suffer irreparable harm as a consequence of SAP's conduct.  Teradata is entitled to an injunction restraining SAP from engaging in the unlawful tying of upgrades to its ERP Applications with HANA.  Unless and until SAP is enjoined, SAP will continue to engage in the unlawful tying set forth above.

139.     By reason of the foregoing, Teradata is entitled to injunctive and monetary relief, including treble damages and attorneys' fees, pursuant to 15 U.S.C. §§ 15 and 26.

**COUNT V**
**(Attempted Monopolization of EDAW Market for SAP Top-Tier ERP Applications Customers (15 U.S.C. § 2))**

140.     Teradata hereby restates and re-alleges the allegations set forth in paragraphs 1 through 139 above and incorporates them by reference.

141.     SAP provides Top-Tier ERP Applications and EDAW products.

142.     As set forth above, EDAW products for SAP's Top-Tier ERP Applications customers constitutes a relevant product market.

143.     SAP has acted with the specific intent to monopolize the EDAW Market for SAP's Top-Tier ERP Applications customers through its exclusionary conduct, specifically, tying upgrades of SAP's Top-Tier ERP Applications to the adoption of HANA, as set forth above.

144.     The impact of the above-described exclusionary conduct has been heightened by SAP's attempts to significantly restrict Teradata's ability to access customers' SAP ERP-derived data stored in HANA.

145.     SAP was able to engage in the exclusionary practice described above through its misappropriation of Teradata's trade secrets.

146.    As set forth above, SAP's Top-Tier ERP Application customers could not have known that SAP would restrict their ability to utilize their EDAW products of choice and force them to adopt HANA at the time they entered into their agreements with SAP.  Further, SAP's abrupt reversal in its practices after years of permitting customers to use competing EDAW products demonstrates that SAP's conduct lacks any legitimate business purpose, and serves solely to foreclose competition.

147.    Given SAP's power over its Top-Tier ERP Applications customers and the extent to which SAP's anticompetitive conduct precludes competition in the EDAW Market, there is a dangerous probability that SAP will acquire monopoly power in the EDAW Market for SAP's Top-Tier ERP Applications customers.

148.    SAP has already begun to enjoy the fruits of its anticompetitive conduct, as an estimated 60% of SAP's largest ERP Applications customers (and perhaps more than 80%), are employing or preparing to employ HANA.  This rate will only rise more rapidly as more customers upgrade to S/4 HANA and are foreclosed from either licensing alternative EDAW products or accessing their SAP ERP data for use with Teradata's EDAW products.  Rather than being the product of skill, business acumen, or luck, much of HANA's adoption rate is the direct result of SAP's anticompetitive conduct.

149.    Moreover, SAP's conduct has immediate and significant anticompetitive effects. As set forth above, customers cannot justify paying for EDAW products with substantially overlapping functionality.  As the result of this conduct, Teradata and similarly situated vendors will be forced to exit the market.

150.    As a result of SAP's conduct, SAP's Top-Tier ERP Applications customers have suffered and will continue to suffer from a reduction in choice in the EDAW Market.  SAP's conduct will also have the effect of higher prices, reduced quality, and lower innovation and output in the EDAW Market for SAP's Top-Tier ERP Applications customers.

151.    The conduct set forth above constitutes unreasonable and anti-competitive means by which SAP is attempting to monopolize the EDAW Market for SAP Top-Tier ERP Applications customers, in violation of the Sherman Antitrust Act, 15 U.S.C. § 2.

152.    Teradata has suffered direct and tangible injury as a result of SAP's anticompetitive conduct and the damage it has caused to free and fair competition in the EDAW Market for SAP Top-Tier ERP Applications customers.  By reason of the foregoing, Teradata is entitled to injunctive and monetary relief, including treble damages and attorneys' fees, pursuant to 15 U.S.C. §§ 15 and 26.

**PRAYER FOR RELIEF**

WHEREFORE, Teradata respectfully requests the following relief:

A.      A preliminary injunction prohibiting SAP, its officers, agents, servants, employees, attorneys, and affiliated companies, its assigns and successors in interest, and those persons in active concert or participation with them, from continued acts of (1) misappropriation of Teradata's trade secrets, (2) infringement of the Teradata copyrights at issue in this litigation, and (3) violation of antitrust laws;

B.      A permanent injunction prohibiting SAP, its officers, agents, servants, employees, attorneys, and affiliated companies, its assigns and successors in interest, and those persons in active concert or participation with them, from continued acts of (1) misappropriation of Teradata's trade secrets, (2) infringement of the Teradata copyrights at issue in this litigation, and (3) violations of antitrust laws;

C.      Entry of judgment holding SAP liable for infringing the Teradata copyrights at issue in this litigation;

D.      A permanent injunction prohibiting SAP, its officers, agents, servants, employees, attorneys, and affiliated companies, its assigns and successors in interest, and those persons in active concert or participation with them, from disclosing, exploiting, or continuing to utilize Teradata's confidential information relating to Teradata Database, including but not limited to Teradata Database source code;

E.      Entry of judgment holding SAP liable for misappropriating Teradata's trade secrets;

F.      Entry of judgment holding SAP liable for violating the Sherman and Clayton Acts;

G.      An order that all copies made or used in violation of Teradata's copyrights or trade

1   secrets, and all means by which such copies may be reproduced, be impounded and destroyed or

2   otherwise reasonably disposed of;

3       H.      An order awarding damages, together with pre-judgment and post-judgment

4   interest, to compensate Teradata for SAP's copyright infringement and acts of trade secret

5   misappropriation, including actual and exemplary damages and lost profits, or in the alternative

6   for copyright infringement, statutory damages under 17 U.S.C. § 504(c);

7       I.      An order awarding treble damages, along with reasonable attorney's fees, pre-

8   judgment and post-judgment interest, for SAP's violation of the antitrust laws;

9       J.      An order awarding Teradata its costs and attorney's fees; and

10      K.      Any and all other legal and equitable relief as may be available under law and

11  which the court may deem proper.

12                                  **JURY DEMAND**

13      Teradata hereby demands TRIAL BY JURY of all claims and issues presented in this

14  Complaint so triable.

15  Dated:   June 19, 2018                MORRISON & FOERSTER LLP

16

17                                      By:   _/s/  Bryan Wilson_____
                                              Bryan Wilson
18
                                            Attorneys for Plaintiffs
19                                          TERADATA CORPORATION,
                                            TERADATA US, INC., and
20                                          TERADATA OPERATIONS, INC.

21

22

23

24

25

26

27

28