Tharan Gregory Lanier (State Bar No. 138784)
tglanier@JonesDay.com
Nathaniel P. Garrett (State Bar No. 248211)
ngarrett@JonesDay.com
Joshua L. Fuchs (*Pro Hac Vice*)
jlfuchs@JonesDay.com
JONES DAY
555 California Street, 26th Floor
San Francisco, CA  94104
Telephone:    +1.415.626.3939
Facsimile:    +1.415.875.5700

Attorneys for Defendants
SAP SE, SAP AMERICA, INC., AND SAP
LABS, LLC

Kenneth A. Gallo (*Pro Hac Vice*)
kgallo@paulweiss.com
David J. Ball (*Pro Hac Vice*)
dball@paulweiss.com
William B. Michael (*Pro Hac Vice*)
wmichael@paulweiss.com
PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP
2001 K Street NW
Washington, DC  20006-1047
Telephone:    +1.202.223.7356
Facsimile:    +1.202.204.7356

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| TERADATA CORPORATION, TERADATA US, INC., and TERADATA OPERATIONS, INC.,<br><br>             Plaintiffs,<br><br>     v.<br><br>SAP SE, SAP AMERICA, INC., and SAP LABS, LLC,<br><br>             Defendants. | Case No. 3:18-CV-03670-WHO<br><br>**DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS FIRST AMENDED COMPLAINT**<br><br>Date:       **October 24, 2018**<br>Time:      **2:00 p.m.**<br>Judge:    **Hon. William H. Orrick**<br>Courtroom: **2, 17th Floor** |

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

## NOTICE OF MOTION AND MOTION

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on October 24, 2018 at 2:00 p.m., or as soon thereafter as the matter may be heard, before the Honorable William H. Orrick, District Judge of the United States District Court for the Northern District of California, San Francisco Division, located at 450 Golden Gate Avenue, San Francisco, California, Defendants SAP SE, SAP America, Inc. and SAP Labs, LLC (collectively "SAP" or "Defendants") will, and hereby do, move the Court for an Order under Federal Rule of Civil Procedure 12(b)(6) dismissing with prejudice all claims asserted in the First Amended Complaint by Plaintiffs Teradata Corporation, Teradata US, Inc., and Teradata Operations, Inc. (collectively "Teradata").  The motion is made and based upon this Notice of Motion and Motion to Dismiss, the accompanying Declaration of Tharan Gregory Lanier and exhibits attached thereto, the complete files and records in this action, oral argument of counsel, and such other and further matters as the Court may consider.

Dated: August 31, 2018                    JONES DAY

/s Tharan Gregory Lanier
Tharan Gregory Lanier

Counsel for Defendants
SAP SE, SAP AMERICA, INC., AND SAP LABS, LLC

**TABLE OF CONTENTS**

                                                                                      Page

INTRODUCTION ...................................................................................... 1

BACKGROUND AND THE FAC'S ALLEGATIONS ............................... 3

    A.    The Bridge Project and the Governing Agreements ......................... 3

    B.    SAP HANA & S/4HANA ............................................................... 5

LEGAL STANDARD ................................................................................. 6

ARGUMENT .............................................................................................. 6

I.    TERADATA'S TRADE SECRET CLAIMS SHOULD BE DISMISSED ....................... 6

    A.    The FAC Fails to Allege That SAP Engaged in Conduct Prohibited By the Bridge Project Agreements .............................................. 6

    B.    The FAC Fails to Identify Trade Secrets with Sufficient Particularity ............ 8

    C.    The Trade Secret Claims Are Time-Barred .................................... 9

        1.    ███████ Teradata Became Aware of the Events Giving Rise to Its Claims More than Two Years Before Filing Suit ....................................................................... 9

        2.    The FAC Fails to Allege Facts Sufficient to Invoke ████ ██████████ ....................................................... 10

        3.    Teradata's Claims Are Time-Barred Under the Statutory Three-Year Limitations Period Even if ████████ Does Not Apply .............................................................................. 11

    D.    The DTSA Does Not Have Retroactive Effect ............................. 12

II.    TERADATA'S COPYRIGHT CLAIM SHOULD BE DISMISSED ....................... 13

III.    TERADATA ANTITRUST CLAIMS SHOULD BE DISMISSED ....................... 14

    A.    The FAC Fails to State a Claim for Unlawful Tying ...................... 14

        1.    The FAC Does Not Identify a Tie Because S/4HANA is One Integrated Product ............................................. 15

        2.    The FAC Does Not Plausibly Allege that SAP Coerced Customers into Purchasing HANA .................................. 17

        3.    The FAC Fails to Allege a Plausible Relevant Tying Market in Which SAP Has Market Power ...................... 18

        4.    Teradata's Tying Claim Must be Assessed Under the Rule of Reason, Which the FAC's Allegations Fail to Meet .................... 21

    B.    Teradata's Attempted Monopolization Claim Fails Because the FAC Does Not Plausibly Allege a Dangerous Probability of Monopolization ...................... 23

CONCLUSION .......................................................................................... 25

# TABLE OF AUTHORITIES

Page

Cases

*Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*,
    836 F.3d 1171 (9th Cir. 2016).................................................................... 20

*Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*,
    592 F.3d 991 (9th Cir. 2010)............................................................... 15, 18

*Apple Inc. v. Psystar Corp.*,
    586 F. Supp. 2d 1190 (N.D. Cal. 2008) ............................................... 19, 20

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)................................................................................... 6

*Avago Techs. U.S. Inc. v. Nanoprecision Prods., Inc.*,
    2017 WL 412524 (N.D. Cal. Jan. 31, 2017) ............................................ 12

*Babcock & Wilcox Co. v. Areva NP, Inc.*,
    788 S.E.2d 237 (Va. 2016).......................................................................... 7

*Becton, Dickinson & Co. v. Cytek Biosciences Inc.*,
    2018 WL 2298500 (N.D. Cal. May 21, 2018) ......................................... 13

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)................................................................................... 6

*Bhan v. NME Hosps., Inc.*,
    929 F.2d 1404 (9th Cir. 1991).................................................................. 22

*BladeRoom Grp. Ltd. v. Facebook, Inc.*,
    2015 WL 8028294 (N.D. Cal. Dec. 7, 2015) ............................................. 8

*Brantley v. NBC Universal, Inc.*,
    675 F.3d 1192 (9th Cir. 2012)........................................................... 14, 23

*Brown Shoe v. United States*,
    370 U.S. 294 (1962)................................................................................. 19

*California ex rel. Harris v. Safeway, Inc.*,
    651 F.3d 1118 (9th Cir. 2011).................................................................. 21

*Cascade Health Sols. v. PeaceHealth*,
    515 F.3d 883 (9th Cir. 2008)............................................................. 15, 17

*Cave Consulting Grp., Inc. v. Truven Health Analytics, Inc.*,
    2017 WL 1436044 (N.D. Cal. Apr. 24, 2017) ..................................... 12, 13

*Commercial Data Servers, Inc. v. IBM Corp.*,
    262 F. Supp. 2d 50 (S.D.N.Y. 2003)................................................... 19, 20

**TABLE OF AUTHORITIES**
**(continued)**

Page

*Convolve Inc. v. Compaq Computer Corp.*,
  527 Fed. App'x 910 (Fed. Cir. 2013) ............................................................................. 7

*Cooper Interconnect, Inc. v. Glenair, Inc.*,
  2015 WL 13722129 (C.D. Cal. Feb. 3, 2015) ............................................................. 10

*Datel Holdings, Ltd. v. Microsoft Corp.*,
  712 F. Supp. 2d 974 (N.D. Cal. 2010) ........................................................................ 19

*Diodes, Inc. v. Franzen*,
  260 Cal.App.2d 244 (1968) ........................................................................................... 9

*Doe v. Roman Catholic Bishop of Sacramento*,
  189 Cal.App.4th 1423 (2010) ...................................................................................... 12

*Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.*,
  732 F.2d 480 (5th Cir. 1984) ....................................................................................... 19

*Eastman Kodak Co. v. Image Tech. Servs.*,
  504 U.S. 451 (1992) ............................................................................................... 20, 21

*Entous v. Viacom Int'l, Inc.*,
  151 F. Supp. 2d 1150 (C.D. Cal. 2001) ...................................................................... 14

*Farhang v. Indian Inst. of Tech.*,
  2010 WL 2228936 (N.D. Cal. June 1, 2010) ................................................................ 9

*Foremost Pro Color, Inc. v. Eastman Kodak Co.*,
  703 F.2d 534 (9th Cir. 1983) ................................................................................. 17, 22

*Fox v. Ethicon Endo-Surgery*,
  35 Cal. 4th 797 (2005) ..................................................................................... 11, 12, 14

*Gabriel Techs. Corp. v. Qualcomm Inc.*,
  857 F. Supp. 2d 997 (S.D. Cal. 2012) ......................................................................... 12

*Grisham v. Philip Morris U.S.A., Inc.*,
  40 Cal. 4th 623 (2007) ................................................................................................. 11

*Groves v. Kaiser Found. Health Plan, Inc.*,
  32 F. Supp. 3d 1074 (N.D. Cal. 2014) .......................................................................... 6

*Hamilton Chapter of Alpha Delta Phi, Inc. v. Hamilton Coll.*,
  106 F. Supp. 2d 406 (N.D.N.Y. 2000) ........................................................................ 25

*ILC Peripherals Leasing Corp. v. IBM*,
  458 F. Supp. 423 (N.D. Cal. 1978) ............................................................................. 17

