UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

TERADATA CORPORATION, et al.,

Plaintiffs,

v.

SAP SE, et al.,

Defendants.

Case No. 18-cv-03670-WHO

**ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS**

Re: Dkt. No. 39

## INTRODUCTION

Plaintiffs Teradata Corporation, Teradata US, Inc., and Teradata Operations, Inc. (collectively "Teradata") assert five causes of action in the first amended complaint against defendants SAP SE, SAP America, Inc., and SAP Labs, LLC (collectively "SAP"). Teradata alleges that SAP disingenuously entered a joint venture with it to steal its trade secrets in the Enterprise Data Analytics and Warehousing ("EDAW") market and develop a competing product, misappropriating trade secrets, infringing Teradata's copyrights, and violating antitrust laws in the process. SAP moves to dismiss all these claims with prejudice. I agree with SAP that Teradata must describe its trade secrets with greater specificity to demonstrate that they are not generally known in the trade or by those who are skilled in the trade. None of SAP's other challenges to the pleadings has merit. For the reasons below, SAP's motion to dismiss is GRANTED in part and DENIED in part. Teradata's first amended complaint is DISMISSED WITH LEAVE TO AMEND within ten days of the date of this Order.

## BACKGROUND

Teradata and its subsidiaries conduct research, development, engineering, and other technical operations related to its EDAW products. *See* First Amended Complaint ("FAC") ¶¶ 4–

United States District Court
Northern District of California

6 (Dkt. No. 24). Its flagship product is Teradata Database, a relational database management system designed for EDAW. FAC ¶ 16. EDAW products provide centralized data storage collected from numerous sources across a business enterprise in its day-to-day operations to help large companies analyze their business operations. *See id.* Teradata was the first commercial EDAW vendor to utilize massively parallel processing ("MPP") through Teradata Database to execute high volumes of analytical queries on massive amounts of data for EDAW customers. FAC ¶ 17. Teradata Database accomplishes this feat by linear-performance scalability, meaning that it can accommodate a customer's analytical demands by adding parallel processors and data-storage devices as needed. FAC ¶ 18. Teradata released the first commercial system incorporating its MPP architecture in the early 1980s and has improved upon the technology since then, developing other technologies and trade secrets in the EDAW market. FAC ¶¶ 20–21.

SAP and its subsidiaries also work on research, development and engineering activities in the EDAW space. FAC ¶ 9. At the same time, SAP is the dominant provider in the separate market for Enterprise Resource Planning ("ERP") Applications, comprised of the world's most complex, large-scale business enterprises ("Top-Tier ERP Applications Market"). FAC ¶ 30. ERP Applications allow companies to manage data required to conduct their day-to-day operations across numerous aspects of the business enterprise and are typically designed around a relational transactional database that can ensure users have access to a uniform and current set of data. FAC ¶ 30. SAP also offers a Business Warehouse reporting tool ("SAP BW"), which allows ERP users to generate reports with their ERP-derived data. FAC ¶ 31. The Top-Tier ERP Applications Market that SAP services includes customers with millions of transactions or data-generating events daily, multiple business lines, diverse geographic operations, multiple sources of data, and revenues typically exceeding $1 billion. FAC ¶ 58.

In 2009, SAP and Teradata entered into a partnership referred to as the "Bridge Project" to combine SAP's ERP Applications and SAP BW tool interface with Teradata's MPP architecture that it uses in Teradata Database for EDAW. FAC ¶¶ 1, 31. Before the agreement was finalized the parties executed two mutual non-disclosure agreements restricting the use of confidential information outside evaluating the potential transaction. FAC ¶ 33. Eventually SAP and Teradata

2

executed two more agreements to formalize the Bridge Project, the Software Development Cooperation Agreement ("SDCA") and the Technology Partner Agreement ("TPA"). *Id.* These agreements restricted disclosures of each parties' confidential information and prohibited reverse engineering while working to connect the SAP and Teradata software. *Id.* Teradata also provided SAP with access to its databases for Bridge Project purposes pursuant to its "standard end user license." FAC ¶ 36.

During the Bridge Project, SAP and Teradata jointly developed "Teradata Foundation" which enabled SAP's Top-Tier ERP Applications Market to use Teradata for the transactional database and data-analytics for EDAW activities. FAC ¶¶ 32, 37. The parties brought Teradata Foundation to market and installed Teradata Foundation on site for one major customer facility. FAC ¶ 37. However, while the Bridge Project was underway, SAP was developing a competing EDAW product called SAP HANA. FAC ¶ 38. At SAP's user conference in November 2010, the SAP Chief Technology Officer at the time, Dr. Vishal Sikka, announced SAP had begun shipping the SAP HANA product. FAC ¶ 39. At the next year's user conference, a SAP customer demonstrated a new product, HANA for SAP BW, described as incorporating a "massively parallel" database like the architecture used in Teradata Database. *Id.* By June 2011, SAP HANA was commercially available. *Id.*

After nearly three years in the Bridge Project, and two months after SAP HANA was made available, SAP unilaterally terminated the joint venture and stopped supporting, selling, and marketing Teradata Foundation. FAC ¶ 40. SAP positioned itself as a competitor to Teradata with the SAP HANA product offering to perform the same tasks as Teradata Foundation was intended to achieve. FAC ¶¶ 40, 42. SAP customers were still able to access the data created in their SAP ERP Applications by using Teradata EDAW products, but in February 2015 SAP launched its latest version of ERP Application, SAP S/4HANA, which was incompatible with other EDAW products besides HANA. FAC ¶¶ 77, 86. SAP then combined its ERP Application and EDAW products into a single sales offering and announced that it was ending support for prior versions of its ERP Applications by 2025 – an effort Teradata believes was intended to force customers to adopt SAP HANA. FAC ¶¶ 87, 89, 91. Teradata expects that given the costs of

3

licensing and maintaining EDAW products, most Top-Tier SAP ERP Applications customers who use Teradata EDAW products will abandon them in response to SAP's decision not to facilitate products other than HANA. FAC ¶ 92. Teradata also believes SAP is forcing customers to abandon Teradata by restricting customer ability to access SAP ERP data for use with Teradata's EDAW products. FAC ¶ 93.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(b)(6), a district court must dismiss a complaint if it fails to state a claim upon which relief can be granted. To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible when the plaintiff pleads facts that "allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). There must be "more than a sheer possibility that a defendant has acted unlawfully." *Id.* While courts do not require "heightened fact pleading of specifics," a plaintiff must allege facts sufficient to "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555, 570.

In deciding whether the plaintiff has stated a claim upon which relief can be granted, the court accepts the plaintiff's allegations as true and draws all reasonable inferences in favor of the plaintiff. *See Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987). However, the court is not required to accept as true "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008).

If the court dismisses the complaint, it "should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000). In making this determination, the court should consider factors such as "the presence or absence of undue delay, bad faith, dilatory motive, repeated failure to cure deficiencies by previous amendments, undue prejudice to the opposing party and futility of the proposed amendment." *Moore v. Kayport Package Express*, 885 F.2d 531, 538 (9th Cir. 1989).

4

**DISCUSSION**

**I.    MISAPPROPRIATION OF TRADE SECRETS (COUNTS I AND II)**

Teradata alleges that SAP misappropriated its trade secrets under the federal Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836 *et seq*., and California's Uniform Trade Secrets Act ("CUTSA"), Cal. Civ. Code § 3426 *et seq*.  The elements of trade secret misappropriation are substantially the same under the federal and state statutes.  *See Waymo LLC v. Uber Techs., Inc.*, No. 17–CV–00939–WHA, 2017 WL 2123560, at *7 (N.D. Cal. May 15, 2017) (stating that "the California Uniform Trade Secrets Act and the federal Defend Trade Secrets Act…offer essentially the same definitions for our purposes.").

A trade secret is defined to include "all forms and types" of information that derives value from being secret and that the owner took reasonable measures to keep secret.  18 U.S.C. § 1839(3); *see also* Cal. Civ. Code § 3426.1(d).   Misappropriation is the "acquisition of a trade secret" by a person who knows or should know the secret was acquired by improper means.  18 U.S.C. § 1839(5); Cal. Civ. Code § 3426.1(b).  The term "improper means" includes, among other ways, misrepresentation, theft, or breach of a duty to maintain secrecy.  18 U.S.C. § 1839(6); Cal. Civil Code § 3426.1(a).