Defs.' Mot. to Dismiss
Case No. 3:18-CV-03670-WHO

-iv-

**TABLE OF AUTHORITIES**
(continued)

Page

*In re ATM Fee Antitrust Litig.*,
    2010 WL 2557519 (N.D. Cal. June 21, 2010) ......................................................... 20

*In re Gilead Scis. Sec. Litig.*,
    536 F.3d 1049 (9th Cir. 2008) ............................................................................... 6

*Int'l Mfg. Co. v. Landon, Inc.*,
    336 F.2d 723 (9th Cir. 1964) ............................................................................... 15

*Jefferson Par. Hosp. Dist. No. 2 v. Hyde*,
    466 U.S. 2 (1984) ................................................................................... 14, 22

*Jolly v. Eli Lilly & Co.*,
    44 Cal. 3d 1103 (1988) ............................................................................... 10, 12

*Khoja v. Orexigen Therapeutics, Inc.*,
    --- F.3d ----, 2018 WL 3826298 (9th Cir. Aug. 13, 2018) ........................................... 3

*Knievel v. ESPN*,
    393 F.3d 1068 (9th Cir. 2005) ............................................................................... 3

*Lee v. Life Ins. Co. of N. Am.*,
    23 F.3d 14 (1st Cir. 1994) ............................................................................... 20

*Loop AI Labs Inc. v. Gatti*,
    195 F. Supp. 3d 1107 (N.D. Cal. 2016) .................................................................. 9

*Los Angeles Mem'l Coliseum Comm'n v. NFL*,
    726 F.2d 1381 (9th Cir. 1984) ............................................................................... 18

*M & M Med. Supplies & Serv., Inc. v. Pleasant Valley Hosp., Inc.*,
    981 F.2d 160 (4th Cir. 1993) ............................................................................... 24

*Manuel v. Pac. Gas & Elec. Co.*,
    173 Cal.App.4th 927 (2009) ............................................................................... 10, 11

*Marketel Int'l, Inc. v. Princeline.com, Inc.*,
    36 Fed. App'x 423 (Fed. Cir. 2002) ...................................................................... 6

*N. Pac. R.R. Co. v. United States*,
    356 U.S. 1 (1958) ................................................................................... 17, 22

*Newcal Indus., Inc. v. Ikon Office Solution*,
    513 F.3d 1038 (9th Cir. 2008) ............................................................................... 18, 20

*Nilssen v. Motorola, Inc.*,
    963 F. Supp. 664 (N.D. Ill. 1997) ...................................................................... 7

Defs.' Mot. to Dismiss
Case No. 3:18-CV-03670-WHO

-v-

**TABLE OF AUTHORITIES**
**(continued)**

Page

*Paladin Assocs., Inc. v. Montana Power Co.*,
    328 F.3d 1145 (9th Cir. 2003) .................................................................................. 17

*Polar Bear Prods., Inc. v. Timex Corp.*,
    384 F.3d 700 (9th Cir. 2004) .................................................................................... 14

*RealPage, Inc. v. Yardi Sys., Inc.*,
    852 F. Supp. 2d 1215 (C.D. Cal. 2012) .................................................................... 24

*Rebel Oil Co. v. Atl. Richfield Co.*,
    51 F.3d 1421 (9th Cir. 1995) ............................................................................. 23, 24

*Response of Carolina, Inc. v. Leasco Response, Inc.*,
    537 F.2d 1307 (5th Cir. 1976) .................................................................................. 16

*Rick-Mik Enters., Inc. v. Equilon Enters. LLC*,
    532 F.3d 963 (9th Cir. 2008) .................................................................................... 15

*Rutman Wine Co. v. E. & J. Gallo Winery*,
    829 F.2d 729 (9th Cir. 1987) .................................................................................... 16

*S. Cal. Inst. of Law v. TCS Educ. Sys.*,
    2011 WL 1296602 (C.D. Cal. Apr. 5, 2011) .......................................................... 7, 8

*Sidibe v. Sutter Health*,
    4 F. Supp. 3d 1160 (N.D. Cal. 2013) .......................................................... 15, 21, 22

*Space Data Corp. v. X*,
    2017 WL 3007078 (N.D. Cal. July 14, 2017) .......................................................... 12

*Spectrum Sports, Inc. v. McQuillan*,
    506 U.S. 447 (1993) .................................................................................................. 24

*Taiwan Semiconductor Mfg. Co. v. Tela Innovations, Inc.*,
    2014 WL 3705350 (N.D. Cal. July 24, 2014) .......................................................... 10

*Tanaka v. Univ. of S. Cal.*,
    252 F.3d 1059 (9th Cir. 2001) ........................................................................... 19, 25

*Todd v. Exxon Corp.*,
    275 F.3d 191 (2d Cir. 2001) .................................................................................... 25

*Tompkins v. 23andMe, Inc.*,
    840 F.3d 1016 (9th Cir. 2016) .................................................................................... 9

*Unigestion Holding, S.A. v. UPM Tech., Inc.*,
    305 F. Supp. 3d 1134 (D. Or. 2018) ........................................................................ 24

Defs.' Mot. to Dismiss
Case No. 3:18-CV-03670-WHO

-vi-

**TABLE OF AUTHORITIES**
**(continued)**

Page

*Union Pac. R.R. Co. v. Mower,*
   219 F.3d 1069 (9th Cir. 2000) ............................................................. 6

*United Energy Trading, LLC v. Pac. Gas & Elec. Co.,*
   200 F. Supp. 3d 1012 (N.D. Cal. 2016) ............................................. 23

*United States v. Grinnell Corp.,*
   384 U.S. 563 (1966) .......................................................................... 24

*United States v. Microsoft Corp.,*
   147 F.3d 935 (D.C. Cir. 1998) ................................................... 16, 17

*United States v. Microsoft Corp.,*
   253 F.3d 34 (D.C. Cir. 2001) ........................................................... 21

*Universal Avionics Sys. Corp. v. Rockwell Int'l Corp.,*
   184 F. Supp. 2d 947 (D. Ariz. 2001) ............................................... 21

*Usher v. City of Los Angeles,*
   828 F.2d 556 (9th Cir. 1987) ............................................................. 6

Statutes

15 U.S.C. § 2 .......................................................................................... 23

17 U.S.C. § 507 ...................................................................................... 14

17 U.S.C. § 1201 .................................................................................... 13

18 U.S.C. § 1836 .................................................................................... 11

18 U.S.C. § 1839 .................................................................................. 6, 8

Cal. Civ. Code § 3246.6 ......................................................................... 11

Cal. Civ. Code § 3426.1 ....................................................................... 6, 8

Defend Trade Secrets Act of 2016, Pub. L. No. 114–153, 130 Stat. 376 ....................................... 12

Rules

Fed. R. Civ. P. 9 .................................................................................... 10

Fed. R. Civ. P. 12 .................................................................................... 6

Other Authorities

X P. Areeda, H. Hovenkamp & E. Elhauge, *Antitrust Law* (3d ed. 2007) .................. 15, 17, 18, 24

Defs.' Mot. to Dismiss
Case No. 3:18-CV-03670-WHO

1

**INTRODUCTION**

2          Teradata's First Amended Complaint ("FAC") should be dismissed.  SAP disagrees with

3    many of the FAC's factual allegations.  But even if those allegations are assumed to be true, there

4    are fundamental flaws in the claims that mandate dismissal with prejudice.

5          Teradata sells databases stored on hard drives that support the operation of separate

6    analytics applications.  More than nine years ago, Teradata and SAP engaged in a short-term,

7    limited collaboration to build a "bridge" between Teradata's database and SAP's data

8    warehousing product.  Teradata had a limited customer base and wanted to access SAP's users.

9    Teradata approached SAP to request assistance in building the "Bridge Project."  The so-called

10   "bridge" was necessary because SAP's software and Teradata's software had vastly different

11   architectures.  However, despite the efforts of the parties, only one customer signed up for the

12   joint offering.

13         For years before the Bridge Project, SAP had been independently developing its own

14   database product, later coined HANA.  HANA, which was designed to work seamlessly with all

15   of SAP's products, is a fast, revolutionary database that is successfully competing against product

16   offerings from Oracle, IBM, Microsoft, and Teradata, among others.  The latest generation of the

17   HANA product family—S/4HANA, released in February 2015—is a huge success.  It is a

18   complete customer solution with transaction services (such as Enterprise Resource Planning

19   ("ERP") software) and analytical services all integrated into one system.  Teradata has not been

20   able to compete effectively with S/4HANA because it only focuses on its flagship analytical

21   database and has failed to offer innovative and relevant compelling products.  Having fallen

22   behind, Teradata has now elected to sue SAP, making time-barred and conclusory claims for theft

23   of trade secrets and copyright violations related to the parties' unsuccessful collaboration nearly a

24   decade ago.  Teradata also has tacked on antitrust allegations that fail to state a claim for tying or

25   attempted monopolization and fail to plausibly allege anticompetitive effects in any properly

26   defined antitrust market.