SAP moves to dismiss both trade secret misappropriation claims on the basis that the FAC fails to identify the trade secrets and to allege misappropriation prohibited by the Bridge Project agreements.  Further SAP argues that the claims are barred by applicable statutes of limitations and that the DTSA does not have retroactive effect.  I address each argument in turn.

**A.    The FAC Does Not Sufficiently Allege Trade Secrets**

To identify a trade secret, Teradata "need not spell out the details of the trade secret" the claim is based on, *see Space Data Corp. v. X*, No. 16–CV–03260–BLF, 2017 WL 5013363, at *2 (N.D. Cal. Feb. 16, 2017) (internal quotation marks and citation omitted), but it must "describe the subject matter of the trade secret with sufficient particularity to separate it from matters of general knowledge in the trade or of special knowledge of those persons…skilled in the trade." *See Imax Corp. v. Cinema Techs., Inc.*, 152 F.3d 1161, 1164–65 (9th Cir. 1998) (internal quotation, citation, and emphasis omitted).  The pleadings must give defendants "reasonable notice of the issues

which must be met at the time of trial and…provide reasonable guidance in ascertaining the scope of appropriate discovery." *Diodes, Inc. v. Franzen*, 260 Cal. App. 2d 244, 252–53 (1968).

The FAC alleges trade secret information related to massively parallel processing ("MPP"). *See* FAC ¶¶ 1, 16–23. Teradata contends that its trade secrets include information "on the design and optimization of Teradata's MPP systems and the execution of analytical queries in such systems." FAC ¶ 34. These trade secrets, information and techniques for optimizing the integration and analysis of massive data, are repeated several times. *See* FAC ¶¶ 24, 32, 34, 35. In addition, Teradata asserts that with its trade secrets, SAP "optimize[d] the processing of certain Open SQL queries for large volumes of data, enabling improved performance speed and opportunities for parallel processing and other enhancements on SAP's HANA." FAC ¶ 44.

At the hearing, Teradata repeated its reliance on the paragraphs of the complaint discussed above, arguing that allegations concerning its proprietary methods related to MPP and executing queries were enough to survive the motion to dismiss. However, several cases in this district demonstrate what is currently lacking in Teradata's FAC. In *Farhang v. Indian Inst. of Tech., Kharagpur*, the Hon. Ronald Whyte dismissed a trade secret claim defined as "specific business models and implementations" related to a "core technology." *Farhang v. Indian Inst. of Tech., Kharagpur*, No. 08–CV–02658–RMW, 2010 WL 2228936, at *14 (N.D. Cal. June 1, 2010). Judge Whyte found defendants, on these allegations, could not determine what subject matter of the trade secret was separate from matters of general knowledge in the trade. *Id.*

Similarly, in *Synopsys, Inc. v. ATopTech, Inc.*, the Hon. Samuel Conti dismissed a trade secret defined as information including "proprietary input and output formats, scripts, and technical product documentation…" *Synopsys, Inc. v. ATopTech, Inc.*, No. 13–CV–02965–SC, 2013 WL 5770542, at *6 (N.D. Cal. Oct. 24, 2013). Judge Conti found this too vague to determine "where trade secret protection begins and ends as to any of this material." *Id.*

Finally, in *Vendavo, Inc. v. Price f(x) AG*, the Hon. Richard Seeborg analyzed a trade secret claim that allegedly included things like "…negative knowhow learned through the course of research and development, and other information related to the development of its price-optimization software, including ideas and plans for product enhancements." *Id.* at *3 (internal

quotations omitted). *Vendavo, Inc. v. Price f(x) AG*, No. 17–CV–06930–RS, 2018 WL 1456697, at *4 (N.D. Cal. Mar. 23, 2018). Judge Seeborg dismissed these allegations, finding they were too broad. *Id*.

Teradata's alleged trade secret information is too broad and vague. The repeated allegations that its trade secrets include specific ways to optimize data with its MPP technology is indistinguishable from the allegations in *Farhang*, *Synopsis*, and *Vendavo*. Even the most specific allegation that the trade secret information included an optimization process for "certain Open SQL queries" suffers the same flaw. FAC ¶ 44. As it stands, there are no allegations suggesting what the proprietary information regarding optimization was, or how or why it is proprietary besides simply being labeled a trade secret by Teradata in its first amended complaint.

Teradata informed the court of its intention to disclose a trade secrets list to opposing counsel. Although Teradata need not "spell out the details" of its trade secrets, *Space Data Corp.*, 2017 WL 5013363, at *2, more particularity is needed to separate Teradata's alleged trade secret information on design and optimization from other information that is "general knowledge in the trade or of special knowledge of those persons who are skilled in the trade." *Diodes*, 260 Cal. App. at 253.

## B. The FAC Sufficiently Alleges Misappropriation by Improper Means

SAP contends the claim must be dismissed because Teradata failed to comply with its contractual obligation to designate information as confidential when it is disclosed and failed to plead that SAP breached the Bridge Project agreements. *See Convolve Inc. v. Compaq Computer Corp.*, 527 Fed. App'x 910, 924–25 (Fed. Cir. 2013) (finding "a duty to maintain the secrecy of the disclosed information is dictated by the terms of the NDA.").

SAP relies on cases finding a "written non-disclosure agreement supplants any implied duty of confidentiality that may have existed between the parties." *Marketel Inter., Inc. v. Priceline.com, Inc.*, 36 Fed. Appx. 423, 425 (Fed. Cir. 2002) (citing *Union Pac. R.R. Co. v. Mower*, 219 F.3d 1069, 1076 (9th Cir. 2000)). In response, Teradata argues that whether it complied with the Bridge Project agreements is a premature question at the motion to dismiss stage because this requirement is not determinative of the claim. *See PQ Labs, Inc. v. Yang Qi*,

No. 12–CV–0450–CW, 2014 WL 334453, at *4 (N.D. Cal. Jan. 29, 2014) (finding the marking requirement was irrelevant at summary judgment because plaintiff "has presented evidence that it used other means to notify its employees and agents that its technological and customer information was confidential.").

As an initial matter, it is appropriate to consider the Bridge Project agreements on a motion to dismiss where they have been incorporated by reference in the complaint. Incorporation by reference is "a judicially created doctrine that treats certain documents as though they are part of the complaint itself." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1002 (9th Cir. 2018). A defendant may seek to incorporate documents into the complaint "if the plaintiff refers extensively to the document or the document forms the basis of the plaintiff's claim." *Id.* (internal citations and quotations omitted).

Here, SAP seeks to incorporate five documents for review in support of its motion to dismiss. *See* Lanier Decl. Ex. A-E (Dkt. No. 38-7). There appears to be no dispute of the authenticity of Exhibits A-C, respectively the SDCA, TPA, and a 2009 mutual non-disclosure agreement. It is appropriate to incorporate these documents by reference in the complaint under *Khoja*. However, Exhibits D and E are introduced on "information and belief" and are the subject of dispute. For the reasons explained more fully in the forthcoming copyright infringement analysis, Exhibits D and E will not be incorporated by reference. I now turn to SAP's misappropriation arguments.

### 1. Designating Confidential Information

Teradata's reliance on *PQ Labs* is persuasive. There, the court found that evidence plaintiffs took other measures to protect information beyond a non-disclosure agreement made the issue of marking documents confidential irrelevant. *Id.* The facts included explicitly warning defendant not to disclose any product design concepts and placing other controls on access to company research. *Id.*; *see also Vesta Corp. v. Amdocs Mgmt., Ltd*, No. 14–CV–01142–HZ, 2018 WL 4354301, at *15 (D. Or. Sept. 12, 2018) (finding the case law "unclear about the extent to which compliance with an NDA is required to succeed on a claim for trade secret misappropriation.").