27         With respect to the intellectual property claims, the assertion that HANA is the result of

28   anything but SAP's technological innovation, investment, and development is factually

1    groundless.  But even taking the allegations of the FAC as true, Teradata fails to state a valid

2    trade secret or copyright infringement claim.  To begin, Teradata does not identify with

3    particularity what the "trade secrets" at issue involve.  The FAC vaguely alleges that, during the

4    Bridge Project, Teradata identified "certain inefficiencies" in SAP's own software.  But even if

5    this conclusory allegation identified Teradata's trade secret with particularity—and it does not—

6    Teradata's theory contravenes the contractual language that governed the sharing of information

7    between Teradata and SAP.  As the FAC acknowledges, several contracts—which are

8    incorporated by reference into the FAC and may be considered on a motion to dismiss—

9    governed the Bridge Project and the parties' sharing and use of information.  ███████████

10   ████████████████████████████████████████████████

11   ████████████████████████████████████████████████████

12   ████████████████████████████████████  Yet the FAC fails to

13   allege that Teradata actually designated any information confidential or that SAP exceeded its use

14   rights.  Where, as here, the parties enter into a confidentiality agreement regarding a particular

15   subject matter, a plaintiff cannot use a trade secret claim to circumvent the contractual rules the

16   parties have chosen for themselves.

17         Teradata's intellectual property claims also are time-barred.  ███████████████

18   ████████████████████████████████, and the FAC's allegations make

19   clear that Teradata was on notice of the events underlying its claims well more than two years

20   before filing suit.  The FAC itself cites a German media report from more than two years before

21   filing as purportedly revealing SAP's alleged misconduct to Teradata.  Indeed, the claims are

22   time-barred even if the statutory three-year statute of limitations applies because the FAC makes

23   it clear that Teradata was on notice of its claims by the time SAP terminated the Bridge Project in

24   2011.  Last, the federal trade secret claim also fails because the DTSA was not enacted until 2016

25   and does not have retroactive effect.

26         The antitrust claims fare no better.  The FAC alleges that S/4HANA "ties" HANA to ERP

27   software.  Yet S/4HANA is not two separate products at all: it is one technologically-integrated

28   product offering advantages that would be unavailable if consumers attempted to combine an

Defs.' Mot. to Dismiss
Case No. 3:18-CV-03670-WHO

-2-

1    ERP Application and a database on their own.  Moreover, the FAC does not plausibly allege that

2    SAP coerces its customers into purchasing HANA, and the FAC's allegations regarding the

3    relevant product market are hopelessly contradictory.

4         The FAC also claims that SAP is attempting to monopolize the so-called "Enterprise Data

5    Analytics and Warehousing" ("EDAW") market, but the FAC alleges nothing more than that

6    Teradata now has to compete in its favored marketplace.  The attempted monopolization claim

7    fails, at the least, because the FAC has not plausibly alleged a dangerous probability of

8    monopolization.  Indeed, the FAC does not identify SAP's power in the EDAW market at all.

9                    **BACKGROUND AND THE FAC'S ALLEGATIONS**

10        **A.    The Bridge Project and the Governing Agreements.**

11        The FAC alleges that beginning in 2008, SAP and Teradata worked together to develop a

12   "bridge" between certain SAP software and Teradata databases.  Dkt. 24 ¶¶ 16, 30, 31.  During

13   this "Bridge Project," *id.* ¶ 31, and pursuant to certain contracts, Teradata allegedly shared trade

14   secrets and copyrighted software with SAP, *id.* ¶¶ 29, 32, 34–36.  The Bridge Project had only

15   limited success and throughout its lifetime served only a single customer.  *Id.* ¶ 37.  SAP

16   terminated the Bridge Project in 2011 and announced an innovative in-memory database product,

17   known as HANA, that introduced a "new, faster database architecture."  *Id.* ¶¶ 38-40.

18        The FAC alleges that the Bridge Project was governed by four contracts (collectively, the

19   "Bridge Project Agreements"): (1) the Software Development Cooperation Agreement

20   ("SDCA"), (2) the Technology Partner Agreement ("TPA"), (3) the 2008 Mutual Non-Disclosure

21   Agreement ("2008 MNDA"), and (4) the 2009 Mutual Non-Disclosure Agreement ("2009

22   MNDA").  Dkt. 24 ¶ 33.  In connection with the Bridge Project, Teradata also provided SAP with

23   access to its database systems for experimental and research purposes; SAP's access was

24   governed by Teradata's "standard" end user license ("End User License" or "EUL").  *Id.* ¶ 36.

25   Teradata fails to attach these contracts to the FAC, but the Court may consider them on a motion

26   to dismiss because they form the basis for its claims.  *See id.* ¶¶ 33-36; *Khoja v. Orexigen*

27   *Therapeutics, Inc.*, --- F.3d ----, 2018 WL 3826298, at *9 (9th Cir. Aug. 13, 2018); *Knievel v.*

28   *ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005).

Defs.' Mot. to Dismiss
Case No. 3:18-CV-03670-WHO

-3-

**SDCA (Lanier Decl. Ex. A):** 

**TPA (Lanier Decl. Ex. B):**

**MNDAs (Lanier Decl. Exs. C-D):**

SAP believes that the FAC's reference to a "December 2008 MNDA," Dkt. 24 ¶ 33, is an error, because

Moreover, the only copy of a 2008 MNDA that SAP has located

Defs.' Mot. to Dismiss
Case No. 3:18-CV-03670-WHO

-4-

1   (Lanier Decl. Ex. D) is dated June and not December 2008.  SAP has been unable to locate an

2   executed copy of the 2008 MNDA, but the 2009 MNDA has substantively identical terms and

3   supersedes any prior MNDAs.  *See* Lanier Decl. Ex. C § 15; *id.* Ex. A § 14.7.

4       **End-User License (Lanier Decl. Ex. E):**  The EUL provides the terms of use for

5   Teradata Express, the limited trial version of Teradata Database that the FAC alleges SAP reverse

6   engineered.  Dkt. 24 ¶¶ 36, 46.  The EUL only prohibits reverse engineering "for purposes of

7   illegally obtaining the Software's source code."  Lanier Decl. Ex. E § 3.  It provides that "[a]ny

8   claim or action must be brought within two years after the cause of action accrues."  *Id.* § 10.

9                                                     * * *

10      Notably, Teradata does not allege that SAP breached any provision in the Bridge Project

11  Agreements, including the confidentiality provisions.  Nor does the FAC allege that any of

12  Teradata's purported trade secrets were identified as confidential at the time of disclosure.

13  Nonetheless, the FAC alleges in conclusory form that Teradata shared "trade secrets" with SAP

14  during the Bridge Project, including unidentified "innovative techniques" for optimizing speed

15  and efficiency.  Dkt. 24 ¶¶ 34–35.

16      **B.     SAP HANA & S/4HANA**

17      In 2011, SAP terminated the Bridge Project, with only one installed customer.  During the

18  same year, SAP officially announced and demonstrated HANA for SAP BW "to create what

19  purported to be an EDAW-type environment."  Dkt. 24 ¶¶ 37-40.  HANA is "both types of

20  database required by" large customers: "a transactional database that allows for the processing of

21  transactional data in real-time," and a database "that can enable enterprise analytics."  *Id.* ¶ 42.

22      Initially, there was allegedly relatively little demand for HANA because of the "size and

23  complexity of [large customers'] database needs," Dkt. 24 ¶ 81, and the expense of hardware

24  costs to host large in-memory databases.  In February 2015, however, SAP introduced a fully-

25  integrated product known as S4/HANA, *id.*, which combines ERP applications and "a database

26  solution with integrated software to perform data analytics."  *Id.* ¶ 42.

27      The FAC alleges that because S/4HANA purports to offer "some or all of the functionality

28  offered by Teradata," the "vast majority" of large-scale customers who choose to purchase

Defs.' Mot. to Dismiss
Case No. 3:18-CV-03670-WHO

-5-

S/4HANA will also choose to abandon Teradata, Dkt. 24 ¶ 92, and thus SAP has hindered Teradata's ability to compete in the EDAW market, *id.* ¶ 55.

## LEGAL STANDARD

To avoid Rule 12(b)(6) dismissal, the plaintiff must "state a claim to relief that is plausible on its face," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007), with "more than a sheer possibility that a defendant has acted unlawfully," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The Court presumes the plaintiff's allegations to be true and draws all reasonable inferences in its favor. *See Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987). But the court is not required to accept as true "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008). Moreover, "[t]hough a court generally is obligated to regard the well-pleaded facts of a complaint as true when deciding a Rule 12(b)(6) motion, that principle gives way when the allegations contradict documents attached to the complaint or incorporated by reference." *Groves v. Kaiser Found. Health Plan, Inc.*, 32 F. Supp. 3d 1074, 1079-80 n.4 (N.D. Cal. 2014).

## ARGUMENT

### I.    TERADATA'S TRADE SECRET CLAIMS SHOULD BE DISMISSED.

#### A.    The FAC Fails to Allege That SAP Engaged in Conduct Prohibited By the Bridge Project Agreements.

To state a claim for trade secret misappropriation, a plaintiff must plausibly allege that the defendant knew or had reason to know that the purported trade secret was acquired by improper means, or under circumstances giving rise to a duty to maintain its secrecy or limit its use. *See* 18 U.S.C. § 1839(5)(A)-(B); Cal. Civ. Code § 3426.1(b)(1)-(2). This is fatal to Teradata's claims.

A "written non-disclosure agreement supplant[s] any implied duty of confidentiality that may have existed." *Marketel Int'l, Inc. v. Princeline.com, Inc.*, 36 Fed. App'x 423, 425 (Fed. Cir. 2002) (California law) (applying *Union Pac. R.R. Co. v. Mower*, 219 F.3d 1069, 1076 (9th Cir. 2000) (Oregon law)). Trade secret claims are subject to dismissal if the disclosing party failed to comply with a contractual requirement to designate the allegedly-misappropriated information as confidential upon disclosure, *see Convolve Inc. v. Compaq Computer Corp.*, 527 Fed. App'x 910,

Defs.' Mot. to Dismiss
Case No. 3:18-CV-03670-WHO

-6-

924-25 (Fed. Cir. 2013), or if the alleged misconduct complied with a governing agreement, *see S. Cal. Inst. of Law v. TCS Educ. Sys.*, 2011 WL 1296602, at *8 (C.D. Cal. Apr. 5, 2011).