SAP counters that the facts here are more like *Gemisys Corp. v. Phoenix Am., Inc.*, 186 F.R.D. 551 (N.D. Cal. 1999), in which the court dismissed a trade secret claim on summary judgment for failing to mark the trade secrets as confidential, than like *PQ Labs* which did not involve an NDA with a marking requirement. *See* Reply at 4 (Dkt. No. 47-4). This does not make the dicta in *PQ Labs*, which stated the marking requirement was irrelevant, any less applicable. In *PQ Labs*, the NDA marking requirement was irrelevant because there remained a question of fact whether plaintiffs notified defendants of confidential information through other means. *See* 2014 WL 334453, at *4. Teradata is correct that at the motion to dismiss stage, the mutual non-disclosure agreements could be non-determinative of the outcome.

The mutual non-disclosure agreements were only two of four contracts involved in the Bridge Project to ensure that Teradata's proprietary information would not be misappropriated or reverse engineered. The SDCA and TPA reference the NDA's confidentiality terms but independently also place restrictions on reverse engineering or creating derivative works of software. *See* Lanier Decl. Ex. A §§ 10.7-8; Ex. B § 8.6. In addition, Teradata pleads specific instances in which it provided SAP information subject to the "parties' agreements" which refers not only the NDAs, but to the SDCA, TPA, and EUL. *See, e.g.,* FAC ¶ 34 (training sessions on Teradata's database); ¶ 35 (identifying solutions for SAP's software based on confidential solutions Teradata implements in its own products); ¶ 36 (installing Teradata Database at SAP's COIL facility in Palo Alto, California and its research center in Walldorf, Germany); ¶ 36 (providing access to Teradata Express subject to EUL). Given the other agreements Teradata entered to protect its trade secrets, the NDA's are not determinative of the claim at the pleading stage.

### 2. Bridge Project Agreements

Although *PQ Labs* recognized that an NDA may not be determinative of a trade secret misappropriation claim, Teradata's other measures to protect its information also lie in the Bridge Project agreements. SAP contends the trade secrets, as alleged, are barred by the terms of the SDCA in three respects.

First, the SDCA grants SAP a license to use "Input" in any SAP products, which is defined

as "suggestions, comments, and feedback." Lanier Decl. Ex. A §§ 1.6, 9.4. In response, Teradata argues that it has alleged it provided SAP with trade secret information beyond "Input." *See* FAC ¶¶ 32-36. I agree with Teradata. The FAC, even without sufficiently detailing the trade secrets, already states that Teradata provided SAP with "information, software, tools, and other materials," FAC ¶ 33, "conducted training sessions," FAC ¶ 34, and conveyed "techniques for optimizing the speed and efficiency" of the joint product. FAC ¶ 35. Taking these allegations as true, it is plausible that SAP misappropriated information beyond the terms of the SDCA.

Second, the SDCA provides for Teradata to share "optimization" support with SAP. *See id.* Ex. A, Appx. 2 (Task 5B). SAP argues that the alleged trade secrets were limited to optimization support based on allegations that Teradata conveyed "techniques for optimizing" massive amounts of data, *see* FAC ¶¶ 32,35, and that it shared the "optimization of Teradata's MPP systems." FAC ¶ 34. However, Teradata asserts again that the information it provided went beyond "optimization" as identified above. Teradata also argues that regardless of the agreement, it did not authorize SAP to use the information for its competing product.

Third, SAP contends that the SDCA grants it ownership of "Newly Developed Materials" resulting from the Bridge Project. *See id.* §§ 1.8, 10.3. The agreement defined new materials as those "developed by SAP and/or [Teradata] in connection with or as a result of a party's interaction with the other party within the context of this Agreement…" *Id.* § 1.8. As with the argument that Teradata agreed to share "optimization" support to SAP, there is no indication from the agreement that it contemplated using the information outside the context of the Bridge Project, let alone for a competing product. SAP, in its reply, argues that it would own any intellectual property "if SAP learned something proprietary from Teradata during the Bridge Project." Reply at 5. Even this argument, however, does not extend to Teradata's existing trade secrets, which it alleges it developed before the Bridge Project and which was taken from it under the pretense of the agreement. *See* FAC ¶ 1 ("SAP then stole Teradata's trade secrets (accumulated by Teradata over the course of four decades in the EDAW space)…"); ¶ 34 ("Teradata provided to SAP proprietary, confidential, and trade secret information acquired through decades of research and development.").

Accordingly, assuming the allegations in the complaint as true, the FAC contains plausible allegations that there is misappropriation by improper means.

### C.    The Trade Secret Misappropriation Claims Are Not Time Barred

SAP contends that regardless of the pleadings, Teradata's trade secret misappropriation claims are barred by the Bridge Project SDCA's two-year limitations period, and the three-year statutory limitations period. These arguments are not well taken.

#### 1.    The SDCA Time Bar Is Not In Effect and Would Not Apply

It is a well-settled point of law that parties may contract around a limitations period shorter than the default statute of limitations. *See, e.g., W. Filter Corp. v. Argan, Inc.*, 540 F.3d 947, 952 (9th Cir. 2008). Section 8.5 of the SDCA provides "Any claims for damages" must be filed within two years after the party becomes "aware of the event giving rise to the claim." Lanier Decl. Ex. A § 8.5. The SDCA also contains a survival clause in Section 13.4 that provides "upon such effective date of termination, each Party's rights and obligations hereunder will terminate…" but the terms in Articles 9 through 13 survive. *Id.* at § 13.4.

Teradata argues that the SDCA time bar in Section 8.5 no longer applies after SAP terminated the Bridge Project. *See id.* § 13.4; FAC ¶ 40. SAP insists that there is a presumption that dispute resolution provisions survive the termination of a contract. *See Marcotte v. Micros Sys., Inc.*, 2014 WL 4477349, at *9 (N.D. Cal. Sept. 11, 2014) (citing *Litton Fin. Printing Div. v. NLRB*, 501 U.S. 190, 204 (1991) (finding "a presumption in favor of postexpiration arbitration of matters unless negated expressly or by clear implication.") (internal quotations omitted).

I find that the SDCA two-year limitations period is not in effect. The exception in *Litton* concerned arbitration rights that "accrued or vested under the agreement, or where, under normal principles of contract interpretation, the disputed contractual right survives expiration of the remainder of the agreement." *Litton*, 501 U.S. at 206. *Litton's* holding has also applied to forum selection clauses. *See Marcotte v. Micros Sys., Inc.*, 2014 WL 4477349, at *9 (N.D. Cal. Sept. 11, 2014) (citing *Saleemi v. Gosh Enterprises, Inc.*, 467 F. App'x 744 (9th Cir. 2012)). SAP seeks to extend it further, but I am not aware of, and the parties have not cited, any cases in this jurisdiction that have directly applied *Litton* to a contractual limitations provision.

The only case SAP provides applying the presumption of survivability to a contractual limitations provision is a Massachusetts District Court case, *Creative Playthings Franchising, Corp. v. Reiser*, 2011 WL 13250940, at *3 (D. Mass. Apr. 28, 2011), which found a liability limitation provision was "in the nature" of other dispute resolution provisions. The Ninth Circuit has found, however, that in California "contractual stipulations are not favored" and should be "construed with strictness against the party invoking them" because they are in "derogation" of the statutorily set limitation. *W. Filter Corp.*, 540 F.3d at 952 (internal quotation and citation omitted).

Construing the agreement strictly against SAP, the contract language of Section 13.4 is clear that only Articles 9 through 13 survive after the agreement is terminated. Accordingly, absent clear language to the contrary, principles of contract construction require that I not give Section 8.5's contractual limitations clause post-termination effect.

Assuming the contractual limitation was in effect, SAP also argues that Teradata has not alleged "willful misconduct," which the SDCA identifies as an exception to the two-year limitations period. Willful misconduct has been defined similarly in various contexts. *See, e.g.*, *Manuel v. Pac. Gas & Elec. Co.*, 173 Cal. App. 4th 927, 947 (2009) (defining willful misconduct as involving a "positive intent actually to harm another or to do an act with a positive, active and absolute disregard for its consequences.") (quotation marks and citation omitted). In the CUTSA, the statute states if "willful" misappropriation exists, the court can award exemplary damages. *See* Cal. Civ. Code § 3426.3(c). In turn, the California Code of Civil Procedure defines "malice" related to exemplary damages as conduct intended to cause injury or conduct "with a willful and conscious disregard of the rights" of others. *See id.* at § 3294(c)(1).