In *Convolve*, the plaintiff failed to designate its information as confidential at the time of disclosure, as required by the underlying agreements. 527 Fed. App'x at 924-25. Applying "general principles of California contract law," the Federal Circuit held that when parties have "contracted the limits of their confidential relationship," one cannot "circumvent its contractual obligations or impose new ones . . . via some implied duty of confidentiality." *Id.* Thus, if a plaintiff fails to allege compliance with the disclosure terms of the parties' confidentiality agreement, the trade secret claim necessarily fails because the defendant has not acquired or used the allegedly-proprietary information *improperly*. *See id.*[1]

The FAC alleges that Teradata disclosed its trade secret information "subject to the terms of the parties' agreements." *See* Dkt. 24 ¶¶ 33-35. The FAC also alleges that those contracts governed permissible use of information shared by the parties, including the information SAP allegedly misappropriated. *Id.* ¶ 45. Critically, however, the FAC does not assert a breach of contract claim, and the FAC fails to supply factual allegations sufficient to raise a plausible inference that SAP breached any of its contractual obligations. To the contrary, much of what the FAC alleges as purported misconduct (which SAP denies) is expressly permitted by the relevant provisions of the Bridge Project Agreements.

*First,* ████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████ The FAC does not allege, however, that Teradata ever designated as confidential or proprietary any of the

---

[1] *Convolve* noted that "[c]ommon sense leads to the same conclusion," 527 Fed. App'x at 925, and courts applying other states' enactments of the Uniform Trade Secrets Act agree. "It should be obvious" that "the party choosing to apply or not to apply the label cannot later claim confidentiality for unlabeled material." *Nilssen v. Motorola, Inc.*, 963 F. Supp. 664, 680 n.17 (N.D. Ill. 1997) (Illinois law). "There can be no misappropriation where acquisition, disclosure, and use of a trade secret have been expressly authorized by contract." *Babcock & Wilcox Co. v. Areva NP, Inc.*, 788 S.E.2d 237, 260 (Va. 2016) (Virginia law).

Defs.' Mot. to Dismiss
Case No. 3:18-CV-03670-WHO

-7-

1   information it allegedly shared and SAP purportedly misappropriated.  Therefore, this

2   information was not "[a]cquired under circumstances giving rise to a duty to maintain its secrecy

3   or limit its use."  18 U.S.C. § 1839(5)(B)(ii)(II); Cal. Civ. Code § 3426.1(b)(2). ███

4   ███████████████████████████████████████████████████████████████████

5   ████████████████████, Teradata cannot at this late date retroactively assert that

6   information it freely shared actually was secret.

7       *Second*, the FAC alleges that "during the Bridge Project, Teradata identified certain

8   inefficiencies in SAP's software" and "suggested solutions," Dkt. 24 ¶ 35, but it does not say

9   what they were or that Teradata identified them as confidential or proprietary.  Moreover, █

10  ████████████████████████████████████████████████████████████████████

11  ██████████████████████████████████████████████, and the FAC does

12  not allege SAP breached this license.  Likewise, the FAC purports to assert misappropriation of

13  trade secret techniques for optimizing data storage and retrieval, Dkt. 24 ¶¶ 101-103, 110-112, but

14  it fails to mention that ████████████████████████████████████████████████

15  ███████████████████████████████ The FAC also ignores ███████████

16  ██████████████████████████████████████████████████

17  ████████████████████████████████████████████████████████████████████

18  ██████████████████████████████████████████████

19  ████████████████████████████████████████████████████

20  ██████████████████████████████████████████████████████████

21  ██████████████████████████████████████████████████████

22  Thus, "the Complaint alleges no facts that suggest anything other than Agreement-compliant

23  use."  *S. Cal. Inst. of Law*, 2011 WL 1296602, at *7–8.

24       **B.    The FAC Fails to Identify Trade Secrets with Sufficient Particularity.**

25       Dismissal is warranted when "[t]he allegations identifying the purported trade secret are

26  vague and conclusory, and consist of a generic list of categories of various types of information."

27  *BladeRoom Grp. Ltd. v. Facebook, Inc.*, 2015 WL 8028294, at *3 (N.D. Cal. Dec. 7, 2015).

28

Defs.' Mot. to Dismiss
Case No. 3:18-CV-03670-WHO

-8-

> Before a defendant is compelled to respond to a complaint upon claimed misappropriation or misuse of a trade secret and to embark on discovery which may be both prolonged and expensive, the complainant should describe the subject matter of the trade secret with sufficient particularity to separate it from matters of general knowledge in the trade or of special knowledge of those persons who are skilled in the trade, and to permit the defendant to ascertain at least the boundaries within which the secret lies.

*Farhang v. Indian Inst. of Tech.*, 2010 WL 2228936, at *13 (N.D. Cal. June 1, 2010) (citing *Diodes, Inc. v. Franzen*, 260 Cal.App.2d 244, 253 (1968)).

As noted above, the FAC alleges that during the Bridge Project, Teradata identified "certain inefficiencies" in SAP's software and offered "suggested solutions," but does not identify what these inefficiencies or solutions were.  Dkt. 24 ¶ 35.  The FAC also alleges that Teradata "conveyed numerous other trade secrets" to SAP, but it does not narrow this catch-all phrase other than to allege unspecified "innovative techniques" for "optimizing . . . speed and efficiency," *id.*, and it does not explain how optimization techniques could have been misappropriated when ████████████████████████████████████████ ████████████████████████████████████████  These vague descriptions fall well short of the reasonable particularity required to state a valid claim for trade secret misappropriation.  *Cf. Loop AI Labs Inc. v. Gatti*, 195 F. Supp. 3d 1107, 1114-15 (N.D. Cal. 2016).

**C.     The Trade Secret Claims Are Time-Barred.**

Teradata did not bring its claims within ████████████████████ or even within the statutory three-year limitations period that would apply in absence of the SDCA.

*1.*     ████████████     *Because Teradata Became Aware of the Events Giving Rise to Its Claims More than Two Years Before Filing Suit.*

Parties may contract to a specific limitations period.  *See, e.g., Tompkins v. 23andMe, Inc.*, 840 F.3d 1016, 1032 (9th Cir. 2016).  ████████████████████████ ████████████████████████████████████████  But Teradata became aware of the acts underlying its claims no later than September 2015, more than two years before Teradata filed this action in June 2018.

Defs.' Mot. to Dismiss
Case No. 3:18-CV-03670-WHO

-9-

1        According to the FAC, the German news magazine *Der Spiegel* published an article in

2    September 2015 disclosing that an internal SAP auditor had alleged that "SAP misappropriated

3    proprietary and confidential information from Teradata that SAP engineers obtained during the

4    Bridge Project." Dkt. 24 ¶ 47. Teradata was aware of this at the time. Paragraph 51 of the FAC

5    alleges that "[a]s a result of *Der Spiegel*'s probe and the resulting article, Teradata began

6    investigating these allegations." Dkt. 24 ¶ 51. There is thus no question that by September

7    2015—more than two years before filing suit—Teradata suspected or should have suspected

8    wrongdoing, and thus was forced to decide "whether to file suit or sit on [its] rights." *Jolly v. Eli*

9    *Lilly & Co.*, 44 Cal. 3d 1103, 1110-11 (1988).

10          2.    *The FAC Fails to Allege Facts Sufficient to Invoke* ███████

11   ████████████████████████████████████████████████████████████████

12   ███████████████████████

13         But as noted above, the FAC does not allege a theft of trade secrets claim at

14   all, let alone one that could be adjudged "willful misconduct."

15       "Willful misconduct" involves a "positive intent actually to harm another or to do an act

16   with a positive, active and absolute disregard for its consequences." *Manuel v. Pac. Gas & Elec.*

17   *Co.*, 173 Cal.App.4th 927, 947 (2009) (quotation marks and citation omitted). Willfulness must

18   be alleged with particularity under Rule 9(b). *See Cooper Interconnect, Inc. v. Glenair, Inc.*,

19   2015 WL 13722129, at *4 n.4 (C.D. Cal. Feb. 3, 2015). Generalized allegations are insufficient

20   where the complaint does not plead willfulness or malice by specific individuals with

21   particularity. *See Taiwan Semiconductor Mfg. Co. v. Tela Innovations, Inc.*, 2014 WL 3705350,

22   at *6 (N.D. Cal. July 24, 2014).

23       Here, the FAC summarily alleges that SAP engaged in "willful and malicious"

24   misappropriation and "willful" copyright infringement. Dkt. 24 ¶¶ 104, 113, 122. Yet these

25   conclusory allegations are unsupported by factual allegations that any SAP leader acted with the

26   intent to harm Teradata. Paragraphs 43-44 allege that Dr. Vishal Sikka and other unnamed

27   "HANA developers" and "key SAP employees" either used Teradata's alleged trade secrets or

28   "were aware of and supported SAP's misappropriation," but they do not allege intent or conscious

Defs.' Mot. to Dismiss
Case No. 3:18-CV-03670-WHO

-10-

1  disregard of harm to Teradata.  *See Manuel*, 173 Cal.App.4th at 947.  And, as explained in Part

2  I.A above, ███████████████████████████████████████████████████████████████████

3  ████████████████████████████████████████████████  These are not plausible

4  allegations of any misconduct at all, let alone "willful misconduct."