Teradata has sufficiently pleaded willful and conscious disregard of its rights. The FAC alleges its trade secrets were improperly misappropriated (as discussed above) when SAP intentionally stole its information by entering the Bridge Project under false pretenses. *See* FAC ¶ 52. Additionally, Teradata alleges that Dr. Sikka was the driving force within SAP behind the plot to steal Teradata's trade secret information and incorporate it into the HANA product. *See id.* ¶¶ 1, 44, 45, 47, 52. At least at the pleading stage, Teradata has alleged facts that plausibly support

its theory of a willful and conscious plan by SAP and Dr. Sikka to steal its trade secrets in direct disregard of the Bridge Project, to develop a competing product, and to engage in anticompetitive practices. Therefore, even if the SDCA limitations period was in effect after the agreement was terminated, Teradata's allegations fit within the exception such that the SDCA's time bar would not apply.

### 2.        Teradata Pleads a Claim Within the Statutory Limitations Period

Both the DTSA and the CUTSA have a three-year statute of limitations. *See* 18 U.S.C. § 1836(d); Cal. Civ. Code § 3426.6. Teradata alleges that its trade secrets were improperly acquired during the Bridge Project from 2009 to 2011 when SAP developed HANA, and that the information continues to be misused in the present. FAC ¶¶ 40, 52. Yet it asserts that it learned of the theft in September 2015, only after a *Der Spiegel* article revealed SAP's conduct. FAC ¶¶ 47, 51. According to the article, SAP concealed an internal investigation from a SAP auditor in 2012 who concluded that SAP had stolen Teradata's intellectual property during the Bridge Project. FAC ¶¶ 47, 48, 51.

SAP's motion essentially contests the truthfulness of these allegations. It proposes that Teradata should have been aware of potential misappropriation in 2011 when HANA was developed, making the misappropriation claim time barred unless there are allegations that it investigated its suspicions. *See Fox v. Ethicon Endo-Surgery, Inc.*, 35 Cal. 4th 797, 808 (2005) ("a potential plaintiff who suspects than injury has been wrongfully ceased must conduct a reasonable investigation."); *see also Jolly v. Eli Lilly & Co.*, 44 Cal. 3d 1103, 1111 (1988) (finding the plaintiff must go find the facts "[s]o long as a suspicion exists."). At the hearing, SAP also referred to paragraphs in the complaint purportedly showing Teradata was on notice of potential misappropriation in 2011. *See* FAC ¶¶ 3, 38–40, 52.

For three reasons, however, Teradata's FAC does not reveal a reasonable basis for suspicion of misappropriation in 2011. First, the general claim early in the FAC that SAP "could not have so quickly developed and marketed HANA…without its theft of Teradata's trade secrets" is not a veiled admission of some reasonable suspicion in 2011. FAC ¶ 3. The FAC dedicates an entire section on SAP's quick development of HANA, *see* FAC ¶¶ 38–46, and a section on the

discovery of the theft in which it pleads that based on the *Der Spiegel* article "it *has become* clear…SAP was able to go to market so quickly only because SAP entered into an agreement with Teradata…and then incorporated [trade secrets] into and used them to develop HANA."  FAC ¶ 52 (emphasis added).

Second, SAP's announcement of HANA for SAP BW "just days" after SAP terminated the Bridge Project in 2011 also does not provide a reasonable suspicion of misappropriation because, as the FAC alleges, the product did not perform as well as Teradata's MPP database.  *See* FAC ¶¶ 41, 16–18.  SAP argued at the hearing that the announcement alone should have raised suspicions and a duty to investigate for misappropriation.  Perhaps if the product performed similarly to Teradata's it would have raised suspicions, but that is not alleged in the FAC.

Finally, the Teradata employees working on HANA during the Bridge Project and those who left to work for SAP later were allegedly not known to Teradata until after the *Der Spiegel* article.  *See* FAC ¶ 45 ("Teradata was not aware of this cross-pollination between SAP's Bridge Project and HANA development teams.").  This is another allegation that suggests Teradata lacked notice of misappropriation in 2011.

Teradata need not plead that it initiated an investigation sometime after 2011 when it also pleads that it lacked any reasonable suspicion of misappropriation until 2015.  Its trade secret claim did not accrue until it discovered the infringement in September 2015.  Because the complaint was filed on June 19, 2018, it was within the three-year statute of limitation under the DTSA and CUTSA.  The misappropriation claims are not barred.

## D. The DTSA Can be Based on a Continuing-Use Theory

The DTSA applies to "any misappropriation of a trade secret…for which any act occurs on or after [May 11, 2016,] the date of the enactment of [the] Act."  Defend Trade Secrets Act of 2016, Pub. L. No. 114–153, 130 Stat. 376, 381–82 (May 11, 2016).  When bringing a claim under the DTSA, the plaintiff may rely on one of three theories: "(1) acquisition, (2) disclosure, or (3) use."  *Cave Consulting Grp., Inc. v. Truven Health Analytics, Inc.*, No. 15–CV–02177–SI, 2017 WL 1436044, at *4 (N.D. Cal. Apr. 24, 2017).  To state a claim under any of these theories, plaintiffs need to allege "that acts of misappropriation occurred *after* DTSA came into effect."

14

*Avago Techs. U.S. Inc. v. Nanoprecision Prods, Inc.*, No. 16–CV–3737–JCS, 2017 WL 412524, at *9 (N.D. Cal. Jan 31, 2017) (emphasis in original).

If the trade secret was "*publicly* disclosed before the effective date of the DTSA, a plaintiff cannot rely on a theory 'that the same information was disclosed again.'" *Veronica Foods Co. v. Ecklin*, No. 16–CV–07223–JCS, 2017 WL 2806706, at *13 (N.D. Cal. June 29, 2017) (quoting *Avago*, 2017 WL 412524, at *8–9) (emphasis in original). However, where the information was never initially disclosed, "a DTSA claim based on continuous use after May 11, 2016 does not require allegations of 'new or different' misappropriation, unlike a claim based on disclosure of trade secrets." Order Denying Defendants' Motion to Dismiss, *Space Data Corp. v. X, Alphabet, Inc., et al.*, No. 16–cv–03260–BLF (N.D. Cal. 2016) (Dkt. No. 176).

The parties dispute whether the misappropriation claim can have retroactive effect. As discussed above, Teradata alleges a misappropriation that occurred during the Bridge Project but was discovered in September 2015. FAC ¶¶ 47, 51. The misappropriation allegedly continues to the present as SAP keeps selling HANA which, according to Teradata, was only possible because of the trade secrets that were stolen from it. FAC ¶¶ 41, 54, 102–103. SAP argues that the DTSA claim should be dismissed because the federal statute does not have retroactive effect for the continued use of the same misappropriated information before DTSA was enacted.

SAP misapplies the law to the facts of this case. In *Avago*, the Hon. Joseph Spero held there is "no authority suggesting that the DTSA allows a misappropriation claim to be asserted based on the continued use of information that was disclosed prior to the effective date of the statute." *Id.* Next, SAP points to *Space Data Corp.*, where the Hon. Beth Freeman found that plaintiff failed to allege a continuing-use theory when the information was disclosed prior to the DTSA and failed to allege any new post-enactment misappropriation. *Space Data Corp. v. X*, No. 16–CV–03260–BLF, 2017 WL 3007078, at *3 (N.D. Cal. July 14, 2017). Finally, SAP relies on *Cave Consulting*, where the Hon. Susan Illston dismissed DTSA claims for failing to allege post-enactment uses in the first instance. 2017 WL 1436044, at *5. Consistent with cases where the trade secret is previously disclosed, Judge Illston found plaintiff failed to state a DTSA claim without "new or somehow different [information] from the prior misappropriation." *Id.*

Unlike those cases, however, the trade secret information alleged here has not been publicly disclosed or "extinguished" at the time it was initially misappropriated. *See, e.g., Avago*, 2017 WL 412524, at *1-3 (quoting *Ultimax Cement Mfg. Corp. v. CTS Cement Mfg. Corp.*, 587 F.3d 1339, 1355 (Fed. Cir. 2009)); *Attia v. Google LLC*, No. 17–CV–06037–BLF, 2018 WL 2971049, at *11 (N.D. Cal. June 13, 2018) (dismissing claim for lack of allegations differentiating between secrets disclosed in patent application and secrets remaining that were not disclosed prior to DTSA effective date); *Veronica Foods*, 2017 WL 2806706, at *13 (stating the rule in *Avago* applied where the trade secret was allegedly "*publicly* disclosed before the effective date.").