> 3. *Teradata's Claims Are Time-Barred Under the Statutory Three-Year Limitations Period Even if* ██████████████ *Does Not Apply.*

6      Even if ██████████████████████ does not apply, Teradata's claims are untimely

7  under the three-year statute of limitations.  *See* 18 U.S.C. § 1836(d); Cal. Civ. Code § 3246.6.

8  Because Teradata alleges that SAP misappropriated trade secrets before the 2011 announcement

9  of HANA for SAP BW in direct competition with Teradata's EDAW product (Dkt. 24 ¶¶ 38-46),

10  its claims are time-barred unless saved by the delayed discovery rule.

12      To plead delayed discovery, the plaintiff bears the burden of "specifically plead[ing] facts

13  to show (1) the time and manner of discovery *and* (2) the inability to have made earlier discovery

14  despite reasonable diligence."  *Grisham v. Philip Morris U.S.A., Inc.*, 40 Cal. 4th 623, 638 (2007)

15  (quotation marks and citation omitted).  Teradata, however, fails to allege facts supporting either

16  requirement.  In particular, Teradata fails to allege facts demonstrating that, "despite diligent

17  investigation of the circumstances of the injury, [it] could not have reasonably discovered facts

18  supporting the cause of action within the applicable statute of limitations period."  *Fox v. Ethicon

19  Endo-Surgery*, 35 Cal. 4th 797, 809 (2005).  Teradata must show that it conducted a diligent

20  investigation and that such an investigation would not have revealed the cause of its injuries

21  because it lacked "the opportunity to obtain knowledge from sources open to [its] investigation."

22  *Id.* at 807-08 (quotation marks and citation omitted).

23      SAP publicly announced that it was working on "new, faster database architecture"

24  (HANA) in "2009, just months after the Bridge Project formally began."  Dkt. 24 ¶ 38.  Teradata

25  believed (even if erroneously) that SAP developed and deployed HANA in less than a year, and

26  determined that "SAP could not have so quickly developed … HANA … without its theft of

27  Teradata's trade secrets."  *Id.* ¶¶ 3, 38-39.  And SAP allegedly disclosed by 2011 that HANA

28  created "an EDAW-type environment," which Teradata concluded had "a similar type of database

Defs.' Mot. to Dismiss
Case No. 3:18-CV-03670-WHO

-11-

1   architecture as that pioneered by Teradata." *Id.* ¶ 39.  Indeed, SAP announced HANA for SAP

2   BW—designed to do "the same thing" as the Bridge Project's Teradata Foundation—in

3   September 2011, "just days" after SAP terminated the Bridge Project in August 2011.  *Id.* ¶ 40.

4           Despite awareness of these facts well before the *Der Spiegel* article was published in

5   September 2015, the FAC contains no allegations showing that Teradata "conduct[ed] a

6   reasonable investigation of all potential causes of [its] injury," and did not simply "wait for the

7   facts."  *Fox*, 35 Cal. 4th at 815; *Jolly*, 44 Cal. 3d at 1111.  Having failed to conduct a reasonably

8   diligent investigation, Teradata cannot now speculate what such an investigation might have

9   revealed.  *Doe v. Roman Catholic Bishop of Sacramento*, 189 Cal.App.4th 1423, 1432-34 (2010).

10  Instead, Teradata's "failu[re] to take the steps a reasonably diligent plaintiff would take in

11  investigating its claims"—such as investigating the finished HANA product and any components

12  potentially containing Teradata confidential information—dooms its claims.  *Gabriel Techs.*

13  *Corp. v. Qualcomm Inc.*, 857 F. Supp. 2d 997, 1006 (S.D. Cal. 2012) (citation omitted).

14          **D.      The DTSA Does Not Have Retroactive Effect.**

15          A further reason to dismiss Count 1, the DTSA claim, is that the DTSA was enacted on

16  May 11, 2016, *see* Pub. L. No. 114–153, § 2(e), 130 Stat. 376, 381-82, long after the alleged

17  misappropriation in 2008–2011.  The FAC's conclusory allegation that SAP "continues to use

18  Teradata's trade secrets," Dkt. 24 ¶¶ 102–103, is insufficient to trigger the DTSA.

19          Courts dismiss DTSA claims that do not allege post-enactment use or disclosure of new

20  protected information that is different from information allegedly misappropriated pre-enactment.

21  In *Avago Techs. U.S. Inc. v. Nanoprecision Prods., Inc.*, 2017 WL 412524, at *9 (N.D. Cal. Jan.

22  31, 2017), the Court found no "authority suggesting that the DTSA allows a misappropriation

23  claim to be asserted based on the continued use of information that was disclosed prior to the

24  effective date of the statute."  In *Space Data Corp. v. X*, 2017 WL 3007078, at *3 (N.D. Cal. July

25  14, 2017), the Court dismissed DTSA claims based on pre-enactment misappropriation, stating

26  that "[e]ven assuming that [the complaint] has alleged 'continuing use,' . . . this is insufficient."

27  And in *Cave Consulting Grp., Inc. v. Truven Health Analytics, Inc.*, 2017 WL 1436044, at *5

28  (N.D. Cal. Apr. 24, 2017), the Court dismissed DTSA claims for failure to allege specific "facts

Defs.' Mot. to Dismiss
Case No. 3:18-CV-03670-WHO

-12-

1  about when post-enactment use occurred and whether the information disclosed was new or

2  somehow different from the prior [pre-enactment] misappropriation."  DTSA claims alleging

3  continuing use have only survived motions to dismiss when they included specific allegations

4  naming particular actors and post-enactment conduct.  *See*, *e.g.*, *Becton, Dickinson & Co. v. Cytek*

5  *Biosciences Inc.*, 2018 WL 2298500, at *4-5 (N.D. Cal. May 21, 2018).  The conclusory

6  allegation that SAP "continues to use Teradata's trade secrets," Dkt. 24 ¶¶ 111-112, is insufficient

7  and should be dismissed.  *See Cave Consulting*, 2017 WL 1436044 at *4-5.

8  **II.      TERADATA'S COPYRIGHT CLAIM SHOULD BE DISMISSED.**

9       The FAC alleges that SAP committed copyright infringement by reverse engineering in

10 violation of the Bridge Project Agreements and End User License, Dkt. 24 ¶¶ 36, 46, 121, but the

11 copyright claim is no more viable than the trade secret claims.

12       *First*, the FAC fails to make allegations sufficient to raise a plausible inference that SAP

13 breached any of its obligations under those contracts; to the contrary, SAP's alleged conduct is

14 expressly permitted.  ███████████████████████████████

15 ████████████████████████████████████████████

16 ███████████  the EUL allows reverse engineering that is not "illegal," *id.* Ex. E § 3; and the

17 Copyright Act permits reverse engineering for interoperability, *see* 17 U.S.C. § 1201(f)(2).  This

18 is particularly noteworthy because the FAC alleges "fast and efficient interoperation" was "a key

19 challenge of the Bridge Project."  Dkt. 24 ¶ 32.  Moreover, ██████████████

20 ████████████████████████████████████████████

21 ███████████████████████████████

22 ████████████████████████████████

23 ████████████████████████████████

24 █████████████████████████████████

25 ██████████████████████████

26       *Second*, any copyright claim would be time-barred.  Not only does ██████████

27 ██████████  apply, but the EUL also sets forth a two-year limitation that broadly applies to

28 "[a]ny claim or action"—including "claims for misuse or infringement of a party's intellectual

Defs.' Mot. to Dismiss
Case No. 3:18-CV-03670-WHO

-13-

1   property rights"—and contains no exception ████████████ Lanier Decl. Ex. E § 10;

2   *see Entous v. Viacom Int'l, Inc.*, 151 F. Supp. 2d 1150, 1155 (C.D. Cal. 2001) (applying

3   contractual limitations period).  The FAC does not allege any reverse engineering by SAP within

4   the two years prior to its filing of this lawsuit or facts that would plausibly establish Teradata was

5   not, or did not have reason to be, on notice of any reverse engineering until sometime within the

6   two years preceding its filing.

7        Even if the two-year limitation did not apply, Teradata's claim would be time-barred

8   under the three-year copyright statute of limitations, 17 U.S.C. § 507(b), which begins to run

9   when the copyright owner discovers, or reasonably could have discovered, the alleged

10  infringement.  *See Polar Bear Prods., Inc. v. Timex Corp.*, 384 F.3d 700, 706 (9th Cir. 2004).

11  The FAC asserts infringement based on alleged reverse engineering before the 2011 launch of

12  HANA for SAP BW.  *See* Dkt. 24 ¶¶ 40, 46, 121.  Yet the FAC identifies no new facts,

13  discovered in the three years preceding this action, underlying Teradata's infringement claim that

14  could not reasonably have been discovered well before 2015.  Teradata has thus failed to plead, as

15  it must, that despite diligent investigation, it could not reasonably have discovered facts

16  supporting its claim within the three-year limitations period.  *See Fox*, 35 Cal. 4th at 809.