Teradata alleges continuing-use of its trade secrets; that is not disputed. However, there are no factual allegations in this case that Teradata's trade secret information was ever publicly disclosed pre- or post-enactment of the DTSA. Therefore, assuming Teradata can amend the complaint to sufficiently identify its trade secret information as outlined above, it has adequately brought a DTSA claim on a continuing-use theory.

## II.   COPYRIGHT INFRINGEMENT (COUNT III)

The FAC alleges copyright infringement prohibited by Teradata's end-user license ("EUL"). SAP moves to dismiss the copyright claim because there is no breach of any obligations under the parties' agreements, and because the claim is time-barred under the Bridge Project agreements and 17 U.S.C. § 507(b) of the Copyright Act.

SAP's interpretation of the Bridge Project agreements that are incorporated by reference in the complaint fall short when it comes to the EUL. To restate the law briefly, the Ninth Circuit in *Khoja v. Orexigen Therapeutics, Inc.* clarified that incorporation by reference allows courts to treat documents as if they are a part of the complaint "if the plaintiff refers extensively to the document or the document forms the basis of the plaintiff's claim." 899 F.3d at 1002 (internal citations and quotations omitted). However, "if the document merely creates a defense to the well-pled allegations in the complaint, then that document did not necessarily form the basis of the complaint." *Id.*

Here, SAP asserts the Bridge Project agreements allowed it to reverse engineer Teradata's software within the terms of the agreement and that the EUL has its own two-year limitations

16

provision that is distinct from the SDCA terms addressed earlier. However, SAP's request to incorporate the EUL by reference is based on "information and belief" that the exhibit has the same license language as the EUL referenced in the first amended complaint. Lanier Decl. ¶ 6, Ex. E. I cannot know or assume on SAP's information and belief that the attached EUL is the same as the EUL plaintiff extensively refers to in the FAC merely because the FAC alleges the EUL was a "standard" agreement. On the specific contract interpretation arguments raised here, treating a different EUL like it contains the same terms as the one referenced in the FAC would permit what the court in *Khoja* cautioned; it would allow SAP to create a defense to an otherwise well-pleaded allegation. *See* 899 F.3d at 1002. Without knowing the terms of the relevant EUL, SAP cannot prove that a contractual limitation provision bars the claim, that reverse engineering for the purpose of interoperability or circumvention was permitted under the EUL, or that no set of facts exists for Teradata to raise a plausible copyright claim.

SAP's remaining argument is that, regardless of the claim, the FAC is time-barred under the three-year statute of limitations in the Copyright Act. This is incorrect. The statute of limitations begins to run "when one has knowledge of a violation or is chargeable with such knowledge." *Roley v. New World Pictures, Ltd.*, 19 F.3d 479, 481 (9th Cir. 1994). Each infringing act is considered a distinct harm so the statute of limitations "bars infringement claims that accrued more than three years before suit was filed, but does not preclude infringement claims that accrued within the statutory period." *Oppenheimer v. Allvoices, Inc.*, No. 14–CV–00499–LB, 2014 WL 2604033, at *3 (N.D. Cal. June 10, 2014). The point when a plaintiff knew or should have known about an infringement is a "question of fact," *Polar Bear Prods., Inc. v. Timex Corp.*, 384 F.3d 700, 707 (9th Cir. 2004), and courts may dismiss a claim where there is no reasonable basis to conclude a lack of knowledge under the circumstances. *Goldberg v. Cameron*, 482 F.Supp.2d 1136, 1148 (N.D. Cal. 2007).

SAP asserts that Teradata failed to plead that it could not reasonably discover the infringement within three years of 2011 when HANA for SAP BW was launched. This is a mischaracterization of the FAC and appears to incorrectly presume that the claim accrued when infringement began. Teradata alleges that it learned of the theft of its proprietary information after

17

the September 2015 *Der Spiegel* article.  *See* FAC ¶¶ 47, 51; *see also* Oppo. at 3:18, 12:11.  The article revealed an internal SAP auditor's conclusion that SAP stole Teradata's intellectual property during the Bridge Project, and that SAP concealed the investigation from Teradata and the public until the article exposed the infringement.  *Id*.

In sum, Teradata's copyright claim did not accrue until it discovered the infringement in September 2015.  The complaint was filed on June 19, 2018, within the three-year statute of limitation under 17 U.S.C. § 507(b) of the Copyright Act.  Accordingly, the motion to dismiss the copyright claim is DENIED.

## III. ANTITRUST VIOLATIONS (COUNTS IV AND V)

Teradata's antitrust claims include unlawful tying under 15 U.S.C. §§ 1, 14, and attempted monopolization under 15 U.S.C. § 2.  SAP moves to dismiss each for failure to state a claim.

### A. Unlawful Tying

In a tying arrangement the seller conditions one product, the tying product, on the buyer's purchase of another product, the tied product, to extend its market power in a distinct product market.  *See Cascade Health Sols. v. PeaceHealth*, 515 F.3d 883, 912 (9th Cir. 2008).  A tying arrangement is "forbidden on the theory that, if the seller has market power over the tying product, the seller can leverage this market power through tying arrangements to exclude other sellers of the tied product."  *Id*.

Teradata appears to accuse SAP of a per se tying violation.  *See, e.g.*, Oppo. at 16:13–18.  To sufficiently bring a per se tying claim, Teradata must plead that: (i) SAP "tied together the sale of two distinct products or services;" (ii) SAP has the "economic power in the tying product market to coerce its customers into purchasing the tied product;" and (iii) the arrangement "affects a not insubstantial volume of commerce in the tied product market."  *Cascade Health Sols.*, 515 F.3d at 913 (internal citation and quotation omitted).  SAP moves to dismiss, arguing that there are deficient allegations of tied products, coercion, and market power, and that the claim is subject to the rule of reason.

#### 1. The FAC Sufficiently Alleges SAP Tied Two Products

SAP contends that S/4HANA is one integrated product and therefore the first element of

the tying claim cannot be satisfied.  *See Int'l Mfg. Co. v. Landon, Inc.*, 336 F.2d 723, 730 (9th Cir. 1964) ("it is not an unlawful tying arrangement for a seller to include several items in a single mandatory package when the items may be reasonably considered to constitute parts of a single distinct product.").  At the hearing, SAP repeated that the allegations in paragraphs 69, 73, 86, 87, 88, and 129 of the FAC support that S/4HANA is an integrated product.  *See, e.g.*, FAC ¶ 73 ("SAP developed HANA to function as both a transactional database for managing ERP Applications data and an analytical database with EDAW functionality.").  But Teradata asserts that it sufficiently alleged a market for different products, the S/4HANA product in the ERP Applications market and the HANA product in the EDAW market.

The existence of distinct products depends on "the character of the demand for the two items."  *Jefferson Par. Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 19 (1984).  This consideration, known as the purchaser demand test, examines direct and indirect evidence of consumer demand and whether defendants "foreclosed competition on the merits in a product market distinct from the market for the tying item."  *Id.* at 21.  Direct evidence of demand includes "whether, when given a choice, consumers purchase the tied good from the tying good maker, or from other firms."  *Rick-Mik Enterprises, Inc. v. Equilon Enterprises LLC*, 532 F.3d 963, 975 (9th Cir. 2008) (internal citations and quotations omitted).  Indirect evidence includes firm behaviors, for instance a single product is apparent if "competitive firms always bundle the tying and tied goods" together.  *Id.*

Here, the FAC contains plausible allegations directly and indirectly evidencing demand in distinct markets.  Teradata alleges that EDAW and ERP Applications products perform different functions.  FAC ¶ 69.  "ERP Applications allow companies to gather and manage the data required to conduct their day-to-day operations across many aspects of the business enterprise," and "typically are designed around a relational database that acts as a common repository for all the data used and managed by the ERP Applications…"  FAC ¶ 30.  An EDAW product, in contrast to ERP Applications and transactional databases, "involves the centralized storage and integration of vast amounts of data collected from numerous sources across an entire business enterprise in its day-to-day operations…"  FAC ¶ 16.  Teradata further describes the EDAW market as products

enabling Top-Tier ERP Applications customers to retain their data, and "to perform complex analytical operations on, vast amounts of data from a wide variety of data streams (*i.e.*, the companies' ERP Applications and numerous other sources)." FAC ¶ 68. EDAW products copy customer ERP Applications data from the transactional database to incorporate it into the EDAW system, which allows customers to "run complex analytical functions against all the data" collected from the ERP data. FAC ¶ 70.