17  **III.     TERADATA ANTITRUST CLAIMS SHOULD BE DISMISSED.**

18      **A.     The FAC Fails to State a Claim for Unlawful Tying.**

19       The FAC alleges that S/4HANA unlawfully ties SAP's HANA to its ERP applications.

20  Dkt. 24 ¶ 129.  "Tying is a form of marketing in which a seller insists on selling two distinct

21  products or services as a package."  *Jefferson Par. Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 33

22  (1984) (O'Connor, J., concurring).  "Like other vertical restraints, tying arrangements may

23  promote rather than injure competition."  *Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1200

24  (9th Cir. 2012).  To establish *unlawful* tying, Teradata must prove: (1) two separate products are

25  involved, the sale of one being conditioned upon the purchase of the other; (2) SAP must have

26  forced the buyer to purchase a tied product "the buyer either did not want at all, or might have

27  preferred to purchase elsewhere on different terms"; (3) SAP must possess economic power in the

28  market for the tying product; and (4) the tying arrangement must significantly and negatively

Defs.' Mot. to Dismiss
Case No. 3:18-CV-03670-WHO

-14-

1    impact competition in the tied product market.  *See Cascade Health Sols. v. PeaceHealth*, 515

2    F.3d 883, 913-14 (9th Cir. 2008); *Sidibe v. Sutter Health*, 4 F. Supp. 3d 1160, 1179 (N.D. Cal.

3    2013).

4           Teradata fails to plausibly allege a tying claim: the FAC does not identify two separate

5    products, but one technologically-integrated product; the FAC does not plausibly allege that SAP

6    coerces customers into purchasing HANA; and the FAC fails to identify a relevant tying market

7    in which SAP has market power.  Moreover, Teradata's claim is subject to the "Rule of Reason"

8    but the FAC does not plausibly allege that SAP's purported conduct unreasonably harms

9    competition in any relevant and properly-defined EDAW market.

10                  1.    *The FAC Does Not Identify a Tie Because S/4HANA is One Integrated
                          Product.*

11

12          The first element of a tying claim requires the plaintiff to plead and prove that the

13   purported tying product is "separate and distinct" from the alleged tied product.  *Rick-Mik*

14   *Enters., Inc. v. Equilon Enters. LLC*, 532 F.3d 963, 974 (9th Cir. 2008).  Teradata's claim fails at

15   the threshold because S/4HANA is one technologically-integrated product.

16          "[I]t is not an unlawful tying arrangement for a seller to include several items in a single

17   mandatory package when the items may be reasonably considered to constitute parts of a single

18   distinct product."  *Int'l Mfg. Co. v. Landon, Inc.*, 336 F.2d 723, 730 (9th Cir. 1964).  A single

19   product should be found if the defendant "integrate[s] previously unbundled inputs into a new

20   product design that results in better combined performance than could be obtained if the items

21   were offered unbundled and combined by purchasers or intermediaries."  X P. Areeda, H.

22   Hovenkamp & E. Elhauge, *Antitrust Law*, ¶ 1746b, p. 208 (3d ed. 2007).  This analysis does *not*

23   call for the Court to "balance[e] the benefits or worth of a product improvement against its

24   anticompetitive effects," for there are no criteria "that courts can use to calculate the 'right'

25   amount of innovation, which would maximize social gains and minimize competitive injury."

26   *Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991, 1000 (9th Cir.

27   2010).  Rather, the question—evaluated "narrow[ly] and deferential[ly]"—is simply whether

28   there is a *plausible* claim that the new product combines functionalities in a way that offers

Defs.' Mot. to Dismiss
Case No. 3:18-CV-03670-WHO

-15-

1    advantages "unavailable if the functionalities are bought separately and combined by the

2    purchaser." *United States v. Microsoft Corp.*, 147 F.3d 935, 948, 950 (D.C. Cir. 1998); *see also*

3    *Allied*, 592 F.3d at 1000; *Response of Carolina, Inc. v. Leasco Response, Inc.*, 537 F.2d 1307,

4    1330 (5th Cir. 1976) (holding that an antitrust "violation must be limited to those instances where

5    the technological factor tying the hardware to the software has been designed for the purpose of

6    tying the products, rather than to achieve some technologically beneficial result").

7            The FAC asserts in conclusory form that there is no justification for SAP's decision to

8    "combine" an ERP application, a transactional database, and analytics capability into "a single

9    product offering." Dkt. 24 ¶ 88.  The FAC alleges no facts to support that conclusion and the

10   facts it does allege identify multiple benefits of SAP's integrated product.

11           Teradata admits that the market desires "fast and efficient interoperation" between ERP

12   applications and analytics; indeed, ensuring such interoperability was the purpose of the Bridge

13   Project.  Dkt. 24 ¶ 32; *see also id.* ¶ 75.  When a seller is able to ensure that back-end systems can

14   efficiently access ERP-derived data, and the ERP-derived data can be integrated into the back-end

15   systems, both marketability and desirability increase.  *Id.* ¶ 80.  According to Teradata's own

16   allegations, SAP's S/4HANA product satisfies exactly this market demand by integrating SAP's

17   ERP applications with the company's own database with "various data processing engines." *Id.*

18   ¶¶ 39, 86.  S/4HANA thus accomplishes what Teradata itself recognized as a technological boon.

19           Nor can Teradata plausibly deny that S/4HANA results in better performance than could

20   be obtained by purchasers attempting to achieve similar results on their own.  Teradata itself

21   notes that SAP's S/4HANA was "natively written" to operate seamlessly with HANA.  Dkt. 24

22   ¶ 86.  Customers were enthusiastic about S/4HANA following its introduction in February 2015 –

23   use of HANA "took off," with sales reaching $2 billion in 2016.  *Id.* ¶ 41.  The industry "lauded"

24   the head of the SAP development effort and "credited [him] with reversing SAP's stagnant

25   product offerings." *Id.*  Teradata's real complaint is that SAP chose to offer this integrated

26   system with HANA, rather than integrating with Teradata's database; the antitrust laws, however,

27   are designed to prevent injury to *competition*, rather than injury to *competitors*.  *See Rutman Wine*

28   *Co. v. E. & J. Gallo Winery*, 829 F.2d 729, 734 (9th Cir. 1987).

Defs.' Mot. to Dismiss
Case No. 3:18-CV-03670-WHO

-16-

At root, Teradata's tying claim seeks to challenge product innovation, which is "the essence of competitive conduct," particularly in high-tech industries like computer software. *Foremost Pro Color, Inc. v. Eastman Kodak Co.*, 703 F.2d 534, 542 (9th Cir. 1983). But new product designs are "precisely what the antitrust laws were meant to encourage." *ILC Peripherals Leasing Corp. v. IBM*, 458 F. Supp. 423, 443-44 (N.D. Cal. 1978). Given that there is more than "a plausible claim" that the integration embodied in S/4HANA "brings some advantage," *Microsoft*, 147 F.3d at 950, Teradata's tying claim must fail.

> 2.   *The FAC Does Not Plausibly Allege that SAP Coerced Customers into Purchasing HANA.*

Teradata's tying claim fails also because the FAC fails to plausibly allege that SAP "coerced a buyer to purchase the tied product," here HANA. *Paladin Assocs., Inc. v. Montana Power Co.*, 328 F.3d 1145, 1159-60 (9th Cir. 2003).

The "essential characteristic" of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product "to *force* the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms." *Cascade Health*, 515 F.3d at 913-14 (citation omitted); *see also Paladin*, 328 F.3d at 1159 ("A plaintiff must present evidence that the defendant went beyond persuasion and coerced or forced its customer to buy the tied product in order to obtain the tying product.").

"[P]roducts are not tied unless the supplier refuses to accommodate those who prefer one without the other." IX *Antitrust Law*, ¶ 1700i, p. 9. If a buyer is free to purchase either product by itself, "there is no tying problem." *N. Pac. R.R. Co. v. United States*, 356 U.S. 1, 6 n.4 (1958). Thus, absent an allegation that the purchase of the alleged tied product is *required* as a condition of sale of the alleged tying product, "rather than as a prerequisite to practical and effective use of the tying product[]," the coercion element is not satisfied. *Foremost Pro*, 703 F.2d at 541-42.

The FAC alleges that SAP tied HANA to its Top-Tier ERP Applications. Dkt. 24 ¶ 129. But Teradata also admits that customers can still buy stand-alone versions of SAP's Top-Tier ERP Applications without also purchasing HANA, and that customers can simply continue using their current stand-alone ERP applications with support from SAP (at least until 2025). *Id.* ¶¶ 67,

Defs.' Mot. to Dismiss
Case No. 3:18-CV-03670-WHO

-17-

89.  To be sure, the FAC alleges many of the world's leading companies prefer to migrate to SAP's fully-integrated S/4HANA product, in which ERP applications are "natively written" to operate most efficiently on HANA.  Dkt. 24 ¶¶ 59, 86.  Given that customers are still able to purchase prior ERP applications without the HANA database, the fact that sophisticated companies are voluntarily choosing to update their software now does not amount to an antitrust violation.  *See* X *Antitrust Law*, ¶ 1756b, pp. 298-99 ("Products *A* and *B* are not tied together when buyers choose the bundle from a defendant who also offers the products separately.").