The FAC also alleges that "EDAW products are indispensable for" Top-Tier ERP Application customers, but selling the products together is not necessary. *See* FAC ¶ 72. In fact, EDAW and ERP Application products were historically sold separately to the same customer base. FAC ¶ 69. Both before and after the Bridge Project, customers had the ability to select different ERP Applications and EDAW products when given the freedom to choose. FAC ¶¶ 77–78, 84. When HANA was first released, SAP continued to allow its ERP Application customers to choose their own transactional database and their own EDAW products. FAC ¶ 81. This was purportedly the case until SAP made its HANA products inoperable with other EDAW databases. FAC ¶¶ 86–87. After HANA's release, customers still approached Teradata and encouraged it to develop integration for HANA. FAC ¶ 84.

Nonetheless, SAP argues that the product is bundled, which does not necessarily amount to an unlawful tying arrangement. *See Cascade Health Sols.*, 515 F.3d at 915 n. 27. According to SAP, because the bundling "innovates," "integrates," and "improves" the product, it should be treated as a single product for purposes of an unlawful tying claim. *See* X.P. Areeda, H. Hovenkamp & E. Elhauge, *Antitrust Law*, ¶ 1746b, p. 208 (3d ed. 2007) (explaining a single product should be found where defendant "integrate[s] previously unbundled inputs into a new product design that results in better combined performance than could be obtained if the items were offered unbundled and combined by purchasers or intermediaries."). It relies on two cases to make this argument.

First, SAP asserts that I cannot balance the benefits of "a product improvement against its anticompetitive effects." *Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991, 1000 (9th Cir. 2010) (finding product improvement alone does not render unlawful a

monopoly under Section 2).  Since the product is an improvement, that would be the end of the matter.  The *Allied Orthopedic* case, however, was not concerned with the sufficiency of a plaintiff's tying allegations.  Rather, the court analyzed whether "a design change that improves a product by providing a new benefit to consumers" could defeat summary judgment of a Section 2 monopoly claim.  *Id.* at 998–999.

Second, SAP contends that because there is a plausible claim that its integrated product offers advantages "unavailable if the functionalities are bought separately and combined by the purchaser," there is no viable tying claim.  *United States v. Microsoft Corp.*, 147 F.3d 935, 948 (D.C. Cir. 1998).  However, in *Microsoft Corp.*, the court was operating under its reading of an antitrust consent decree, and left open "[w]hether or not this is the appropriate test for antitrust law generally…" *Id.* at 950.  SAP does not provide any Ninth Circuit case law applying the plausibility test since *Microsoft Corp.*

Even under the case law SAP relies on, Teradata satisfies its burden to plead tied products.  Assuming the court could apply the *Microsoft Corp.* analysis consistent with antitrust law generally, it is arguable whether there are allegations that the S/4HANA and HANA products are integrated.  As SAP pointed out, Teradata's FAC recognizes that EDAW and EPR Applications products can operate more efficiently together – as was similarly the aim of the Bridge Project and allegedly achieved in Teradata Foundation.  *See* FAC ¶ 32 ("A key challenge of the Bridge Project was to ensure fast and efficient interoperation between SAP's front-end systems and Teradata's EDAW product.").  But the allegations refer only to HANA as it relates to integrating with transactional databases, not integrating with the ERP Applications, S/4HANA.  *See, e.g.,* FAC ¶ 42 (stating that like Teradata Foundation, "SAP's HANA product combines a database solution with integrated software to perform data analytics."); ¶ 52 ("…integrating the two companies' technologies" as a reference to Teradata Foundation solution, not HANA or S/4HANA); ¶ 83 (alleging HANA "was ill-suited for integration of enterprise data from third-party sources.").

Applying *Allied Orthopedic*, even if a design change leads to improvements it is tolerated in the antitrust context "unless the monopolist abuses or leverages its monopoly power in some other way when introducing the product." *Allied Orthopedic Appliances Inc.*, 592 F.3d at 1000.

An abuse of leverage "in some other way" is exactly what the FAC alleges. *Id.* For instance, Teradata asserts that SAP is a dominant player in the ERP Application market and made its newest version of the ERP Application, S/4HANA, incompatible with other EDAW products and transactional databases, FAC ¶¶ 86–87, while at the same time announcing that it is ending support for prior versions of its ERP Applications by 2025. FAC ¶ 89. Teradata also alleges that, in addition to bundling the sales of HANA and S/4HANA, SAP placed restrictive language in its licensing agreements preventing customers from using other databases, FAC ¶ 87, and restricted customers' ability to extract their ERP-derived data stored within HANA. FAC ¶ 93. These are all changes that Teradata alleges are specifically geared toward extending SAP's market power from the ERP Application market to the distinct EDAW market. *See Rick-Mik Enterprises*, 532 F.3d at 971. Accordingly, the FAC contains enough allegations satisfying the first element that SAP tied together the sale of two distinct products.

### 2. The FAC Sufficiently Alleges Coercion

SAP contests the second element, that Teradata has not plausibly alleged coercion. The coercion element requires Teradata to "present evidence that the defendant went beyond persuasion and coerced or forced its customers to buy the tied product in order to obtain the tying product." *Paladin Assocs., Inc. v. Montana Power Co.*, 328 F.3d 1145, 1159 (9th Cir. 2003). The Ninth Circuit recognizes so called "implied" or "de facto" tying claims in which a seller "adopts a policy that makes it unreasonably difficult or costly to buy the tying product…without buying the tied product." *Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1179 (9th Cir. 2016) (quoting *Collins Inkjet Corp. v. Eastman Kodak Co.*, 781 F.3d 264, 272 (6th Cir. 2015)).

SAP asserts that "products are not tied unless the supplier refuses to accommodate those who prefer one without the other." IX Antitrust Law, ¶ 1700i, p. 9. It focuses on language in *Foremost Pro Color, Inc. v. Eastman Kodak Co.* that requires plaintiffs plead "some modicum" of facts "that the purchase of the alleged tied products was required as a condition of sale of the alleged tying products." 703 F.2d 534, 540, 542 (9th Cir. 1983). Teradata has done so. SAP's most recent ERP Applications product, S/4HANA, is allegedly now combined with the sale of HANA in a single offering, which requires customers who buy S/4HANA to buy HANA as their

22

EDAW product.  *See* FAC ¶ 87.  This is a direct allegation that the purchase of the tied product is conditioned on the sale of the tying product.  *See Eastman Kodak*, 703 F.2d at 542.

The claim becomes stronger when considering the tying allegations that imply coercion.  For example, the costs of implementing ERP Applications are allegedly extremely high, as are the costs of switching ERP Applications products.  A single customer invests tens of millions of dollars on its ERP Applications each year.  FAC ¶¶ 62–66.  These expenses include licensing, development, and implementation of ERP Applications for their unique businesses, as well as the needs of training employees to use the product, troubleshooting issues with the product, migrating data to the new service, and other expenses.  FAC ¶¶ 63–64.  In this context, SAP placed a sunset on its existing ERP Applications and is ending support of prior versions by 2025.  FAC ¶ 89.  On Teradata's information and belief, SAP also limited the updates for prior versions of its ERP Applications.  FAC ¶ 91.  Therefore, existing ERP Applications customers can upgrade to S/4HANA before the 2025 sunset period, which is allegedly tied to HANA for EDAW services, or they can suffer the switching costs.  Teradata alleges that when faced with this choice, customers will upgrade so they can continue to have "the latest features and functionality, most robust support and most recent security and software updates."  FAC ¶ 59.