Teradata's contention that customers have no choice but to upgrade to S/4HANA because SAP has announced that it is "ending support for prior versions of its ERP Applications by 2025" is facially implausible.  Dkt. 24 ¶¶ 59, 89.  The FAC acknowledges that customers of SAP's Top-Tier ERP Applications—which are the largest and most sophisticated companies in the world—are capable of transitioning to alternative ERP applications within "months or years."  *Id.* ¶ 65.  The seven years that SAP has committed to support its stand-alone ERP applications, *id.* ¶ 89, provides ample time for companies to transition to another ERP provider if they wish.  The fact that customers are voluntarily choosing to adopt S/4HANA now may result in harm to Teradata, as a competitor, as the result of increased competition.  But there is no coercion and no harm to competition itself.  *See Allied*, 592 F.3d at 1002 (holding that defendant "did not force consumers to purchase" its new technology "simply by discontinuing its support" of an older one that had been compatible with plaintiff's products, and explaining that even "a monopolist has no duty to help its competitors survive or expand when introducing an improved product design").

> ### 3.  The FAC Fails to Allege a Plausible Relevant Tying Market in Which SAP Has Market Power.

Teradata's tying claim should be dismissed additionally because the FAC's "'relevant market' definition is facially unsustainable."  *Newcal Indus., Inc. v. Ikon Office Solution*, 513 F.3d 1038, 1044-45 & n.3 (9th Cir. 2008).  The relevant product market identifies the products or services that compete with each other.  *See Los Angeles Mem'l Coliseum Comm'n v. NFL*, 726 F.2d 1381, 1392-93 (9th Cir. 1984).  "The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product

Defs.' Mot. to Dismiss
Case No. 3:18-CV-03670-WHO

-18-

1    itself and substitutes for it." *Brown Shoe v. United States*, 370 U.S. 294, 325 (1962).  Failure to

2    plead a relevant, valid market in the complaint is grounds for dismissal.  *See Tanaka v. Univ. of S.*

3    *Cal.*, 252 F.3d 1059, 1063 (9th Cir. 2001).  Thus, when a complaint makes relevant market

4    "allegations [that] are internally contradictory," it must be dismissed.  *Apple Inc. v. Psystar Corp.*,

5    586 F. Supp. 2d 1190, 1200 (N.D. Cal. 2008).

6         The FAC's allegations regarding the relevant market plainly are internally contradictory.

7    On the one hand, the FAC alleges that there is a product market for "ERP Applications" used by

8    large-scale, complex enterprises (the "Top-Tier ERP Applications Market").  Dkt. 24 ¶ 56; *see*

9    *also id.* ¶ 131.  Teradata acknowledges that this market—which includes all providers of Top-Tier

10   ERP Applications—contains "significant competitor[s]" to SAP, such as Oracle.  *Id.* ¶ 67.

11        Other allegations in the FAC, however, refer to a much narrower, brand-specific

12   "market."  For example, the FAC alleges that "*SAP's* Top-Tier ERP Applications" are themselves

13   a "separate and distinct" market.  *Id.* ¶ 129 (emphasis added).  Likewise, the FAC alleges that

14   "there are no reasonable or adequate economic substitutes for *upgrades* of *SAP* ERP

15   Applications," suggesting that the outer boundaries of the relevant market do not include ERP

16   applications offered by competing providers.  *Id.* ¶ 60 (emphasis added).  Teradata's internally

17   contradictory market allegations render the FAC fatally flawed.

18        To the extent Teradata seeks to avoid pleading and proving that SAP has market power in

19   the ERP Applications market generally—by relying on a product market that includes only SAP's

20   ERP applications—Teradata's gambit must be rejected.  "[C]ourts generally conclude that single

21   brands do not constitute separate markets."  *Commercial Data Servers, Inc. v. IBM Corp.*, 262 F.

22   Supp. 2d 50, 66 (S.D.N.Y. 2003) (citing cases); *see also Domed Stadium Hotel, Inc. v. Holiday*

23   *Inns, Inc.*, 732 F.2d 480, 488 (5th Cir. 1984) ("[A]bsent exceptional market conditions, one brand

24   in a market of competing brands cannot constitute a relevant product market."); *Datel Holdings,*

25   *Ltd. v. Microsoft Corp.*, 712 F. Supp. 2d 974, 986 (N.D. Cal. 2010) ("In general, single brand

26   markets do not constitute a relevant market.").  The reason is straightforward: SAP is the world's

27   leading producer of SAP products, "just as the Coca-Cola Company is undoubtedly the leading

28

Defs.' Mot. to Dismiss
Case No. 3:18-CV-03670-WHO

-19-

1    producer of Coca-Cola.  But it is an established maxim that antitrust law protects competition, not

2    competitors."  *Commercial Data Servers*, 262 F. Supp. 2d at 66.

3          The Supreme Court has adopted a limited exception when the plaintiff identifies a single-

4    brand "aftermarket" to which customers' previous purchases have removed all alternative

5    options.  In these cases, market imperfections prohibit customers from imposing market discipline

6    in the aftermarket by switching among competitors in the primary market.  *See Eastman Kodak*

7    *Co. v. Image Tech. Servs.*, 504 U.S. 451, 464-78 (1992); *Psystar*, 586 F. Supp. 2d at 1201.

8          But the limited *Kodak* exception does not apply here, for several reasons.  To begin, "a

9    valid single-brand, derivative aftermarket follows a particular model": a consumer purchases a

10   particular brand of a good, and the nature of that good requires the same consumer to purchase a

11   follow-on good in a derivative aftermarket.  *In re ATM Fee Antitrust Litig.*, 2010 WL 2557519, at

12   *7 (N.D. Cal. June 21, 2010).  The single-brand market theory thus may be appropriate where an

13   "aftermarket" product (such as repair parts) is "wholly derivative from and dependent upon the

14   primary market" (such as a new copier).  *Newcal*, 513 F.3d at 1049.

15         Teradata, however, does not plausibly allege the existence of a derivative aftermarket.

16   The FAC alleges that customers are forced to "upgrade" their SAP ERP Applications.  Dkt. 24

17   ¶ 98.  But the term "upgrade" is simply Teradata's characterization of SAP's S/4HANA product.

18   *See id.* ¶ 86.  This application is not wholly derivative of and dependent upon prior ERP

19   applications; it is a stand-alone product integrating ERP applications, analytics, and an in-

20   memory database.  "*Kodak* simply does not map onto the facts here…."  *Aerotec Int'l, Inc. v.*

21   *Honeywell Int'l, Inc.*, 836 F.3d 1171, 1179 (9th Cir. 2016); *see also Lee v. Life Ins. Co. of N. Am.*,

22   23 F.3d 14, 20 (1st Cir. 1994) (declining to extend *Kodak* beyond the "derivative aftermarket"

23   context).

24         Even if *Kodak* could be extended to the circumstances here, Teradata does not plausibly

25   allege that conditions necessary for a single-brand market are present.  Single brand aftermarkets

26   are limited to where a "substantial number" of customers are "too ignorant of 'lifecycle' prices to

27   protect themselves by judicious interbrand comparisons or by contract before they become locked

28   in."  *Universal Avionics Sys. Corp. v. Rockwell Int'l Corp.*, 184 F. Supp. 2d 947, 955 (D. Ariz.

Defs.' Mot. to Dismiss
Case No. 3:18-CV-03670-WHO

-20-

2001).  Teradata does not allege that the most sophisticated businesses on the planet—"Fortune 1000 companies in the United States, FTSE 100 companies in Europe, and similarly-sized privately-held entities" (Dkt. 24 ¶ 57)—are unable to protect themselves during the lifecycle of their initial ERP application.  Its theory, rather, is that once the lifecycle of a customer's initial ERP application has concluded, customers prefer to purchase SAP's newest stand-alone product.  But this is simply not the type of "information cost" *Kodak* addressed.

> ### 4. *Teradata's Tying Claim Must be Assessed Under the Rule of Reason, Which the FAC's Allegations Fail to Meet.*

Finally, Teradata's tying claim should be dismissed because—even if it could somehow show that the alleged "tie" was something other than a product improvement that therefore is *per se* legal (*see supra* Part III.A.1)—its claim must be assessed under the Rule of Reason, and the FAC both fails to identify a relevant tied market, and fails to plausibly allege that SAP *unreasonably* harms competition in that tied market.

The FAC alleges that SAP's conduct is *per se* unlawful given its market power[2] and that, alternatively, SAP's conduct constitutes a Rule of Reason violation because it unreasonably restrains competition in the market for EDAW products.  *See* Dkt. 24 ¶¶ 135-136.

As a general proposition, the Rule of Reason should be used where alleged conduct presents novel circumstances and uncertain economic effects.  *See California ex rel. Harris v. Safeway, Inc.*, 651 F.3d 1118, 1139 (9th Cir. 2011).  That is the case here.  The *per se* rule is not appropriate in software cases where "the tied good physically and technologically [is] integrated with the tying good."  *United States v. Microsoft Corp.*, 253 F.3d 34, 90 (D.C. Cir. 2001).  In *Microsoft*, for example, the defendant was accused of integrating its web browser with its Windows operating system: two products that historically were sold separately.  *Id.* at 84.  In these circumstances, the court explained, application of the *per se* rule would improperly condemn "the first firm to merge previously distinct functionalities."  *Id.* at 92.  In light of the

---

[2] Of course, even if Teradata had adequately pled that SAP has market power in a relevant market—and it has not for the reasons explained in Part III.A.3—that would not absolve Teradata from pleading and proving an anticompetitive effect in the tied market to establish a *per se* claim. *See Sidibe*, 4 F. Supp. 3d at 1178-79.