SAP contends there is no coercion because customers can still buy stand-alone versions of SAP's Top-Tier ERP Applications without purchasing HANA.  However, that is not an allegation in the FAC.  Even if it was alleged that customers can still buy stand-alone ERP Applications from SAP, this does not reconcile with the other allegations such as the high costs of implementing these systems, the lack of updates offered for older versions, and the expected 2025 sunset date for older versions of the product.  Accordingly, at the pleading stage, Teradata has alleged coercion.

### 3. The FAC Sufficiently Alleges SAP's Market Power in a Relevant Market

Third, also within the second element of a tying claim, SAP challenges the market power allegations.  The definition of a "relevant market" in which defendant has market power is typically a factual rather than legal question.  *Newcal Indus., Inc. v. Ikon Office Sol.*, 513 F.3d 1038, 1045 (9th Cir. 2008).  The relevant market inquiry need not be pleaded with specificity to

23

1    survive a motion to dismiss. *Id*. Still, claims can be dismissed if they fail to satisfy certain legal

2    principles. *Id*.

3           In *Newcal*, the Ninth Circuit stated the relevant market: (i) must be "a product market,"

4    not one defined by consumers; (ii) must encompass the product as well as "all economic

5    substitutes for the product;" and (iii) may include a submarket if it is "economically distinct from

6    the general product market." *Id*. Submarkets are identified by indicia like "industry or public

7    recognition of the submarket as a separate economic entity, the product's peculiar characteristics

8    and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price

9    changes, and specialized vendors." *Brown Shoe v. United States*, 370 U.S. 294, 325 (1962).

10          Teradata alleges that there is a product market for ERP Applications in which the

11   customers are large-scale, complex enterprises, referred to in the FAC as the "Top-Tier ERP

12   Applications Market." FAC ¶¶ 56, 131. In the Top-Tier ERP Applications market, Teradata

13   alleges that SAP holds a dominant position in the market of about 60% to 90%, with Oracle as its

14   only significant competitor. FAC ¶ 67. An additional source of SAP's power in the market for

15   Top-Tier ERP Applications is the allegedly locked-in customer base due to the severe costs of

16   switching vendors discussed above. *See* FAC ¶¶ 63–64. This suffices to plead SAP's market

17   power, and it does not appear that SAP disputes this aspect of the complaint.

18          Instead, SAP argues that other portions of the FAC are "internally contradictory" and make

19   it unclear whether the relevant ERP market includes competitors to SAP or is limited to SAP's

20   ERP Applications alone. *See Apple Inc. v. Psystar Corp.*, 586 F. Supp. 2d 1190, 1200 (N.D. Cal.

21   2008) (granting motion to dismiss where antitrust claim did not plausibly allege an independent

22   market because the allegations were internally contradictory). If the relevant market includes only

23   SAP's products, SAP contends this is fatal to the claim. *See Datel Holdings, Ltd. v. Microsoft

24   Corp.*, 712 F. Supp. 2d 974, 986 (N.D. Cal. 2010) ("In general, single brand markets do not

25   constitute a relevant market."). SAP cites three "internally contradictory" paragraphs of the FAC

26   to that end. *See* FAC ¶¶ 56, 60, 129. I disagree that there are internal contradictions in the

27   complaint.

28          First, in paragraph 56 of the FAC, Teradata identifies the product market for ERP

24

Applications, "such as SAP's S/4HANA and SAP's predecessor ERP programs." FAC ¶ 56. This refers to the relevant market discussed above, made up of SAP and Oracle products. Referring to SAP's HANA product line as an exemplary product in the ERP Applications market does not introduce a contradiction when, elsewhere in the pleading, it is clear that the market is also alleged to include Oracle and its products. FAC ¶ 67 ("Oracle is the only other significant competitor for these Top-Tier customers.").

Second, in paragraph 60, Teradata alleges "there are not reasonable or adequate economic substitutes for upgrades of SAP ERP Applications for the vast majority of Top-Tier ERP Applications customers because they are locked-in to their current ERP application provider." FAC ¶ 60. This appears to refer to a submarket of customers in the ERP Application market over whom SAP has particularly strong control due to their locked-in relationship. It is legally permissible to plead a submarket which is "economically distinct" from the general product market (in this case distinct customers who are locked-in to SAP as their ERP Applications vendor). *Newcal*, 513 F.3d at 1045. An alleged submarket of SAP customers who use SAP ERP Applications products is entirely consistent with the general product market for ERP Applications dominated by SAP with competition from Oracle.

Finally, paragraph 129 asserts that SAP's Top-Tier ERP Applications, products like S/4HANA, are a "separate and distinct" market from the market for HANA and EDAW products. FAC ¶ 129. SAP argues it is contradictory to allege a market for SAP's Top-Tier ERP Applications products as well as a market for S/4HANA. I do not see the contradiction. In the context of the alleged submarket of locked-in SAP customers, some customers may use older versions of the ERP Applications and some may use S/4HANA. This paragraph is not contradictory.

The FAC's allegations that SAP exerted market power in a relevant market survive the motion to dismiss. Teradata ultimately must prove the validity of the relevant market factual element "subject to factual testing at summary judgment or trial." *Newcal*, 513 F.3d at 1045.

### 4. The Tying Claim Assessed Under the Rule of Reason

Finally, SAP contends the tying claim should be dismissed because it must be assessed

under the rule of reason, which Teradata fails to do.  *See* Mot. to Dismiss at 21.  Teradata alleges

SAP's tying arrangement is both a per se violation and a rule of reason violation of the Sherman

Act.  I do not need to decide whether the per se or rule of reason analysis applies; that is more

appropriate on a motion for summary judgment.  *See, e.g., In re High-Tech Employee Antitrust*

*Litig.*, 856 F. Supp. 2d 1103, 1122 (N.D. Cal. 2012) (finding it inappropriate to determine whether

rule or reason analysis applies until summary judgment).  If one of the theories is plausible, that is

sufficient at this stage.

Under the rule of reason test, Teradata must plead: (1) a contract, combination or

conspiracy among two or more persons or distinct business entities; (2) by which the persons or

entities intended to harm or restrain trade or commerce [ ]; (3) which actually injures

competition."  *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1047 (9th Cir. 2008).  In addition,

Teradata must plead an antitrust injury: "(4) that they were harmed by the defendant's anti-

competitive contract, combination, or conspiracy…"  *Brantley v. NBC Universal, Inc.*, 675 F.3d

1192, 1197 (9th Cir. 2012) (citations omitted).  It satisfies the test.

### a.    Delineating a Relevant Tied Market

Starting with the first element, Teradata "must delineate a relevant market" to plead a

restraint on trade that ultimately harms competition in the tied market.  *Bhan v. NME Hosps., Inc.*,

929 F.2d 1404, 1413 (9th Cir. 1991).  As with SAP's argument concerning the tying market for

Top-Tier ERP Applications, it contends that the tied market allegations for EDAW products are

internally contradictory.  *See Psystar Corp.*, 586 F. Supp. 2d at 1200.  Teradata argues not that the

relevant market is EDAW products for Top-Tier Applications customers, FAC ¶ 68, but that it is

limited to existing SAP customers within a derivative aftermarket, FAC ¶¶ 129, 133.  *See* Oppo. at

23:20–21.

SAP contends again that limiting the tied market to a single-product is impermissible,

while Teradata claims that it has adequately alleged a tied market comprised of a single-product

market for EDAW products used with SAP Top-Tier ERP Applications.  Generally, "single brand

markets do not constitute a relevant market."  *Datel Holdings Ltd.*, 712 F. Supp. 2d at 986.

However, the Supreme Court, in *Eastman Kodak*, adopted a limited exception for a single-product

"aftermarket" in which customers do not agree on restrictions that were undisclosed at the time of the purchase of the product from the primary market. *See Eastman Kodak Co. v. Image Tech. Servs.*, 504 U.S. 451, 464–78 (1992). The actual existence of an aftermarket is a factual question. *Newcal*, 513 F.3d at 1051.