Defs.' Mot. to Dismiss
Case No. 3:18-CV-03670-WHO

-21-

1   "pervasively innovative character" of software markets, the court held that judicial experience

2   "provides little basis" for believing that "a software firm's decisions to sell multiple

3   functionalities as a package" should be conclusively presumed unreasonable "without elaborate

4   inquiry as to the precise harm they have caused or the business excuse for their use." *Id.* at 90-92

5   (citation and internal quotations omitted); *cf. Foremost Pro*, 703 F.2d at 542–43 (characterizing

6   the development "of a system of technologically interrelated products" as a *per se* unlawful tie

7   "would unjustifiably deter the development and introduction of those new technologies so

8   essential to the continued progress of our economy").

9         As in *Microsoft*, it cannot safely be concluded that integrating SAP's ERP applications

10   into its in-memory database has so little "redeeming virtue," *N. Pac. R.R.*, 356 U.S. at 5, that

11   there would be so "very little loss to society from [its ban]," such that "an inquiry into its costs in

12   the individual case [can be] considered [] unnecessary." *Jefferson Par.*, 466 U.S. at 33-34

13   (O'Connor, J., concurring).  Teradata's tying claim, if it is to proceed at all, must proceed under a

14   Rule of Reason analysis.

15         The FAC, however, fails to plausibly allege an antitrust violation under the Rule of

16   Reason.  Under the Rule of Reason, "the factfinder must analyze the anti-competitive effects

17   along with any pro-competitive effects to determine whether the practice is unreasonable on

18   balance." *Bhan v. NME Hosps., Inc.*, 929 F.2d 1404, 1413 (9th Cir. 1991).  Teradata bears the

19   burden of pleading facts showing a negative impact on competition in the tied market, *Sidibe*, 4 F.

20   Supp. 3d at 1178-79, which requires delineating a relevant market and showing that SAP "plays

21   enough of a role in that market to impair competition significantly." *Bhan*, 929 F.3d at 1413.

22         As with its definition of the tying product market, the FAC's allegations regarding the tied

23   product market are internally contradictory.  The FAC defines the tied product market as the

24   market for EDAW products, which "enable Top-Tier ERP Applications customers to retain, and

25   more importantly to perform complex analytical operations on, vast amounts of data from a wide

26   variety of data streams." Dkt. 24 ¶ 68.  Yet the FAC fails to allege that the relevant market—the

27   EDAW market generally—has suffered anticompetitive harm.

28

Defs.' Mot. to Dismiss
Case No. 3:18-CV-03670-WHO

-22-

Instead, the FAC alleges that SAP has foreclosed competition in only a small subset of this market:  the EDAW market for *existing SAP customers*.  *Id.* ¶ 129; *see also id.* ¶ 133 (SAP's conduct forecloses competition "in the EDAW Market for SAP's Top-Tier ERP Applications customers.").  For the reasons explained above, limiting the tied market to a single-brand product is impermissible.

Nor has the FAC plausibly alleged that SAP's conduct *unreasonably* harms competition in the EDAW market, even when limited to existing SAP customers.  As discussed above, the FAC's allegations show that S/4HANA was a significant product innovation, which customers perceived as a benefit.  At most, the FAC alleges that, at some point in the future, customers who choose to stay with SAP and adopt S/4HANA may have fewer choices when it comes to EDAW products.  *Id.* ¶¶ 77, 92.  But "allegations that an agreement has the effect of reducing consumers' choices or increasing prices to consumers does not sufficiently allege a harm to competition. Both effects are fully consistent with a free, competitive market."  *Brantley*, 675 F.3d at 1202. Nowhere does the FAC allege, as it must, any "actual anticompetitive effect," *id.*, much less attempt to quantify the anticompetitive harm allegedly resulting from SAP's conduct or show that it outweighs the undeniable pro-competitive benefits the FAC describes.

### B.   Teradata's Attempted Monopolization Claim Fails Because the FAC Does Not Plausibly Allege a Dangerous Probability of Monopolization.

Finally, the FAC alleges that SAP violated Section 2 of the Sherman Act (15 U.S.C. § 2), by attempting to "monopolize the EDAW market for SAP's Top-Tier ERP Applications customers."  Dkt. 24 ¶ 143.  This claim fails because the conduct alleged is not anticompetitive, for all the reason discussed above, and because the FAC does not plausibly allege a "dangerous probability" of SAP achieving monopoly power in the EDAW market.

To make out its claim for attempted monopolization, Teradata must specify the market threatened by SAP and SAP's economic power within that market. *United Energy Trading, LLC v. Pac. Gas & Elec. Co.*, 200 F. Supp. 3d 1012, 1020 (N.D. Cal. 2016).  Teradata also must demonstrate, *inter alia*, "a dangerous probability of achieving monopoly power."  *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1432–33 (9th Cir. 1995) (internal quotation marks omitted).

Defs.' Mot. to Dismiss
Case No. 3:18-CV-03670-WHO

-23-

1    Monopoly power is "the power to control prices or exclude competition." *United States v.*

2    *Grinnell Corp.*, 384 U.S. 563, 571 (1966).  Thus, "to determine whether there is a dangerous

3    probability of monopolization," courts "consider the relevant market and the defendant's ability

4    to lessen or destroy competition in that market." *Spectrum Sports, Inc. v. McQuillan,* 506 U.S.

5    447, 456 (1993).

6          Once again, the FAC's confused allegations regarding the relevant market—here the

7    market SAP allegedly intends to monopolize—doom its attempted monopolization claim.

8    According to Teradata, the market threatened by monopolization from SAP is the "market for

9    EDAW products."  Dkt. 24 ¶ 68.  Yet the FAC does not include *any* factual allegations regarding

10   SAP's market share in the EDAW market.

11         While the market share necessary to show a dangerous probability of monopolization is

12   difficult to quantify, claims involving less than 50% market share in the targeted market generally

13   are rejected.  *See M & M Med. Supplies & Serv., Inc. v. Pleasant Valley Hosp., Inc.*, 981 F.2d

14   160, 168 (4th Cir. 1993); III *Antitrust Law*, ¶ 835c, p. 350.[3]  The FAC is bereft of any allegations

15   about competitive conditions in the EDAW Market at all, other than to acknowledge that there are

16   multiple competitors within the market, of which Teradata is one.  *See* Dkt. 24 ¶¶ 74-75.  The

17   absence of any credible allegation regarding SAP's current or threatened power in the EDAW

18   Market is fatal.  *See, e.g.*, *Unigestion Holding*, 305 F. Supp. 3d at 1150-51; *see also RealPage,*

19   *Inc. v. Yardi Sys., Inc.*, 852 F. Supp. 2d 1215, 1228 (C.D. Cal. 2012).

20         Rather than allege any "dangerous probability" that SAP will monopolize the EDAW

21   Market, Teradata once again shifts its focus, alleging that SAP is attempting to monopolize "the

22   EDAW Market for *SAP's* Top-Tier Applications customers."  Dkt. 24 ¶¶ 143, 147 (emphasis

23   added).  Teradata then alleges that "60% of SAP's largest ERP Applications customers . . . are

24   employing or preparing to employ HANA" over some undefined period of time.  *Id.* ¶ 148.  But

25

26   _____
         [3] Although the Ninth Circuit has expressed reluctance to adopt "bright-line rules regarding
     market share in deciding whether a defendant has market power," *Rebel Oil*, 51 F.3d at 1438
27   n.10, demonstrating a dangerous probability of monopolization requires *some* showing of the
     defendant's market share in the targeted market.  *See, e.g.*, *Unigestion Holding, S.A. v. UPM*
28   *Tech., Inc.*, 305 F. Supp. 3d 1134, 1151 (D. Or. 2018).

Defs.' Mot. to Dismiss
Case No. 3:18-CV-03670-WHO

-24-

1  the FAC never alleges that EDAW "for SAP's Top-Tier ERP Applications customers" or EDAW

2  for "SAP's largest ERP Applications customers" is a relevant market.

3  　　　　Nor could such a market—consisting only of SAP's existing customers—constitute a

4  proper relevant market under the antitrust laws, as explained above.  "By defining the market in

5  terms of a single class of consumers," Teradata has improperly "create[d] an artificially narrow

6  market which is defined essentially in terms of the practice of which they complain." *Hamilton*

7  *Chapter of Alpha Delta Phi, Inc. v. Hamilton Coll.*, 106 F. Supp. 2d 406, 413 (N.D.N.Y. 2000).

8  A monopolization claim must be dismissed where, as here, the plaintiff seeks "to limit a product

9  market to a single brand, franchise, institution, or comparable entity that competes with potential

10 substitutes." *Todd v. Exxon Corp.*, 275 F.3d 191, 200 (2d Cir. 2001); *see, e.g., Tanaka*, 252 F.3d

11 at 1063–64 (UCLA women's soccer program does not constitute its own market because other

12 college programs compete to recruit student-athletes).

13 　　　　　　　　　　　　　　　　　　**CONCLUSION**

14 　　　　For these reasons, SAP's motion to dismiss should be granted with prejudice.

15 Dated: August 31, 2018　　　　　　　　　　Respectfully submitted,

16 　　　　　　　　　　　　　　　　　　　　　JONES DAY

17 　　　　　　　　　　　　　　　　　　　　　/s Tharan Gregory Lanier

18 　　　　　　　　　　　　　　　　　　　　　Tharan Gregory Lanier

19 　　　　　　　　　　　　　　　　　　　　　Counsel for Defendants
　　　　　　　　　　　　　　　　　　　　　　SAP SE, SAP AMERICA, INC., AND SAP LABS,
20 　　　　　　　　　　　　　　　　　　　　　LLC

21

22

23

24

25

26

27

28

Defs.' Mot. to Dismiss
Case No. 3:18-CV-03670-WHO

-25-