In *Newcal*, the Ninth Circuit determined that allegations fit into the exception of *Eastman Kodak* to survive a motion to dismiss because of four relevant aspects of the complaint. First, the court found the complaint sufficiently alleged "two separate but related markets in intrabrand" products and services. *Id*. at 1049. Teradata alleges the first market is the initial market for ERP Applications products for Top-Tier ERP Applications customers, in which SAP and Oracle are the only major competitors. The second market is the derivative aftermarket for EDAW products that are "specifically designed for" SAP customer's specific ERP Application and are not "interchangeable" with EDAW products for another ERP Application. FAC ¶ 74.

The alleged aftermarket here has aspects of *Eastman Kodak*, but it also has aspects of an impermissible contractual aftermarket depending on what ERP Application program the customer has. *See, e.g., Forsyth v. Humana, Inc.*, 114 F.3d 1467, 1476 (9th Cir.1997) (rejecting a contractually based restriction on competition could not form the basis for an antitrust submarket). On one hand, the market is derivative from the primary market because EDAW products for SAP ERP Applications customers would exist regardless of SAP's ERP Application products. On the other hand, EDAW products that are "specifically designed" for SAP ERP Applications and that are not "interchangeable" would only exist in a market for SAP ERP customers. Relatedly, SAP's customers who purchased S/4HANA after the alleged policy changes are not subjected to the same information disparities that Teradata alleges with other SAP ERP Applications customers because they would have purchased the product knowing that HANA was the only compatible choice for EDAW services.

The three remaining "relevant" allegations identified in *Newcal* are present in Teradata's FAC as well. *Newcal*, 513 F.3d at 1050. Teradata contends that there is a restraint on trade in the tied market for SAP customer's EDAW products but does not allege a restraint in the initial market for ERP Applications, which is competitive between Oracle and SAP. FAC ¶ 67 (alleging

27

that SAP holds a dominant position in the ERP Applications market of about 60% to 90%, with Oracle as its only significant competitor.). Teradata claims that SAP's market power in the tied market for SAP customer EDAW products flows from its relationship with its customers in the ERP Application market because there are extremely high implementation costs for ERP Applications, and high switching costs needed to change ERP Applications providers. FAC ¶¶ 62–66. Finally, Teradata alleges that SAP customers were subjected to a change in practice that is not prevalent in the market for ERP Applications and could not be known at the time they decided to purchase SAP's product. FAC ¶ 90; *see Newcal*, 513 F.3d at 1050 ("The fourth relevant aspect of the complaint is that it alleges that market imperfections…prevent consumers from realizing that their choice in the initial market will impact their freedom to shop in the aftermarket.").

The relevant tied market allegations are similar to *Eastman Kodak*, though SAP has identified some differences that will be explored in the litigation. Teradata's allegations – taken as true and drawing reasonable inferences in its favor at this stage – are enough to survive a motion to dismiss.

### b. Allegations of Anticompetitive Harm

Next, SAP contends the third element of the rule of reason violation claim is not met since there is no unreasonable anticompetitive harm alleged. SAP claims the S/4HANA product was an innovation, as discussed previously, and it relies on *Brantley v. NBC Universal, Inc.*, 675 F.3d 1192 (9th Cir. 2012), to argue that there was no actual anticompetitive effect from the S/4HANA upgrade requiring SAP's HANA product to be used for EDAW.

As an initial matter, the argument that SAP was simply innovating a product and is therefore immune from unlawful tying antitrust claims before discovery is not convincing. The FAC does not claim SAP/4HANA was innovative or integrated the EDAW and ERP Applications products. To the contrary, the allegations concerning integration only refer to HANA as it integrated with transactional databases. *See, e.g.,* FAC ¶ 42 (stating that like Teradata Foundation, "SAP's HANA product combines a database solution with integrated software to perform data analytics.").

SAP is right that in *Brantley,* the Ninth Circuit found agreements that effectively reduce

customer choices or increase prices were not sufficient to allege an anticompetitive harm because "[b]oth effects are fully consistent with a free, competitive market." *Brantley*, 675 F.3d at 1202. But in that case, the court found that the complaint did not allege injuries to competition that are typically sufficient; such as selling product packages that "excludes other sellers… from the market," placing "barriers to entry" in the market, or causing customers to "forego the purchase of substitutes for the tied product." *Id*. at 1201.

Here, Teradata has alleged that SAP's market behavior excludes Teradata from the market as a direct result of SAP locking in its customer base. FAC ¶ 149. It asserts that SAP's conduct prevents Teradata's EDAW product offerings for Top-Tier ERP Applications customers from entering the market. FAC ¶ 75. It also alleges SAP's customers have little reasonable choice but to adopt HANA for EDAW rather than Teradata's substitute given the prohibitive costs of switching services and the lack of information that customers have at the time of purchase. FAC ¶ 92. This is more than enough to plead an anticompetitive injury.

### B. Attempted Monopolization

An attempted monopolization claim under Section 2 of the Sherman Act must first "specify the market [SAP] targeted and [SAP's] economic power within that market." *United Energy Trading, LLC v. Pac. Gas & Elec. Co.*, 200 F. Supp. 3d 1012, 1020 (N.D. Cal. 2016). Teradata must plead that SAP: (i) had "specific intent to control prices or destroy competition;" (ii) engaged in "anticompetitive conduct directed at accomplishing that purpose;" (iii) has a "dangerous probability of achieving monopoly power;" and (iv) a "causal antitrust injury." *Id*. (citing *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1432–33 (9th Cir. 1995)). SAP moves to dismiss the attempted monopolization claim on the ground that Teradata fails to plead a dangerous probability of monopolization. *See* Mot. to Dismiss at 23.

Under the Sherman Act, "monopoly power" is the power to control prices or exclude competition. *United States v. Grinnell Corp.*, 384 U.S. 563, 571 (1966). Monopoly power can be inferred "from the predominate share of the market." *Id*. Similarly, a dangerous probability of monopolization is based on "the relevant market and the defendant's ability to lessen or destroy competition in that market." *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993).

SAP argues again that there are no allegations about the competitive conditions in the general EDAW market for Top-Tier ERP Applications customers other than to state there are multiple competitors. FAC ¶ 75 ("EDAW products providers, such as Teradata,…"). It also asserts that because the relevant market is only "SAP's Top-Tier Applications customers," ¶¶ 143, 147, the claim must be dismissed. *See Todd v. Exxon Corp.*, 275 F.3d 191, 200 (2d Cir. 2001) (finding cases were dismissal is frequently appropriate involve attempts "to limit a product market to a single brand, franchise, institution, or comparable entity that competes with potential substitutes."). But as I explained earlier in this Order, Teradata has sufficiently alleged a relevant derivative aftermarket of SAP's Top-Tier ERP Applications customers.

The question remaining is whether Teradata has alleged that SAP has market power in the relevant EDAW market for Top-Tier Applications customers. It has. Teradata alleged that it has a market-leading EDAW product generally and that SAP was a dominant player in the Top-Tier ERP Applications market—with 60% to 90% market share on information and belief. FAC ¶¶ 31, 67. Teradata also alleges that 60% of SAP's existing ERP Applications customers "are employing or preparing to employ HANA" based on SAP's recent anticompetitive conduct. FAC ¶ 148. The FAC states there are prohibitively high switching costs combined with restrictions on customers' ability to export their own ERP Applications data to use with other EDAW products. FAC ¶¶ 75, 94. Customers in the Top-Tier ERP Applications market also lack the information at the point of purchase to perform detailed cost analyses, contributing to SAP's ability to lock-in those customers. FAC ¶¶ 60–62.

Considering these allegations regarding SAP's market share and conduct that precludes competitors from servicing its Top-Tier Applications customers in the EDAW market, I find Teradata sufficiently states a claim. Accordingly, SAP's motion to dismiss the attempted monopolization claim is DENIED.

## CONCLUSION

In accordance with the foregoing, SAP's motion to dismiss is GRANTED with regards to the trade secret misappropriation claims but DENIED with regards to all other claims. Teradata does not sufficiently allege its trade secrets. Therefore, Teradata's first amended complaint is

DISMISSED WITH LEAVE TO AMEND within ten days of the date of this Order.

**IT IS SO ORDERED.**

Dated: December 12, 2018



William H. Orrick
United States District Judge