1   Tharan Gregory Lanier (State Bar No. 138784)
    tglanier@JonesDay.com
2   Nathaniel P. Garrett (State Bar No. 248211)
    ngarrett@JonesDay.com
3   Joshua L. Fuchs (*Pro Hac Vice*)
    jlfuchs@JonesDay.com
4   Joseph M. Beauchamp (*Pro Hac Vice*)
    jbeauchamp@JonesDay.com
5   JONES DAY
    555 California Street, 26th Floor
6   San Francisco, CA  94104
    Telephone:  +1.415.626.3939
7   Facsimile:  +1.415.875.5700

8   Kenneth A. Gallo (*Pro Hac Vice*)
    kgallo@paulweiss.com
9   William B. Michael (*Pro Hac Vice*)
    wmichael@paulweiss.com
10  J. Steven Baughman (*Pro Hac Vice*)
    sbaughman@paulweiss.com
11  Crystal M. Johnson (*Pro Hac Vice*)
    cjohnson@paulweiss.com
12  PAUL, WEISS, RIFKIND, WHARTON &
    GARRISON LLP
13  2001 K Street NW
    Washington, DC 20006-1047
14  Telephone:  +1.202.223.7356
    Facsimile:  +1.202.204.7356

    Kristin L. Cleveland (State Bar No. 184639)
    kristin.cleveland@klarquist.com
    John D. Vandenberg (*Pro Hac Vice*)
    john.vandenberg@klarquist.com
    J. Christopher Carraway (*Pro Hac Vice*)
    christopher.carraway@klarquist.com
    Garth A. Winn (*Pro Hac Vice*)
    garth.winn@klarquist.com
    Mark W. Wilson (*Pro Hac Vice*)
    mark.wilson@klarquist.com
    Kyle B. Rinehart (*Pro Hac Vice*)
    kyle.rinehart@klarquist.com
    Roy Chamcharas (*Pro Hac Vice*)
    roy.chamcharas@klarquist.com
    KLARQUIST SPARKMAN, LLP
    121 SW Salmon Street, Suite 1600
    Portland, OR 97204
    Telephone:  +1.503.595.5300
    Facsimile:  +1.503.595.5301

    *Attorneys for Defendant/Counterclaim-*
    *Plaintiff SAP SE and Defendants SAP*
    *AMERICA, INC. and SAP LABS, LLC*

15
16

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

17
18  TERADATA US, INC.,
            Plaintiff,
19  and
20  TERADATA CORPORATION and
    TERADATA OPERATIONS, INC.,
21          Plaintiffs/Counterclaim-Defendants,
22      v.
23  SAP SE,
            Defendant/Counterclaim-Plaintiff,
24  and
25  SAP AMERICA, INC. and SAP LABS, LLC,
26  Defendants.

Case No. 3:18-cv-3670-WHO (JCS)

**DEFENDANTS' NOTICE OF
MOTION AND MOTION FOR
SUMMARY JUDGMENT**

Date:       **October 13, 2021**
Time:       **2:00 P.M.**
Judge:      **Hon. William H. Orrick**
Courtroom:  **2, 17th Floor**

*** REDACTED VERSION OF
DOCUMENT SOUGHT TO BE SEALED ***

27
28

1

**NOTICE OF MOTION AND MOTION**

2    TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

3    PLEASE TAKE NOTICE that on October 13, 2021 at 2:00 p.m., or as soon thereafter as

4    the matter may be heard, before the Honorable William H. Orrick, District Judge of the United

5    States District Court for the Northern District of California, San Francisco Division, located at 450

6    Golden Gate Avenue, San Francisco, California, Defendants SAP SE, SAP America, Inc. and SAP

7    Labs, LLC (collectively "SAP" or "Defendants") will, and hereby do, move the Court for an

8    Order under Federal Rule of Civil Procedure 56 granting summary judgment, in whole or in part,

9    on the claims against them.  This motion is made and based upon this Notice of Motion and Motion

10    for Summary Judgment, the accompanying Declaration of Tharan Gregory Lanier and exhibits

11    attached thereto, the accompanying Declarations of Greg Anicich, Lauren Stiroh, Tim Kraska,

12    Gregory K. Leonard, Sharad Mehrotra, and Kevin Murphy and exhibits attached thereto, the

13    complete files and records in this action, oral argument of counsel, and such other and further

14    matters as the Court may consider.

15      Dated:  August 25, 2021              JONES DAY

16                                          By: *s/ Tharan Gregory Lanier*
                                              Tharan Gregory Lanier
17

18                                          Counsel for Defendant/Counterclaim-
                                            Plaintiff SAP SE and Defendants SAP
19                                          AMERICA, INC. and SAP LABS, LLC

20

21

22

23

24

25

26

27

28

**TABLE OF CONTENTS**

Page

I.      INTRODUCTION ............................................................................................ 1

II.     BACKGROUND .............................................................................................. 1

        A.      The Business Software at Issue ........................................................... 1

                1.      ERP Applications & Transactional Databases ......................... 1

                2.      Analytical Applications & Analytical Databases ..................... 3

        B.      The Parties' Core Products ................................................................. 3

        C.      The Bridge Project ............................................................................... 4

        D.      SAP's HANA Translytical Database .................................................. 6

        E.      Today's Dynamic and Competitive Database Market ......................... 8

III.    LEGAL STANDARD ....................................................................................... 9

IV.     ARGUMENT .................................................................................................... 9

        A.      THE COURT SHOULD GRANT SUMMARY JUDGMENT ON
                TERADATA'S TRADE SECRET CLAIMS ......................................... 9

                1.      Teradata Lacks Standing To Sue ........................................... 10

                        (a)     Teradata Assigned the SDCA to Marlin ...................... 10

                        (b)     Teradata Assigned to Marlin Its Trade Secret Claims ................. 11

                2.      Teradata Failed to Mark the ███████████ Communications as
                        Confidential ........................................................................... 11

                        (a)     The NDAs Contain a Marking Requirement .............. 12

                        (b)     Teradata's Communications of the ██████████████
                                Were Never Reduced to Writing and Marked Confidential.......... 13

                        (c)     Teradata's Failure to Mark is Fatal to Its Trade Secret
                                Claims ....................................................................... 14

                3.      The Bridge Project Agreements Give SAP the Right to Use the
                        Supposed ████████████████ in Any SAP Product ...................... 16

                        (a)     SAP Owns the Interface and Conceptual Design that
                                Implemented the Supposed █████████████ .................. 17

                        (b)     At the Least, SAP is Authorized to Use Graas' Input in Any
                                Product ....................................................................... 17

                        (c)     Teradata's Theory of Liability Contravenes the Parties'
                                Intent ......................................................................... 19

                4.      Teradata's Federal Business Trade Secrets Claim Fails ......... 20

        B.      THE COURT SHOULD GRANT SUMMARY JUDGMENT ON
                TERADATA'S ANTITRUST CLAIMS ............................................. 21

**TABLE OF CONTENTS**
(continued)

Page

1.     Teradata's Attempted Monopolization Claim Fails Because There Is No Evidence of a Dangerous Probability of Monopolization .............. 21

2.     Teradata's Tying Claim Must Be Assessed Under the Rule of Reason ........................................................................................... 23

3.     Teradata's Tying Claim Fails Under the Rule of Reason ....................... 26

      (a)     Teradata Has Not Properly Defined a Tied Market in Which HANA Competes ....................................................... 27

      (b)     Teradata Lacks Standing to Challenge Any Tie in a Properly-Defined Tied Market ........................................... 30

      (c)     Teradata Cannot Show Harm to Competition Given SAP's Low and Declining Share of Databases ....................... 31

4.     Teradata's Tying Claim Fails Also Because SAP Lacks Market Power in the Tying Market ....................................................... 32

V.     CONCLUSION ............................................................................. 34

1

## TABLE OF AUTHORITIES

2

**Page**

3

**Cases**

*Am. Ad Mgmt., Inc. v. Gen. Tele. Co. of Cal.*,
190 F.3d 1051 (9th Cir. 1999) ........................................................................................ 30

*Am. Ad Mgmt., Inc. v. GTE Corp.*,
92 F.3d 781 (9th Cir. 1996) ............................................................................................ 31

*Anderson v. Liberty Lobby*,
477 U.S. 242 (1986) .......................................................................................................... 9

*Apple iPod iTunes Antitrust Litig.*,
2009 WL 10678931 (N.D. Cal. May 15, 2009) .......................................................... 25

*Ashwood Capital, Inc. v. OTG Mgmt., Inc.*,
948 N.Y.S.2d 292 (2012) ................................................................................................ 16

*BDT Prod., Inc. v. Lexmark Int'l, Inc.*,
124 Fed. Appx. 329 (6th Cir. 2005) .............................................................................. 16

*Bhan v. NME Hosps., Inc.*,
929 F.2d 1404 (9th Cir. 1991) ....................................................................................... 26

*Big Vision Priv. Ltd. v. E.I. DuPont de Nemours & Co.*,
1 F. Supp. 3d 224 (S.D.N.Y. 2014) .............................................................................. 15

*BladeRoom Grp. Ltd. v. Facebook, Inc.*,
2018 WL 514923 (N.D. Cal. Jan. 23, 2018) ............................................................... 12

*Broad. Music, Inc. v. CBS*,
441 U.S. 1 (1979) ............................................................................................................. 23

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*,
509 U.S. 209 (1993) ......................................................................................................... 31

*California Bank & Tr. v. Piedmont Operating P'ship, L.P.*,
218 Cal. App. 4th 1322 (2013) ...................................................................................... 11

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) .......................................................................................................... 9

*Convolve, Inc. v. Compaq Computer Corp.*,
527 Fed. Appx. 910 (Fed. Cir. 2013) ................................................................... 12, 14

*Dimmitt Agri Indus., Inc. v. CPC Int'l Inc.*,
679 F.2d 516 (5th Cir. 1982) ......................................................................................... 21

*Douzinas v. Am. Bureau of Shipping, Inc.*,
888 A.2d 1146 (Del. Ch. 2006) ..................................................................................... 11

4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1
2

**TABLE OF AUTHORITIES**
(continued)

Page

3    *Foremost Pro Color, Inc. v. Eastman Kodak Co.*,
4       703 F.2d 534 (9th Cir. 1983)......................................................................................... 24, 26

    *FTC v. Qualcomm Inc.*,
5       969 F.3d 974 (9th Cir. 2020)..................................................................................... 23, 24, 26

6    *Golden Gate Pharmacy Services, Inc. v. Pfizer, Inc.*,
        433 Fed. Appx. 598 (9th Cir. 2011) ...................................................................................... 31
7
    *Gough v. Rossmoor Corp.*,
8       585 F.2d 381 (9th Cir. 1978)..................................................................................................... 27

9    *Grandonico v. Consortium Commc'ns Intl., Inc.*,
        566 F. Supp. 1288 (S.D.N.Y. 1983)......................................................................................... 15
10
    *HighMark Digital, Inc. v. Casablanca Design Centers, Inc.*,
11      2020 WL 2114940 (C.D. Cal. Mar. 26, 2020) ...................................................................... 20

12   *Illinois Tool Works Inc. v. Indep. Ink, Inc.*,
        547 U.S. 28 (2006)..................................................................................................................... 32
13
    *Image Tech. Servs., Inc. v. Eastman Kodak Co.*,
14      125 F.3d 1195 (9th Cir. 1997)................................................................................................. 32

15   *In re Air Passenger Computer Reservations Sys. Antitrust Litig.*,
        694 F. Supp. 1443 (C.D. Cal. 1988) ...................................................................................... 23
16
    *In re Aluminum Warehousing Antitrust Litig.*,
17      833 F.3d 151 (2d Cir. 2016).................................................................................................... 30

18   *In re ATM Fee Antitrust Litig.*,
        686 F.3d 741 (9th Cir. 2012).................................................................................................... 30
19
    *In re WellPoint, Inc. Out-of-Network UCR Rates Litig.*,
20      903 F. Supp. 2d 880 (C.D. Cal. 2012) .................................................................................. 10

21   *In re: Cox Enters., Inc.*,
        871 F.3d 1093 (10th Cir. 2017)............................................................................................... 24
22
    *Jefferson Par. Hosp. Dist. No. 2 v. Hyde*,
23      466 U.S. 2 (1984)....................................................................................................................... 23

24   *Johnson v. Cty. of Fresno*,
        111 Cal. App. 4th 1087 (2003) .............................................................................................. 10
25
    *Marketel Int'l, Inc. v. Priceline.com, Inc.*,
26      36 Fed. Appx. 423 (Fed. Cir. 2002) ...................................................................................... 12

27   *Ohio v. Am. Express Co.*,
        138 S. Ct. 2274 (2018)......................................................................................................... 23, 31
28

1

**TABLE OF AUTHORITIES**
(continued)

2

**Page**

3

*PQ Labs, Inc. v. Yang Qi,*
  2014 WL 334453 (N.D. Cal. Jan. 29, 2014) .................................................. 14, 15, 16

4

*Progressive Sols., Inc. v. Stanley,*
  2018 WL 2585374 (N.D. Cal. Apr. 24, 2018) ..................................................... 20

5

6

*Prostar Wireless Grp., LLC v. Domino's Pizza, Inc.,*
  360 F. Supp. 3d 994 (N.D. Cal. 2018) ................................................................ 14

7

*Rebel Oil Co. v. Atl. Richfield Co.,*
  51 F.3d 1421 (9th Cir. 1995) ................................................................. 21, 27, 32

8

9

*Rick-Mik Enters., Inc. v. Equilon Enters. LLC,*
  532 F.3d 963 (9th Cir. 2008) ............................................................................. 32

10

*S. Fed. Sav. & Loan Ass'n of Georgia v. 21-26 E. 105th St. Assocs.,*
  145 B.R. 375 (S.D.N.Y. 1991) ........................................................................... 15

11

12

*Sidibe v. Sutter Health,*
  2021 WL 879875 (N.D. Cal. Mar. 9, 2021) ........................................................ 22

13

*Spectrum Sports, Inc. v. McQuillan,*
  506 U.S. 447 (1993) .......................................................................................... 21

14

15

*Thornhill Publ'g Co., Inc. v. GTE Corp.,*
  594 F.2d 730 (9th Cir. 1979) ............................................................................... 9

16

*Town Sound & Custom Tops, Inc. v. Chrysler Motors Corp.,*
  959 F.2d 468 (3d Cir. 1992) .............................................................................. 32

17

18

*Truck-Rail Handling Inc. v. BNSF Ry. Co.,*
  2005 WL 8178364 (N.D. Cal. Mar. 8, 2005) ...................................................... 27

19

*U.S. Anchor Mfg., Inc. v. Rule Indus., Inc.,*
  7 F.3d 986 (11th Cir. 1993) ............................................................................... 21

20

21

*Union Pac. R.R. Co. v. Mower,*
  219 F.3d 1069 (9th Cir. 2000) ........................................................................... 12

22

*United States v. Bazaarvoice, Inc.,*
  2014 WL 203966 (N.D. Cal. Jan. 8, 2014) ......................................................... 33

23

24

*United States v. Empire Gas Corp.,*
  537 F.2d 296 (8th Cir. 1976) ............................................................................. 22

25

*United States v. Grinnell Corp.,*
  384 U.S. 563 (1966) .......................................................................................... 21

26

27

*United States v. Microsoft Corp.,*
  253 F.3d 34 (D.C. Cir. 2001) ................................................................. 24, 25, 26

28

**TABLE OF AUTHORITIES**
(continued)

Page

*Vesta Corp. v. Amdocs Mgmt., Ltd*,
    2018 WL 4354301 (D. Or. Sept. 12, 2018) .................................................................. 14

*Viasat, Inc. v. Space Sys./Loral, Inc.*,
    2014 WL 11889467 (S.D. Cal. Feb. 4, 2014) ............................................................... 14

*Vollrath Co. v. Sammi Corp.*,
    9 F.3d 1455 (9th Cir. 1993) .......................................................................................... 22

**Statutes**

15 U.S.C. § 1 ...................................................................................................................... 23

**Rules**

Fed. R. Civ. P. 56 ................................................................................................................ 9

**Other Authorities**

Phillip E. Areeda, Antitrust Law (2020) ............................................................... 22, 23, 24

Melvin F. Jager, 2 Trade Secrets Law § 22:23 (April 2021) ....................................... 12

Oxford English Dictionary (2020) ................................................................................ 18

# GLOSSARY

**Data Lake**
A storage repository that holds vast amounts of raw data in its native format until it is needed.

**Data Mart**
A data repository focused on a particular line of business, department, or subject area, which allows defined users to analyze a restricted area of data without wasting time searching through an entire data warehouse.

**Enterprise Data Warehouse ("EDW")**
A central repository that gathers vast amounts of data from multiple sources across an entire business enterprise and stores it in a format capable of analysis.

**Enterprise Resource Planning ("ERP")**
A category of business management software—typically a suite of integrated applications—that an organization can use to collect, store, and manage transaction-based data.

**Online Analytical Processing ("OLAP")**
OLAP applies complex queries to historical data, aggregated from OLTP databases and other sources, for data mining, analytics, and business intelligence projects.

**Online Transactional Processing ("OLTP")**
OLTP captures, stores, and processes data from transactions in real time.

**HANA**
SAP database product that combines analytical and transactional processing in a single column store in-memory database.

**Relational Database**
A database system that stores data in relational form, *i.e.*, as a collection of tables with each table consisting of a set of rows and columns.

**S/4HANA**
SAP ERP business suite designed to work with the HANA in-memory database, which allows companies to perform transactions and to conduct focused business analysis in real-time.

**Structured Query Language ("SQL")**
A programming language used to communicate with relational databases.

**Translytical**
Database platform that can support diverse workloads, including both transactional and analytical processing.

1    **I.    INTRODUCTION**

2          The thrust of Teradata's trade secret case is that SAP misappropriated narrow trade secrets

3    relating to how SAP's enterprise software communicates with HANA, SAP's in-memory

4    database.  Teradata purportedly shared these trade secrets with SAP during a joint project

5    between the parties – a project governed by unambiguous contractual terms.  Teradata did not

6    mark the purported trade secrets as confidential, as the governing contracts required.  And even if

7    it had, the contracts make clear that the alleged trade secrets—suggestions made by a Teradata

8    engineer about ████████████████████████████████████████████████████

9    ████████—belong to SAP.  In any event, before filing this suit, Teradata sold away to a third-

10   party investment fund any right to sue on the alleged trade secrets.

11         Teradata's antitrust claims fare no better.  Teradata accuses SAP of attempting to

12   monopolize a market where there are many bigger and more successful competitors.  While

13   Teradata has not formally dropped its monopolization claim, its experts do not seriously try to

14   support it with evidence.  Under the guise of a tying claim, Teradata also complains that it has

15   been harmed because SAP integrated S/4HANA with HANA.  Teradata's reliance on antitrust

16   law is misplaced, because it and SAP offer different products for different purposes in different

17   markets, as Teradata's own documents show and its own executives admit.

18   **II.    BACKGROUND**

19         **A.    The Business Software at Issue.**

20         Teradata says this case is about SAP using its position in Enterprise Resource Planning

21   ("ERP") applications "to gain entrance to and quickly grab market share" in the Enterprise Data

22   Warehousing ("EDW") market, with a database product ("HANA") derived from Teradata trade

23   secrets.  (Dkt. 67 ¶ 1.)  It is important, therefore, to understand the relationship between four

24   types of business software relevant to this litigation:  (1) ERP applications; (2) transactional

25   databases; (3) analytics applications; and (4) analytics databases.

26              **1.    ERP Applications & Transactional Databases.**

27         "ERP," which stands for "enterprise resource planning," is software used by organizations

28   to manage day-to-day business activities such as finance, accounting, human resources, project

management, supply chain operations, and procurement processes.  (Decl. of Lauren Stiroh Ex. ¶ 10; Ex. 84.)  There are a number of distinct ERP segments, each with distinct competitors.  (Decl. of Greg Anicich Ex. ¶¶ 9, 35.)

An ERP application sits on top of a "transactional" database that serves as the data repository.  (Anicich Decl. Ex. ¶¶ 24-28; Decl. of Tim Kraska Ex. ¶ 19; Ex. 38 at 18:22-19:13.)  Transactional databases are configured to optimize storage and retrieval of all data relating to individual transactions.  (Ex. 39 at 17:16-18:11.)[1]  Transactional databases, also known as "online transactional processing" ("OLTP") databases, typically are "row-based," which is advantageous for processing transactions, such as payroll data, and is efficient at running a large number of relatively simple transactions concurrently.  (Decl. of Sharad Mehrotra Ex. ¶ 53.)

For many years, ERP vendors designed their applications to run on multiple databases, "porting" their applications to various databases.  (Ex. 17 at 75:16-76:12.)  However, because each database runs commands differently, it is necessary for ERP vendors to configure certain commands separately to operate with each specific database.  (Mehrotra Decl. Ex. ¶ 36.)  This "porting" requires programmers from the ERP vendor to work alongside experts from the database vendor to configure relevant commands in the application to operate efficiently in the database.  (Kraska Decl. Ex. ¶ 160.)  Porting involves considerable testing and redesign efforts to ensure optimum performance.  (Mehrotra Decl. Ex. ¶¶ 113-114.)

This all began to change during the late 1990s.  Oracle acquired J.D. Edwards, PeopleSoft, Siebel, and other vendors to become a vertically-integrated ERP applications and database provider.  (Anicich Decl. Ex. ¶ 36.)  Microsoft followed suit by acquiring Dynamics, Navision, and Great Plains Software.  (*Id.*)  Over the following decade, ███████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████  (*Id.* ¶¶ 37-38; Ex. 17 at 35:1-4, 76:13-20.)  ████████████████

---

[1] Unless otherwise noted, Exhibit citations refer to the exhibits attached to the concurrently-filed Declaration of Tharan Gregory Lanier in Support of SAP's Motion for Summary Judgment.

DEFS.' MOTION FOR SUMMARY JUDGMENT
Case No. 3:18-cv-3670-WHO (JCS))

1

2    ████████████████████████████████ (Anicich Decl. Ex. ¶ 38; Ex. 17 at 20:18-21:9.)  To this day,

3    ██████████████████████████████████████████████

4    █████████ (Ex. 17 at 13:20-14:2, 30:19-31:1, 41:12-20; Ex. 74 ¶ 4.)

5                    **2.    Analytical Applications & Analytical Databases**

6          Some companies buy analytical software to analyze historical transaction data.  These

7    analytics applications allow companies to analyze aggregated data to gain insight that may help

8    make important business decisions.  (Mehrotra Decl. Ex. ¶ 59.)  Analytics applications are

9    designed to run on a second type of database, known as an analytics or "OLAP" database.  (Ex.

10   38 at 18:22-19:13; Ex. 21 at 158:8-159:6.)  These databases typically store data in columns, to

11   optimize the running of a small number of queries with a large number of complex records.

12   (Mehrotra Decl. Ex. ¶ 60; Kraska Decl. Ex. ¶ 22.)

13         The industry differentiates among at least three different types of analytic databases:  (1)

14   data marts; (2) enterprise data warehouses; and (3) data lakes.  (Ex. 38 at 14:6-14.)  Data marts

15   are relatively small to mid-sized structured analytics databases that draw data from a single or a

16   small number of data sources and are set up to meet the limited analytics requirements of a

17   particular division or business case.  (*Id.* 14:15-15:5; Ex. 39 at 18:16-22; Ex. 64 ¶ 82.)  Enterprise

18   data warehouses are large structured analytics databases that draw data from different sources

19   (such as OLTP databases) across an enterprise and can support the general analytics requirements

20   of an entire enterprise.  (Ex. 38 at 13:4-21; Ex. 42 at 28:5-29:5; Ex. 22 at 12:4-20.)  Finally, data

21   lakes are vast, often unstructured, stores of enormous quantities of data.  (Ex. 38 at 15:16-16:6;

22   Ex. 42 at 34:24-35:19.)  Data lakes provide inexpensive and efficient storage of rarely-used data,

23   but offer only limited support for analytics.  (Ex. 38 at 16:7-17:2.)

24         Modern enterprises often use various combinations of these products.  A typical large

25   company might have ERP applications from 3-5 different ERP vendors, each running on a

26   different transactional database.  (Ex. 12 at 110:18-111:15; Kraska Decl. Ex. ¶ 17; Anicich Decl.

27   Ex. ¶¶ 19, 46-48.)  It might also have an enterprise-wide data warehouse to support general-

28   purpose analytics, as well as data marts supporting specific analytics use cases, augmented by a

1    data lake for general data storage.  (Ex. 13 at 51:12-52:16; Ex. 48 at 13.)

2         **B.    The Parties' Core Products.**

3         Teradata's traditional flagship database product is an enterprise data warehouse.  (Ex. 43

4    at 15:1-8.)  As an OLAP database, Teradata's EDW product lacks the functionality to support

5    ERP applications; it is designed, rather, for use with analytical applications.  (Ex. 69 (RFA 292);

6    Mehrotra Decl. Ex. ¶¶ 119, 127-128; Stiroh Decl. Ex. ¶ 21.)  According to Teradata's corporate

7    witness, ███████████████████████████████████████████████████████ (Ex.

8    43 at 22:8-15.)

9         SAP is best known as a developer of ERP software, historically designed to run on various

10   transactional databases, including OLTP databases manufactured by Oracle, IBM, and Microsoft.

11   (Anicich Decl. Ex. ¶ 39.)  SAP's ERP applications do not, and have never, run on top of

12   Teradata's analytical database.  (Ex. 70 (RFA 289); Mehrotra Decl. Ex. ¶ 127.)  SAP's most

13   recent ERP application, S/4HANA, is integrated to operate on top of SAP's HANA database

14   (Anicich Decl. Ex. ¶ 40), as discussed more fully below.

15        **C.    The Bridge Project**

16        In 2008, SAP and Teradata entered into a joint project—termed the "Bridge Project"—for

17   the purpose of modifying certain SAP products (including a database known as MaxDB, and a

18   SAP data warehouse known as Business Warehouse, BW, or BI) so that they could together

19   operate on top of Teradata's OLAP database.  (Ex. 33 at 33:6-21; Kraska Decl. Ex. ¶ 161; Ex. 55

20   at Appendix 1 § 3.)  In effect, the Bridge Project contemplated assembling a "stack" of SAP

21   products on top of the Teradata database.  (Ex. 59 at Slide 5; Ex. 2 at 22:20-22.)  At the top of the

22   stack was SAP BW/BI, an analytical application and database capable of extracting data from

23   SAP ERP applications and providing rudimentary analytical processing of that data.  (Kraska

24   Decl. Ex. ¶¶ 154-158.)  SAP BW/BI, in turn, sat on SAP's MaxDB, a transactional database.  (*Id.*

25   ¶ 161.)  Teradata's OLAP database sat at the bottom of the stack.  (*Id.*)  The "bridge"—also

26   known as "Teradata Foundation"—was the software layer designed to communicate with

27   Teradata's database and, critically, was a component of SAP's MaxDB.  (Ex. 36 at 65:12-16,

28

1   224:11-225:15.)  Other than the Teradata database, all of the other components in the stack were

2   SAP products.  (Kraska Decl. Ex. ¶ 161.)

3   ████████████████████████████████████████████████████████████

4   ██████████████████████████████████████████    (Ex. 28 at 32:12-17.)  ████

5   ████████████████████████████████████████████████████████████████

6   ████████████████████████████████████████████████████████████████

7   ████████████████████████████████████████████████████████    (Ex.

8   27 at 27:21-28:4.)  ████████████████████████████████████████████████

9   █████████████████████████████████████████████████    (*Id.*

10  at 29:4-8.)

11          To reflect these realities, the parties entered into three contracts that governed the Bridge

12  Project:  a Software Development Cooperation Agreement ("SDCA") and two non-disclosure

13  agreements ("2008 MNDA" and "2009 MNDA").  ████████████████████████

14  ████████████████████████████████████████████████████████████████

15  ████████████████████████████████    (Ex. 55 § 4.2.)  ████████████

16  █████████████████████████████████████████████████

17  ████████████████████████████████████████████████████    (*Id.* §

18  5.5.)

19          ████████████████████████████████████████████████████████

20  ██████████████████████████████████████████    (Ex. 55 §

21  10.1)  ████████████████████████████████████████████

22  ████████████████████████████████████████████

23  ██████████████████████████████████████████

24  ██████████    (*Id.* § 10.3.)  █████████████████████████

25  ██████████████████████████████████████████

26  ██████████████████████████    (*Id.* §§ 1.7-1.8.)

27          As Teradata was well aware, it was not the only database provider working with SAP on

28  this kind of project.  (*See* Ex. 55 § 2.3 ████████████████████████████

1    ████████████████████████████████    SAP was simultaneously working with

2    Hewlett Packard to support an HP database (named Neoview) under the same stack of SAP

3    software.  (Ex. 33 at 33:6-21; Ex. 30 at 38:10-16; Exs. 61, 62.)  The Bridge Project thus was just

4    one aspect of a larger project to modify SAP's products to be able to interoperate with various

5    OLAP databases.  (Ex. 33 at 85:16-86:5.)  Accordingly, any changes made to SAP products as a

6    result of SAP's collaboration with Teradata necessarily would be made available to databases

7    outside the Bridge Project – another fact of which Teradata was aware.  (Ex. 52; Ex. 15 at 13:5-

8    12, Ex. 27 at 88:25-89:16.)  After all, and as Teradata's witness put it, ████████████████

9    ████████████████████████████████████████████████████████████████

10   ████████████████████████████████████████████████████████████████

11   ████████████████████████████████████████████████████████████████

12   ███████████████    (Ex. 27 at 88:25-89:16.)

13        **D.    SAP's HANA Translytical Database.**

14        Historically, SAP designed its ERP applications to run on a number of transactional

15   databases, including Oracle, IBM, and Microsoft databases.  (Anicich Decl. Ex. ¶ 39.) ████████

16   ████████████████████████████████████████████████████████

17   ████████████████████████████████████████████████████████████████

18   ██████  (*See, e.g., id.* ¶ 39.) ████████████████████████████████████

19   ████████████████████████████████████████████████████████████

20   ████████████████████████████████████████    (*See, e.g., id.*; Ex. 88 at 237, 268; Ex. 89

21   at 59; Ex. 87 at 219.)

22        Before, during, and after the Bridge Project, SAP spent years developing its own database,

23   HANA, to sit under its ERP applications.  (*See* Kraska Decl. Ex. ¶¶ 164-174.)  Years before the

24   Bridge Project, SAP's co-founder, Hasso Plattner, and students with whom he worked, conceived

25   the idea of building a new database as a means for improving the performance of SAP's ERP

26   applications.  (*Id.* ¶ 164; Ex. 83; Ex. 78.)  SAP, in conjunction with Dr. Plattner and his students,

27   concluded that only by controlling the structure and operation of the underlying database could an

28   ERP application achieve the full extent of the improvement sought.  (Ex. 81; Ex. 82; Ex. 91; Ex.

1    83.)

2          HANA was created by SAP developers who borrowed code from three other SAP

3    database products:  P*Time, TREX, and MaxDB.  (Ex. 30 at 14:9-14; Ex. 29 at 23:18-32:18; Ex.

4    7 at 22:23-25:9.)  SAP developers built upon that code to create a database that can support both

5    transactional and analytics applications:  a so-called "translytical" database.  (Ex. 79 at 11; Ex. 80

6    at 8.)  HANA permits customers to support their ERP applications with enhanced speed and

7    efficiency, and also to run analytics queries against the transactional data generated by those

8    applications without the need to copy data.  HANA is an "in-memory database," and the

9    relatively high cost of storing data in memory rather than on disk makes HANA best suited for

10   supporting transactional applications or limited, clearly defined analytics use cases (a data mart),

11   rather than use as an analytical database for storing large amounts of data from across an entire

12   enterprise (an EDW).  (*See* Ex. 22 at 15:4-16:3; Ex. 13 at 47:15-49:17; Ex. 32 at 259:19-260:21;

13   Ex. 77; Ex. 79.)

14         By early 2013, SAP had modified its ERP applications to run on HANA (along with other

15   databases).  As SAP explored the operation of its ERP applications on HANA, it discovered more

16   and more functionality that it could offer only, or optimally, by designing applications

17   specifically to take advantage of HANA's new features.  (Ex. 32 at 164:21-165:12; Ex. 34 at

18   97:8-20; Ex. 16 at 61:21-67:21.)  In January 2013, SAP launched an effort to port new

19   developments, or "Optimizations," to the Oracle and IBM transactional databases.  (Ex. 85.)  By

20   late 2013, SAP encountered significant difficulties porting to other databases a set of

21   optimizations designed for ERP running on HANA.  A report to SAP's Executive Board reported

22   that all four milestones were missed, the planned porting was not included in the late 2013 ERP

23   product shipment, and an RFP for additional porting work was put on hold pending further

24   review.  (*Id.*)  SAP arranged a test in late 2013 to work with IBM engineers and determine

25   whether, working together, they could modify IBM's DB2 database to support the new

26   functionality.  The test "failed miserably."  (Ex. 35 at 30:22-32:3; Ex. 12 at 108:4-16.)

27         In January 2014, SAP decided to "split the code line" and to create a new ERP application

28   designed specifically to run on HANA and to take advantage of its unique functionality.  (Ex. 35

1    at 14:10-16:4; Ex. 11 at 190:5-191:21.)  SAP was able to create an ERP application with a

2    streamlined design capable of pushing many of the required calculations down into the HANA

3    database, where they could be performed more efficiently.  (Ex. 35 at 32:4-33:17; Mehrotra Decl.

4    Ex. ¶¶ 135-160.)  And because SAP did not port the application to other databases, SAP was able

5    to reduce development and testing costs, and to accelerate the design, completion, and release of

6    the new product.  (Mehrotra Decl. Ex. ¶¶ 176-177.)  In 2015, SAP released its first suite of newly

7    designed ERP applications, named S/4HANA.

8            Customers were used to purchasing a SAP ERP application along with a limited-use

9    database license, and SAP continued this practice by offering HANA either with a full-use license

10   (with no restrictions on how the data within HANA can be used), or a lower-cost limited-use (or

11   "runtime") license (with database use limited to supporting S/4HANA).  (Ex. 45 at 105:19-

12   115:12; Ex. 37 at 15:7-15; Ex. 19 at 64:23-65:5.)

13           **E.      Today's Dynamic and Competitive Database Market.**

14           In recent years, a number of new technologies have had a substantial impact on the

15   competitiveness of the database market.  Most importantly, the emergence of cloud computing

16   opened new opportunities for customers and a whole new dimension of competition.  (Ex. 12 at

17   23:15-24:17.)  A customer may choose to take software as a service ("SaaS"), in which case the

18   customer contracts for use of the ERP applications of its choosing, and the cloud vendor is

19   responsible for operating and maintaining the collection of hardware, operating systems,

20   databases, and middleware necessary to deliver the ERP services to the customer.  (Anicich Decl.

21   Ex. ¶ 26; Ex. 74 ¶ 4; Ex. 32 at 159:10-165:5; Ex. 18 at 22:1-23:22.) ▮▮▮▮▮▮▮▮

22   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (Ex. 25 at 41:14-42:13; Ex. 44 at 41:24-42:14.) ▮▮▮▮▮

23   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (Decl. of Gregory K.

24   Leonard Ex. ¶ 76; *see also id.* ¶¶ 69-79.)

25   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (Ex. 90.) ▮▮▮▮▮▮▮

26   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

27   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

28   ▮▮▮▮ *Id.* at Slides 4, 16.) ▮▮▮▮▮▮▮▮▮▮

1

2

3   (*Id.* at Slide 14.)

4

5   (Ex. 95.)

6        Less than two weeks later, however, Teradata filed this lawsuit.  In a fortnight, SAP

7   HANA went from being ███████████████████████████████████ to being

8   the product of the theft of Teradata's trade secrets.  (Dkt. 67 ¶¶ 41-49.)  Teradata's database and

9   HANA went from being ██████████ to being directly competitive.  Whereas Teradata

10  previously described SAP as ███████████████████████

11  ██████, Teradata now claimed that HANA was an EDW product that threatened to monopolize

12  the market.  (*Id.* ¶¶ 58-79.)  In addition to massive damages, Teradata requested a court

13  injunction, seeking to prohibit the very sales of S/4HANA on HANA that just days earlier it had

14  ██████████████████.  (*Id.* at p. 36.)

## III.   LEGAL STANDARD

16        Summary judgment on a claim is appropriate "if the movant shows that there is no

17  genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law"

18  with respect to an essential element of the non-moving party's claim on which the non-moving

19  "party will bear the burden of persuasion at trial."  Fed. R. Civ. P. 56(a); *see Celotex Corp. v.*

20  *Catrett*, 477 U.S. 317, 323 (1986).  Once the movant has made this showing, the burden then

21  shifts to the party opposing summary judgment to identify specific facts showing there is a

22  genuine issue for trial, based on affirmative evidence from which a jury could return a verdict in

23  that party's favor.  *Anderson v. Liberty Lobby*, 477 U.S. 242, 257 (1986).  On summary judgment,

24  the Court draws all reasonable factual inferences in favor of the non-movant, *id.* at 255, because

25  "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate

26  inferences from the facts are jury functions, not those of a judge."  *Id.*  However, conclusory and

27  speculative testimony does not raise genuine issues of fact.  *See Thornhill Publ'g Co., Inc. v. GTE*

28  *Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).

1

## IV.   ARGUMENT

### A.   THE COURT SHOULD GRANT SUMMARY JUDGMENT ON TERADATA'S TRADE SECRET CLAIMS.

After extensive discovery, Teradata has tapered back its grandiose trade secret allegations (*see* Dkt. 1 ¶ 1), and now focuses on one discrete category of technical trade secrets—relating to a supposed ███████████████ (Ex. 72 at Nos. 24-31 and 58-59)—that concerns the interface between SAP applications and HANA (plus three categories of inconsequential business trade secrets based on information supposedly brought over to SAP by former Teradata employees [Ex. 72 at Nos. 54-56]).  Even these narrowed claims fail.

#### 1.   Teradata Lacks Standing To Sue.

Teradata's technical trade secret claims, based on information shared during the Bridge Project, fail out of the gate because Teradata lacks standing, having assigned those claims to a third party.  Once a claim has been assigned, the assignee is the owner and the assignor lacks standing to sue on it.  *In re WellPoint, Inc. Out-of-Network UCR Rates Litig.*, 903 F. Supp. 2d 880, 897 (C.D. Cal. 2012); *see also Johnson v. Cty. of Fresno*, 111 Cal. App. 4th 1087, 1096 (2003).  Teradata assigned the Bridge Project trade secret claims to an investment fund.

##### (a)   Teradata Assigned the SDCA to Marlin.



(Ex. 93 at 15.) ████████████████ (*Id.* at 2.) ██████████████████ (Ex. 93 at 42; *id.* at 12.)  Teradata specifically identified the SDCA, the contract that "formaliz[ed]" the terms governing the Bridge Project (Dkt. 65 at 3), ██████████████ (Ex. 94, Schedule at p. 163).

1  ██████████████████████████████████████████████████████████████

2  ████████████████████████████████████ (Ex. 58).

3          **(b)      Teradata Assigned to Marlin Its Trade Secret Claims.**

4  ██████████████████████████████████████████████████████████████

5  ████████████████████████████████████████ ….” (Ex. 93 § 2.1(k).)

6  Teradata's trade secret claims in this case ████████████████████████████

7  ████████████████████████████████████████████████████████████

8  ████████████████████████████████████████████████████████████

9  ████████████████████████ By Teradata's own admission, the alleged trade secrets were

10 provided by Teradata "[d]uring the Bridge Project, subject to the terms of the parties'

11 agreements." (Dkt. 67 ¶ 34.)  Whether or not Teradata is suing *on* the SDCA, its trade secret

12 claims are tethered to the SDCA:  after all, the information Teradata now claims as the subject of

13 its trade secret causes of action was shared pursuant to the SDCA's terms. ██████████████

14 ████████████████████████████████████████████████████████████

15 ████████████████████████████████████████████████████ *See*

16 *Douzinas v. Am. Bureau of Shipping, Inc.*, 888 A.2d 1146, 1152 (Del. Ch. 2006) (tort claim was

17 "related to" contract because adjudicating claim would require interpretation of contract

18 provisions). ████████████████████████████████ Teradata thus

19 lacks standing to assert them.  *California Bank & Tr. v. Piedmont Operating P'ship, L.P.*, 218

20 Cal. App. 4th 1322, 1347 (2013).

21          **2.      <u>Teradata Failed to Mark the ████████████████████ as
           Confidential.</u>**

22
23 Teradata's ████████████ trade secret claims fail also because Teradata never

24 marked as confidential any of the communications that purportedly disclosed the trade secrets.

   Teradata's Amended List of Trade Secrets identifies nine trade secrets related to a supposed

25 ████████████████████ (Ex. 72 at Nos. 24-31, 58-59).  Teradata claims all nine trade secrets

26
27 were provided by Teradata employee John Graas to SAP as part of the Bridge Project.  (Ex. 10 at

28

1    161:8-11, 169:6-19, 203:3-8, 211:7-212:9.)[2]  While Teradata contends ███████████████████

2    ███████████████████████████████  it is undisputed the communications were not

3    accompanied by an express indicator of confidentiality.  (Ex. 67 at 4-5 (Rog. 2).)

4         Misappropriation occurs when a trade secret is acquired or used under circumstances

5    giving rise to a duty to maintain its secrecy.  *See Convolve, Inc. v. Compaq Computer Corp.*, 527

6    Fed. Appx. 910, 924 (Fed. Cir. 2013).  When the parties have entered into written agreements that

7    govern their duties of confidentiality, those agreements "supplant[] any implied duty of

8    confidentiality that may have existed between the parties."  *Marketel Int'l, Inc. v. Priceline.com,*

9    *Inc.*, 36 Fed. Appx. 423, 425 (Fed. Cir. 2002) (citing *Union Pac. R.R. Co. v. Mower*, 219 F.3d

10   1069, 1076 (9th Cir. 2000)); *see also* Melvin F. Jager, 2 Trade Secrets Law § 22:23 (April 2021)

11   ("California law holds that the existence of a written contract precludes a separate tort claim for

12   misappropriation under the California Uniform Trade Secrets Act.").  "If the parties have

13   contracted the limits of their confidential relationship regarding a particular subject matter, one

14   party should not be able to circumvent its contractual obligations or impose new ones over the

15   other via some implied duty of confidentiality."  *Convolve*, 527 Fed. Appx. at 925; *see also*

16   *BladeRoom Grp. Ltd. v. Facebook, Inc.*, 2018 WL 514923, at *8 (N.D. Cal. Jan. 23, 2018) ("the

17   existence of a non-disclosure agreement between BladeRoom and Facebook" defined "the

18   parties' confidentiality obligations with respect to disclosed trade secrets").

19   _____

20      [2] The supposed ████████████████████████████████████████████

21   ████████████████████████████████  (Ex. 30 at 92:7-16.)  In the case of the Bridge Project,

22   the SFAE command had to be issued in the form of a proprietary statement from SAP BW/BI, at
     the top of the "stack," conveyed to the SAP application server and translated to a SQL statement

23   down to SAP MaxDB, and in SAP MaxDB, the SQL was translated into a new iteration of SQL
     that was finally passed to the Teradata database.  (Ex. 33 at 270:1-271:1; Ex. 30 at 100:5-12; Ex.

24   23 at 53:7-64:9.)  In January 2010, Graas proposed by e-mail that ████████████████████

25   ███████████████████████████  (Ex. 46 at 4.)

26   ████████████████████████████████████████████████████████████████████:
     a well-studied technique, known since the 1980s, that is taught in almost any database class which

27   covers distributed database systems.  (Kraska Decl. Ex. ¶¶ 193, 235-236, 244-245.)  Moreover, a
     SAP employee, Torsten Pfeiffer, had disclosed the same steps years before, in a November 2008

28   email to Teradata.  (*Id.* ¶ 385.)

1

           **(a)**      **The NDAs Contain a Marking Requirement.**

2

      According to their plain text—and by Teradata's own admission (Ex. 40 at 27:15-23)—

3

the Bridge Project contracts governed the sharing of confidential information during the Bridge

4

Project.  (Ex. 55 § 12.)  Recognizing that the parties would be sharing substantial information

5

with each other, and with the evident intention of foreclosing the kind of *post hoc*

6

misappropriation claim that Teradata asserts here, the parties adopted an unambiguous framework

7

for identifying information as "confidential."  ████████████████████████████████

8

████████████████████████████████████████████████████████

9

████████████████████████████████████████████████████████

10

████████████████████████████████████████████████

11

████████████████████████████████████████████████████████

12

████████████████████  (Exs. 53, 54 § 2.)  ████████████████████████

13

████████████████████████████████████████████████████

14

████████████████████████████  (*Id.*)

15

           **(b)**      **Teradata's Communications of the** ████████████
                               **Were Never Reduced to Writing and Marked Confidential.**

16

      According to Teradata's Amended List of Trade Secrets, the ████████████████ was

17

conveyed to SAP in a series of seventeen documents.  (Ex. 72 at 8-9.)  Yet Mr. Graas conceded at

18

his deposition ██████████████████████████████████████

19

██████  (*See, e.g.*, Ex. 9 at 84:4-17, 93:4-10, 105:5-16, 144:12-20, 187:22-188:17, 218:6-16,

20

233:7-15.)  Rather, ██████████████████████████████████

21

██████████████████████████████  (*Id.* at 83:4-17, 105:5-16, 108:21-109:8,

22

187:22-188:21, 233:7-15.)  In Mr. Graas's own words, ████████████████████████

23

████████████████████████  (*Id.* at 84:4-17.)  And these oral

24

communications were never reduced to writing—let alone marked confidential—as the

25

nondisclosure agreements require to maintain confidentiality.  (Ex. 9 at 108:9-19, 188:18-21; Ex.

26

10 at 186:24-187:11.)

27

28

1     Even if Teradata still intends to rely on the written documents, only two were ever marked

2  confidential – and neither disclosed a trade secret.  (Ex. 9 at 72:15-19, 93:4-10, 145:23-146:1,

3  188:22-189:7, 220:14-17, 222:3-12, 229:1-4, 243:1-6, 258:10-13, 259:21-23, 260:19-21, 262:20-

4  263:1.)  The two exceptions—Exhibits 50 and 60—are different versions of a document Mr.

5  Graas created.  (Ex. 50 [v.6]; Ex. 60 [v.1]; Ex. 10 at 184:18-185:24, 225:1-12.)  Notwithstanding

6  the fact that the document contained *SAP* information—such as a screenshot from SAP BW/BI

7  sent to Mr. Graas by a SAP engineer (Ex. 30 at 74:14-22, 283:11-284:12)—the entire document

8  was labeled "Teradata Confidential."

9     Graas conceded that version 1 of the document (Ex. 60) ███████████████████

10  ████████████████████████████████████████████████████████████

11  ████████████████████ (Ex. 9 at 109:16-22.)  As to version 6 of the document,

12  there is no evidence that Graas ever sent it to SAP.  (Ex. 9 at 268:15-21.)  In the absence of any

13  evidence that SAP even saw the document, it cannot possibly serve as the predicate for a trade

14  secret claim.  *Prostar Wireless Grp., LLC v. Domino's Pizza, Inc.*, 360 F. Supp. 3d 994, 1013-14

15  (N.D. Cal. 2018).  Accordingly, Teradata's trade secret claims boil down to the proposition that

16  SAP misappropriated trade secrets conveyed through unmarked oral communications.

17           **(c)**    **Teradata's Failure to Mark is Fatal to Its Trade Secret Claims.**

18     Because Teradata failed to mark as confidential the communications that supposedly

19  conveyed the ███████████████ to SAP, its trade secret claims necessarily fail.  *See, e.g.*,

20  *Convolve*, 527 Fed. Appx. at 925 (affirming summary judgment because plaintiff failed to mark

21  as required by governing contracts); *Viasat, Inc. v. Space Sys./Loral, Inc.*, 2014 WL 11889467, at

22  *4 (S.D. Cal. Feb. 4, 2014) (same).

23     Teradata likely will point this Court to its ruling denying SAP's motion to dismiss on the

24  ground that future evidence might show Teradata "notified [SAP] of confidential information

25  through other means."  (Dkt. 65 at 9:7 (citing *PQ Labs, Inc. v. Yang Qi*, 2014 WL 334453, at *4

26  (N.D. Cal. Jan. 29, 2014)).)  Respectfully, the Court should reconsider its interpretation of *PQ*

27  *Labs* and its relevance to cases, like this one, where an express contractual marking requirement

28

DEFS.' MOTION FOR SUMMARY JUDGMENT
Case No. 3:18-cv-3670-WHO (JCS))

1   exists.  In any event, there is no evidence Teradata notified SAP through other means that Mr.

2   Graas's communications were confidential.[3]

3       *PQ Labs* did *not* hold that the terms of a nondisclosure agreement can be overridden by

4   the parties' conduct.  In that case, an independent contractor argued that his employer failed to

5   take reasonable steps to maintain confidentiality because it failed to mark its trade secrets as

6   confidential.  2014 WL 334453, at *3-4.  But the employer "used other means to notify its

7   employees and agents that its technological and customer information was confidential."  *Id.*

8   Specifically, the employer told the defendant not to disclose the information it claimed as a trade

9   secret, and required the defendant to sign a NDA that required him to keep the plaintiff's

10  information confidential.  *Id.  PQ Labs* did not involve a NDA with a marking requirement at all.

11  It thus does not speak to whether a contract between the parties with a marking requirement can

12  be superseded by an implied duty of confidentiality.

13      Moreover, the Court's previous construction of *PQ Labs* would not apply here, where the

14  nondisclosure agreements are governed by New York law and contain provisions stating they

15  cannot be modified except in writing.  (Ex. 53 § 15; Ex. 54 § 15.)  Under New York law, the

16  parties' NDA could not be modified except by "an oral *agreement* to alter the written contract."

17  *Grandonico v. Consortium Commc'ns Intl., Inc.*, 566 F. Supp. 1288, 1291 (S.D.N.Y. 1983).

18  "[C]onduct itself cannot produce a modification of the contract.  Conduct can at best be evidence

19  of 'an agreement based upon consideration' between both parties to modify the existing contract."

20  *S. Fed. Sav. & Loan Ass'n of Georgia v. 21-26 E. 105th St. Assocs.*, 145 B.R. 375, 381 (S.D.N.Y.

21  1991).  Thus, merely pointing to employee conduct is not enough; Teradata must proffer evidence

22  of an *agreement* to modify or waive the marking provision – evidence that is entirely lacking

23  here.  *See Big Vision Priv. Ltd. v. E.I. DuPont de Nemours & Co.*, 1 F. Supp. 3d 224, 255

24

---

25      [3] The Court also cited *Vesta Corp. v. Amdocs Mgmt., Ltd*, 2018 WL 4354301 (D. Or. Sept.

26  12, 2018), where the parties' contract was ambiguous as to whether information needed to be
    marked to be treated as confidential.  (Dkt. 65 at 8:25-28.)  But under *Vesta*'s own reasoning, the

27  SAP-Teradata NDA was not ambiguous because "unlike in [that] case, the marking requirement
    was referenced in the definition of confidential information."  *Vesta*, 2018 WL 4354301, at *9;

28  *see* Exs. 53, 54 § 2.

DEFS.' MOTION FOR SUMMARY JUDGMENT
Case No. 3:18-cv-3670-WHO (JCS))

1    (S.D.N.Y. 2014) (granting summary judgment for failure to mark and rejecting argument that

2    parties modified marking requirement through course of conduct; "such an argument runs

3    headlong into the text of the NDAs, which quite clearly prohibit oral modification except upon

4    written agreement by both parties").

5          Even if *PQ Labs* were to apply, there is no evidence that Teradata notified SAP, through

6    other means, that the information conveyed by Mr. Graas was confidential.  Lacking that,

7    Teradata relies on the fact that ███████████████████████████████████████████████████

8    ███████████████████████████████████████ (Ex. 2 at 57:6-10; *see also* Ex. 40 at 43:8-15;

9    Ex. 10 at 84:5-15.)  But subjective understanding of the MNDA cannot control over the contract's

10   "objective meaning." *Ashwood Capital, Inc. v. OTG Mgmt., Inc.*, 948 N.Y.S.2d 292, 296 (2012);

11   *see also BDT Prod., Inc. v. Lexmark Int'l, Inc.*, 124 Fed. Appx. 329, 331 (6th Cir. 2005) (because

12   disclosure agreement between parties did not require defendants to keep plaintiff's information

13   confidential, the subjective "understanding of the companies is irrelevant.").  This is especially so

14   where, as here, Teradata's employees were simply unfamiliar with the contract. ███████████

15   ███████████████████████████████████████████████████████████████████████████████

16   (Ex. 10 at 86:18-23.)  Other Teradata employees ████████████████████████████████████

17   ███████████████████████████████████████ (Ex. 3 at 67:9-16; Ex. 28 at 59:15-

18   21; Ex. 27 at 80:21-25.)  Teradata's claims fail because there is no evidence that Teradata notified

19   SAP, in writing or "by other means" that Mr. Graas's communications were confidential.

### 3.    The Bridge Project Agreements Give SAP the Right to Use the Supposed Batched Merge Method in Any SAP Product.

          Even if Mr. Graas's various communications qualified as "Confidential Information"

under the NDAs, SAP still was entitled to use the information – not just for purposes of the

Bridge Project, but in *any* product.  Teradata's description of the purported "batched merge

method" has been vague and shifting throughout the case.  But no matter how the supposed trade

secret is characterized, SAP has an unambiguous contractual right to use it.

1

2

(a)    **SAP Owns the Interface and Conceptual Design that**
**Implemented the Supposed Batched Merge Method.**

3

Teradata's supposed "trade secret" is alleged to have been incorporated into the Bridge

4

Project software (the MaxDB Bridge, also called the Teradata Foundation)—and then allegedly

5

into the interface between SAP applications and HANA ("Native FAE").  That software and its

6

conceptual design is SAP property.

7

Section 10 of the SDCA ████████████████████████

8

████████████████████████████████████████████████

9

████████████████████████████████████████  (Ex. 55

10

§ 10.1 (emphasis added).)  SAP also owns the rights to the █████████████████

11

███████████████████████████  (*Id.*)  ███████████████

12

██████████████████████████████████  (*Id.* § 1.11.)

13

████████████████████████████████████████████████

14

████████████████████████████████████████

15

████████████████████████████████████████████████

16

(*Id.* § 1.2.)  Further, ████████████████████████████████████

17

████████████████████████████████████████████████

18

████████████████████████████████████████████

19

████████████████████████████████████████████

20

██████████████  (*Id.* § 1.8.)

21

According to Teradata's expert, Mr. Graas ████████████████████

22

████████████████████████████████████

23

████████████████████████████  (Ex. 20 at 84:25-86:22.)  In turn, he

24

claims that ████████████████████████████████████████████████

25

██████████████████████████  (*Id.* at 85:2-11.)  Thus, it is uncontroverted

26

that Teradata's purported trade secret ████████████████████████████

27

████████████████████████████████████████████████

28

█████████████████████  Ex. 10 at 229:14-232:23.)  By the SDCA's plain terms,

1    these modifications and/or design architecture, guidelines, or specifications to SAP's software

2    belong to SAP.

3                    **(b)    At the Least, SAP is Authorized to Use Graas' Input in Any**
                            **Product.**

4

5           To the extent Teradata's claimed trade secret is not something incorporated into the

     MaxDB Bridge or conceptual design behind it, but some lesser conversations surrounding it, SAP

6    still is entitled to use the supposed batched merge method in any product.  Both the SDCA and

7    the nondisclosure agreements ████████████████████████████████████████████████████

8    ██████████████████████████████████████████████████████████████ (*See* Ex. 55 §§

9    9.4, 12; Exs. 53, 54 § 7.)  The SDCA's "License" section sets forth the parties' rights to use

10   information shared by the other party during the Bridge Project.  Teradata granted to SAP a

11   ████████████████████████████████████████████████████████████████████████████

12   ██████████████████████████████████████████████████████████████████████████

13   ████████████████████████████████████████████████████████████████████████████████

14   ██████████████████████████████████ (*Id.* § 9.4 (emphasis added).)  This license included the

15   ██████████████████████████████████████████████████████████████████████████████

16   ██████████████████████████████████████████████████████ (*Id.* (emphasis

17   added).)  Moreover, the license provides that ████████████████████████████████████████

18   ████████████████████████████████████████████████████████████████████████

19   ████████████████████████████████████████████████████████████████████████████

20   ████████████████████████████████████████████████████████████████████████

21   ████████████████████████████████████████████████████ (*Id.*)  In turn, ████

22   ████████████████████████████████████████████████████████████████████████████

23   ██████████████████████████████████████████████████████████████████████████████

24   ████████████████████████████████████████████████ (*Id.* § 1.6.)

25          Mr. Graas's dialogue with SAP engineers qualifies as ████████████████████.  (*See* Ex.

26   55 § 1.6.)  At most, Mr. Graas provided suggestions—*i.e.*, "an idea or thought suggested, a

27   proposal" (*Suggestion*, Oxford English Dictionary (2020))—about how to approach a

28

command/query coming from SAP applications.  Mr. Graas's suggestions were conveyed as part of a back-and-forth dialogue with SAP engineers about how best to modify a *SAP* command to work more efficiently with the Teradata database.  (*See* Exs. 46, 47, 51; Ex. 36 at 57:16-58:15, 133:16-134:4; Ex. 30 at 307:10-308:9; Ex. 14 at 145:17-146:15.)  The SDCA's plain text makes clear that these types of suggestions—suggestions from one party about how to modify the *other* party's products—are useable outside the context of the Bridge Project.

The same conclusion follows from the text of the MNDA, which states that ███████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ██████████████████████████████████ (Exs. 53, 54 § 7.)  Like the SDCA, the parties' non-disclosure agreements make clear that if Teradata provided suggestions to SAP about how to modify SAP's *own* products, those suggestions could be used by SAP for any purpose and without restriction.  Once again, Mr. Graas's comments fit squarely within this provision.  ██ ████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ ███████████████████████ (Ex. 54 § 7.)

(c)    **Teradata's Theory of Liability Contravenes the Parties' Intent.**

Teradata argues that permitting SAP's use of the supposed batched merge method outside the context of the Bridge Project would upset the parties' reasonable expectations.  But Teradata has it backwards.  The structure of the SDCA makes clear that the parties intended to distinguish between two distinct circumstances.  Where one party shared its *own* software as deliverables under the project, that software was to be used only for purposes of the Bridge Project.  (*See* Ex. 55 § 9.2)  But where one party (*e.g.*, Teradata) provided suggestions about how to modify or improve the *other* party's own products, the SDCA ensures that the other party (*e.g.*, SAP) is able to continue selling its own software products even if modified per those suggestions and/or added to another SAP product.  (*See* Kraska Decl. Ex. ¶ 369.)  This dichotomy reflects the parties'

1  recognition that, to make the Bridge Project work, SAP had to modify its own software, including

2  the interface.  To the extent Teradata made suggestions about how to modify *SAP* software, SAP

3  could not be expected (and, according to Teradata's own contemporaneous communications, was

4  not expected) to limit use of any such beneficial changes to the Bridge Project.  (Ex. 5 at 20:10-

5  18; Ex. 92 at 3; Ex. 63; Ex. 9 at 212:13-213:10.)  To the contrary, SAP had a business obligation

6  to share any improvements realized during the Bridge Project with SAP's many customers and

7  partners.  (Ex. 56; Ex. 6 at 307:8-12.)  Because the unambiguous terms of the parties' contract

8  gave SAP ownership of the interface and its conceptual design and/or authorized SAP to use

9  Graas's suggestions outside the context of the Bridge Project, SAP is entitled to summary

10 judgment on Teradata's batched merge method trade secret claims.

11                    **4.    Teradata's Federal Business Trade Secrets Claim Fails.**

12          As a tag-along to its batched merge method trade secret claims, Teradata contends that

13 SAP misappropriated three categories of trade secrets (Ex. 72 at Nos. 54-56) that relate to

14 marketing documents supposedly brought to SAP by former Teradata employees.  The Court also

15 should grant summary judgment on Teradata's federal claim based on these "business" trade

16 secrets.

17          Teradata maintains that █████████████████████████████████████████

18 ████████████████████████  (Ex. 71 at 62-63 (Rog 3).)  Teradata further claims that

19 ████████████████████████████████████████████████████████████████████████

20 █████████████████  (*Id.* at 62-67.)  To remedy this purported misappropriation, Teradata

21 asserts a cause of action under California's trade secret law and under the Defend Trade Secrets

22 Act ("DTSA").  (Dkt. 67 ¶¶ 103-111.)  But the DTSA applies only to acts occurring on or after

23 May 11, 2016.  Thus, to survive summary judgment, Teradata bears the burden of proving that an

24 act of misappropriation occurred after that date.  *Progressive Sols., Inc. v. Stanley*, 2018 WL

25 2585374, at *5 (N.D. Cal. Apr. 24, 2018); *HighMark Digital, Inc. v. Casablanca Design Centers,

26 Inc.*, 2020 WL 2114940, at *18 (C.D. Cal. Mar. 26, 2020).

27          While Teradata claims that ████████████████████████████████████████

28 ████████████████████████████████████████████████████████████████████████

1    (Ex. 71 at 21-22 (Rog 2)), none of the communications it cites post-date May 11, 2016.  (*See id.*

2    at 21 (citing Ex. 71 (Rog 3)); Ex. 71 at 8 (Rog 1); Ex. 72 at Nos. 54-56.  None of the use,

3    circulation, or misappropriation Teradata alleges with respect to these documents post-dates May

4    11, 2016.  (*See id.*; *see also* Ex. 73 ¶ 25 & n.12, ¶¶ 26-27, ¶ 96 & nn.201-204, ¶ 196 & n.417, ¶¶

5    207-229 & nn.432-491, ¶¶ 232-259 & nn.503-556).  And all of the SAP sales Teradata claims

6    occurred as a result of the alleged misappropriation and purportedly harmed Teradata or

7    benefitted SAP occurred *prior to* May 11, 2016.  (*See* Ex. 73 ¶¶ 232-259 & nn.503-556).

8    Accordingly, Teradata cannot maintain a DTSA claim based on the alleged business trade secrets.

9    ### B.    THE COURT SHOULD GRANT SUMMARY JUDGMENT ON
10   ### TERADATA'S ANTITRUST CLAIMS.

11   #### 1.    Teradata's Attempted Monopolization Claim Fails Because There Is No Evidence of a Dangerous Probability of Monopolization.

12         In Count V of its complaint, Teradata alleges that SAP is attempting to monopolize the

13   enterprise data warehouse market in violation of § 2 of the Sherman Act.  (Dkt. 67 ¶¶ 143-155.)

14   Yet there is no genuine dispute of material fact that SAP lacks a dangerous probability of

15   acquiring monopoly power in that market.

16         To prove its attempted monopolization claim, Teradata must establish, *inter alia*, a

17   dangerous probability of achieving "monopoly power."  *See Rebel Oil Co. v. Atl. Richfield Co.*,

18   51 F.3d 1421, 1432-33 (9th Cir. 1995).  Monopoly power is "the power to control prices or

19   exclude competition."  *United States v. Grinnell Corp.*, 384 U.S. 563, 571 (1966) (quotation

20   marks omitted).  "[T]o determine whether there is a dangerous probability of monopolization,"

21   the plaintiff first must define "the relevant market" and then identify the defendant's "market

22   power" within that market.  *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 455-56 (1993).

23         According to Teradata's expert, ███████████████████████████████████

24   ████████████████████████████████████  (Ex. 64 ¶ 78.)  Even accepting that

25   market definition as appropriate for purposes of the attempted monopolization claim, no

26   reasonable juror could find there is a dangerous probability of SAP monopolizing it.

27         "It requires no great familiarity with the law of antitrust to know that evidence of a

28   defendant's market share is the principal tool used by courts to determine the existence of

1  monopoly power." *Dimmitt Agri Indus., Inc. v. CPC Int'l Inc.*, 679 F.2d 516, 521 (5th Cir. 1982).

2  "When the claim involves attempted monopolization, most cases hold that a market share of 30

3  percent is presumptively insufficient to establish the power to control price." *Rebel Oil*, 51 F.3d

4  at 1438; *see also U.S. Anchor Mfg., Inc. v. Rule Indus., Inc.*, 7 F.3d 986, 1001 (11th Cir. 1993)

5  ("[B]ecause Rule possessed less than 50% of the market . . . there was no dangerous probability

6  of success . . . as a matter of law."); *United States v. Empire Gas Corp.*, 537 F.2d 296, 307 (8th

7  Cir. 1976) (no dangerous probability of success where market share was "about 50%").

8        Teradata's antitrust expert, John Asker, presents *no* evidence of SAP's share of his alleged

9  market.  (Ex. 64 ¶ 168; Ex. 1 at 148:9-149:19.)  And Teradata identifies no other evidence by

10  which SAP's share could be determined.  (Ex. 1 at 149:21-157:9.)  This evidentiary failure alone

11  warrants summary judgment.  *Sidibe v. Sutter Health*, 2021 WL 879875, at *9 (N.D. Cal. Mar. 9,

12  2021).  To be sure, Dr. Asker points to SAP's shares of relational and analytical database sales.[4]

13  (Ex. 64 ¶ 168.)  Yet SAP's shares of relational and analytical database sales – ██████████

14  respectively – do not approach monopoly power.  (Ex. 64 ¶ 168; Ex. 1 at 159:14-161:4.)

15  Furthermore, Dr. Asker's figures show that SAP's share of relational database sales ████████

16  ████████████████████████  (Ex. 66).  If SAP controls barely 10% of the only proximate

17  market measured, there is "no possibility of [SAP] achieving monopoly power."[5]  *Vollrath Co. v.*

18  *Sammi Corp.*, 9 F.3d 1455, 1461 (9th Cir. 1993).

19        Moreover, the data shows that new entrants like Amazon are snatching up market share.

20  (Ex. 66 (████████████████████████████████████████████████████

21  ████.)  Witnesses on both sides agree that ████████████████████████████████

22  ████████████████████████████████████

---

23

24      [4] A "relational" database is a type of database that stores and provides access to data
points that are related to one another.  (Ex. 38 at 49:22-50:13.)  A relational database can be either

25  transactional or analytical – both HANA and Teradata's database are "relational."  (Ex. 38 at
24:20-26:7, 33:18-34:10; Ex. 41 at 21:8-12.)

26      [5] Indeed, only one entity, Oracle, has more than 30% of the relational database market and
several other manufacturers—Microsoft, IBM, and Amazon—have a larger market share than

27  SAP.  Perversely, by going after a smaller player in the market, Teradata's claim seeks to achieve
"potentially devastating effect … on the very competition" antitrust law "is supposed to foster."

28  Phillip E. Areeda, Antitrust Law ¶ 807b5 (2020).

1    disruption and some of the trends happening in the market such as the transition to cloud." (Ex.

2    37 at 250:8-16.) As Teradata's witness put it, "███████████████████████████████

3    ███████████████████████████████████████████████████████████████████████████████

4    ███████████████████████████████████████████████████████ (Ex. 44

5    at 41:24-42:4.) Since 2013, ████████████████████████████████████

6    ████████████████████████████████████████████ (Ex. 57 at

7    TD05878640.) In light of these competitors' market shares rapidly rising—at the expense of

8    traditional competitors—the notion that *SAP* threatens to monopolize the EDW market for large

9    enterprises is untenable. *See In re Air Passenger Computer Reservations Sys. Antitrust Litig.*, 694

10   F. Supp. 1443, 1467 (C.D. Cal. 1988) (granting summary judgment because plaintiff "failed to

11   present any evidence supporting the dangerous probability of success element" when defendant's

12   market share was less than 12%).

13                    **2.    Teradata's Tying Claim Must Be Assessed Under the Rule of Reason.**

14              In Count IV of its complaint, Teradata alleges that SAP's purported "tying" of its "Top-

15   Tier ERP Applications (the tying product)" to HANA "(the tied product)" is "per se unlawful."

16   (Dkt. 67 ¶¶ 89, 132, 138.) Section 1 of the Sherman Act prohibits "[e]very contract, combination

17   in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the

18   several States." 15 U.S.C. § 1. The Supreme Court has long recognized that "the phrase 'restraint

19   of trade' is best read to mean 'undue restraint.'" *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2283

20   (2018) (citation omitted). "Restraints can be unreasonable in one of two ways." *Id.* "A small

21   group of restraints are unreasonable per se because they always or almost always tend to restrict

22   competition and decrease output." *Id.* (citation marks and quotations omitted). Restraints that are

23   not unreasonable per se are judged under the "rule of reason," which requires courts to conduct a

24   fact-specific assessment of market power and market structure to assess the restraint's actual

25   effect on competition. *See FTC v. Qualcomm Inc.*, 969 F.3d 974, 989 (9th Cir. 2020).

26              *Per se* analysis allows "condemnation without inquiry into actual market conditions"

27   based on precedent that deems certain contractual arrangements "unreasonable as a matter of

28   law." *Jefferson Par. Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 9, 15 (1984). While application of

1    the *per se* test has been sharply criticized as "wildly wrongheaded" in the context of tying claims

2    (Phillip E. Areeda, Antitrust Law ¶ 1709a (2020)), the Supreme Court has recognized that

3    "*certain* tying arrangements pose an unacceptable risk of stifling competition and therefore are

4    unreasonable 'per se.'" *Hyde*, 466 U.S. at 9 (emphasis added).  However, "[i]t is only after

5    considerable experience with certain business relationships that courts classify them as *per*

6    *se* violations." *Broad. Music, Inc. v. CBS*, 441 U.S. 1, 9 (1979).  The *per se* rule thus is

7    appropriate only where experience teaches that the alleged conduct "has so little redeeming

8    virtue, and that there would be so very little loss to society from its ban, that an inquiry into its

9    costs in the individual case [can be] considered [ ] unnecessary." *United States v. Microsoft*

10   *Corp.*, 253 F.3d 34, 94 (D.C. Cir. 2001) (internal quotation marks and citations omitted).

11          This is not such a case.  While the parties disagree about the effects of SAP combining its

12   ERP software (S/4HANA) with the underlying database (HANA), it is uncontroverted that

13   S/4HANA is technologically integrated with HANA.  SAP's prior ERP applications kept

14   substantial functionality in the application layer, so as to make it easier to port to multiple

15   databases.  (Mehrotra Decl. Ex. ¶¶ 125, 158-159.)  One of S/4HANA's innovations is to push

16   functionality down to the database layer, which required writing S/4HANA's code to integrate

17   more tightly with an underlying database.  (*Id.* ¶¶ 136-155.)  Teradata does not dispute these basic

18   facts.

19          In this kind of "technological tying" case, application of the *per se* rule is inappropriate

20   because of the risk that it "would unjustifiably deter the development and introduction of those

21   new technologies so essential to the continued progress of our economy." *Foremost Pro Color,*

22   *Inc. v. Eastman Kodak Co.*, 703 F.2d 534, 542–43 (9th Cir. 1983).  Recently, the Ninth Circuit

23   reaffirmed in *Qualcomm* that "novel business practices—*especially* in technology markets—

24   should not be 'conclusively presumed to be unreasonable and therefore illegal without elaborate

25   inquiry as to the precise harm they have caused or the business excuse for their use.'"  969 F.3d at

26   990-91 (citation omitted); *see also In re: Cox Enters., Inc.*, 871 F.3d 1093, 1102 (10th Cir. 2017).

27   Because the Supreme Court has not considered application of the *per se* rule where a tied

28   software product is "technologically integrated with the tying good," application of the *per se* rule

1   in that circumstance "creates undue risks of error and of deterring welfare-enhancing innovation."

2   *Microsoft*, 253 F.3d at 89-90; *see also* Phillip E. Areeda, Antitrust Law ¶ 1757c (2020) ("most

3   product design or redesign that creates product interdependence is procompetitive").

4           *Qualcomm* relied on the D.C. Circuit's 2001 opinion in *Microsoft*.  *See Qualcomm*, 969

5   F.3d at 990.  There, the United States charged Microsoft with bundling its Windows operating

6   system and Internet Explorer browser.  *See* 253 F.3d at 83-84.  The court observed that

7   integration of operating systems and browsers was common, even among firms without market

8   power, which indicated there were "efficiency gains from doing so."  *Id.* at 93.  Moreover,

9   Microsoft proffered evidence that bundling an operating system and browser improved the

10  functionality of the operating system itself.  *Id.* at 90.  The D.C. Circuit did not have to "pass

11  judgment on Microsoft's claims regarding the benefits from integration" to conclude that

12  application of the *per se* test was inappropriate; it was enough that these "purported efficiencies

13  suggest that judicial 'experience' provides little basis for believing that" Microsoft's integration

14  lacked any redeeming virtue and therefore should be presumed unreasonable.  *Id.* at 90-91; *see*

15  *also Apple iPod iTunes Antitrust Litig.,* 2009 WL 10678931, at *5 (N.D. Cal. May 15, 2009)

16  ("this Court is not aware of any case where *per se* tying liability was found on the basis of a

17  technological tie").

18          Similar considerations here weigh strongly against application of the *per se* rule.  To be

19  clear, the Court need not conclude that SAP's "integration is welfare-enhancing or that it should

20  be absolved of tying liability" to reject application of the *per se* rule.  *Microsoft*, 253 F.3d at 89.

21  Rather, the *per se* framework is appropriate only if the Court can "comfortably say" that the

22  bundling of ERP applications and databases, by *any* software manufacturer, has so little

23  redeeming virtue that an inquiry into its procompetitive benefits in a specific case is unnecessary.

24  *See id.* at 94.  There is no basis to reach that conclusion with respect to the business practices at

25  issue here.

26          As in *Microsoft*, many leading vendors of ERP applications also bundle their applications

27  with an underlying database. ████████████████████████████████████████████████

28  ███████    (Ex. 17 at 13:20-14:2.)  Similarly, ████████████████████████████████

1    ███████████████ (*Id.* at 41:12-20.) ████████████████████

2    ████████████████████████████████████████ (*Id.* at 34:4-18; *see also id.*

3    at 34:19-35:4 ███████████████████████████████████

4    ████████████████████████████████████████

5    ████████████████████████████████ (*Id.* at 49:15-50:14; *see also*

6    *id.* at 34:19-35:4, 47:10-18.)  Likewise, Microsoft's Dynamics ERP application runs only on

7    Microsoft's "SQL Server" database.  (Ex. 74 ¶ 4.)  Microsoft designed Dynamics 365, its SaaS

8    application, with its Microsoft Azure SQL database "integrated as part of the solution."  (*Id.*)

9    ███████████████████████████████████████████████ (Ex. 22

10    at 91:5-92:1; Anicich Decl. Ex. ¶ 38.)  This "ubiquity of bundling" between ERP applications and

11    databases "should give courts reason to pause before condemning" it as *per se* unreasonable.

12    *Microsoft*, 253 F.3d at 93.

13        Further, as in *Microsoft*, SAP has proffered evidence that its design of S/4HANA to

14    integrate with HANA improves functionality.  (*See* Mehrotra Decl. Ex. ¶ 138 ("designing

15    S/4HANA to operate closely with HANA offered several technical and practical benefits to

16    SAP"); *see also id.* ¶¶ 140-198.)  Teradata disputes the benefits of bundling and contends that

17    they do not outweigh the alleged anticompetitive effects of SAP's conduct.  But that is not the

18    relevant issue for purposes of the *per se* framework.  The question, rather, is whether it would be

19    appropriate to judge the integration of S/4HANA with HANA under a rule that *ignores* any

20    benefits of that integration entirely.  *See Microsoft*, 147 F.3d at 89.  For the reasons set out in

21    *Microsoft*,  *Qualcomm*, and *Foremost Pro Color*, application of the *per se* rule in this case would

22    risk deterring innovation and "may make consumers worse off."  *Id.*  The Court should hold

23    instead that Teradata's tying claim must be analyzed under the rule of reason.

24        **3.    Teradata's Tying Claim Fails Under the Rule of Reason.**

25        To maintain a claim under the rule of reason, Teradata must "delineate a relevant [tied]

26    market" and show that SAP "plays enough of a role in that market to impair competition

27    significantly."  *Bhan v. NME Hosps., Inc.*, 929 F.2d 1404, 1413 (9th Cir. 1991).  Teradata cannot

28    make that showing for two independent reasons.  *First*, Teradata has not properly defined a tied

market in which SAP actually competes, much less has caused harm to competition.  And because Teradata does not compete in any properly defined tied market, it lacks standing to bring a tying claim.  *Second*, even if Teradata's definition of the tied market was viable, Teradata cannot show any actual injury to *competition* in that market.

### (a)   Teradata Has Not Properly Defined a Tied Market in Which HANA Competes.

Teradata's expert claims that ███████████████████████████████████ ███████████████████ (Ex. 64 ¶ 78.)  And he opines that ███████████████████ ████████████████████████████████ (*Id.* ¶¶ 79-80.)  But Teradata's own witnesses confirm that, even when purchased independently for analytics use, HANA does *not* compete in the EDW space.  And, certainly, HANA sold for transactional use pursuant to a limited runtime license does not compete in the EDW space.  "[I]n determining the relevant market the courts are not free to accept whatever market is suggested by the plaintiff as fitting most persuasively with his contention that his power to compete effectively has suffered injury." *Gough v. Rossmoor Corp.*, 585 F.2d 381, 389 (9th Cir. 1978).  Because Teradata's evidence could not "sustain a jury verdict" where the tied market is EDW databases with OLAP capabilities for large enterprises, "summary judgment is appropriate."  *Rebel Oil*, 51 F.3d at 1435; *see also Truck-Rail Handling Inc. v. BNSF Ry. Co.*, 2005 WL 8178364, at *8 (N.D. Cal. Mar. 8, 2005) (granting summary judgment on market definition because plaintiff's evidence did not "assist in evaluating cross-elasticity of supply and demand").

The term EDW describes what *Teradata's* database does: ███████████████ ██████████████████████████████████████████████████████████ ████████████████████████████████████████ (Ex. 43 at 15:1-8; *see also* Ex. 42 at 28:23-29:5; Ex. 8 at 42:12-16.)  Teradata's own witnesses admit that customers do not use HANA for this purpose.  Christopher Twogood, Teradata's senior vice president of global marketing, testified that ███████████████████████████████ ██████████████████████████████████████████████████████████ ██████████████████████████████████████████████

1     ██████ (Ex. 43 at 20:3-22:15.)  In the same vein, a senior manager in Teradata's corporate

2     intelligence unit, Allen Licitra, testified that ████████████████████████████████████████

3     ████████████████████████████████████████████████ (Ex. 24 at 39:18-

4     40:21, 151:22-152:8; *see also id.* at 26:11-14 ███████████████████████████████

5     ██████████████████████████████

6          Dr. Asker reaches a contrary conclusion only by conflating two distinct concepts:  he

7     assumes that ████████████████████████████████████████████████████████

8     ████████████████████████ (Ex. 65 ¶ 127 & n.308.)  This is a fundamental, and critical,

9     mistake.  Some analytical database products have OLAP capabilities – but they are not

10    necessarily used as an *enterprise* data warehouse, which "involves the centralized storage and

11    integration of vast amounts of data collected from numerous sources across an entire business

12    enterprise."  (Dkt. 67 ¶ 16; Ex. 69 (RFAs 274, 277); Ex. 31 at 33:16-20 ████████████████

13    ████████████████████████████████████████████████████████████████████

14    ████████████████████████████████████████████████████████████████████

15    ████████████████████████ Dr. Asker admits that ████████████████████████████

16    ████████████████████████████████████████████████████████████████████████

17    ████████████████████ (Ex. 1 at 113:9-13; *see also id.* at 116:2-9 ████████████████████

18    ████████████████████████████████████████████████████████.)

19         Teradata will claim that SAP tried (largely unsuccessfully) to position HANA as an EDW

20    when sold independently of S/4HANA.  No matter.  The Court does not need to resolve the issue

21    of whether HANA, when sold independently of S/4HANA, competes in the alleged market for

22    EDW products with OLAP capabilities for large enterprises.  HANA sold independently for

23    analytics use is not within the scope of Teradata's allegation that SAP has tied sales of S/4HANA

24    to HANA, and therefore is irrelevant to the issue of the relevant tied market.

25         The issue is the relevant market for HANA when purchased with S/4HANA.  Here, the

26    determinative fact is that, when sold together with S/4HANA, HANA is ████████████ bundled

27    with S/4HANA under a runtime license.  And it is clear that a runtime license precludes use of

28    HANA as an EDW.  Teradata does not dispute that, since SAP released S/4HANA in 2015

1    (Stiroh Decl. Ex. ¶ 20), ███████████████████████████████████████

2    ███████    (Decl. of Kevin Murphy Ex. at Exhibit 6.)  With a runtime license, HANA can be used

3    only to support the SAP application running on top of it.  (Stiroh Decl. Ex. ¶ 18; Ex. 45 at 106:2-

4    7; Ex. 37 at 15:16-16:8; Ex. 13 at 64:10-22; Ex. 86 at Slide 2.)  Thus, a customer with a runtime

5    license uses HANA as a transactional database to support S/4HANA.  (Stiroh Decl. Ex. ¶ 176.)

6    But an EDW, as defined by Teradata, must bring data from multiple sources across an enterprise,

7    and then use sophisticated analytics tools to conduct analysis of that combined data.  (Dkt. 67

8    ¶ 16; Ex. 68 at 8 ████████████████████████████████████████████

9    ██████████████████████████████████████████████████████

10    Ex. 42 at 36:19-37:4; Ex. 64 ¶ 83.)  That kind of use is impermissible under a runtime license.

11    (Ex. 21 at 163:15-164:3).

12         Teradata insists that HANA sold pursuant to a runtime license has OLAP capabilities and

13    can perform analytics.  True, but that does not make it an EDW.  A runtime license imposes strict

14    limits on the ability of a customer to import data into HANA or use third-party or custom-

15    developed analytics tools on that data, which precludes a customer from using it as an EDW.

16    (Ex. 76 at Slide 8 ("HANA Runtime for Lumira Server . . . Cannot do data modeling; Cannot be

17    used for data mart or data warehouse scenarios"); Ex. 49 at 4 ("3rd Party Applications" and "Big

18    Data Real-Time Analytics" only available with a full use license), *id*. at 10 (runtime customers

19    have HANA's OLAP capabilities "but only use it for SAP Data"), *id*. at 12 ("Runtime only offers

20    a restricted Platform with a centralized and static approach"); Ex. 75 at Slides 17 to 20.)  As a

21    result, customers with a runtime license use the OLAP capabilities of HANA to perform

22    "embedded analytics" using only the built-in tools in S/4HANA and only on the limited set of

23    data generated by the specific S/4HANA application running on that HANA installation.  (Ex. 34

24    at 119:16-120:10.)  As a result, HANA with a runtime license cannot be a functional substitute

25    for an EDW.  (Stiroh Decl. Ex. ¶¶ 179-182.)  A customer with S/4HANA on HANA pursuant to a

26    runtime license uses HANA as a transactional database and also to perform limited embedded

27    analytics, but not to function as an EDW.  (*Id.* ¶ 176.)

28         This leaves the small number of customers that purchase S/4HANA together with HANA

pursuant to a full use license.  Teradata fails to present any evidence regarding how many such customers there are, or how many of them were subject to the alleged tie. One thing, however, is clear:  the small number of customers that purchase S/4HANA together with HANA pursuant to a full use license also use HANA as a transactional database.  Those customers are not legally prohibited from using HANA as an EDW, but there is no evidence that they do so.  Teradata has failed to identify a single customer that has taken S/4HANA together with HANA pursuant to a full use license and used that HANA installation as an EDW.  In fact, most Teradata customers that purchase S/4HANA and HANA continue to purchase an EDW product from Teradata.  (*See, e.g.*, Ex. 26 at 44:19-45:25, 52:7-17; Leonard Decl. Ex. ¶¶ 54-68.)

The evidence is thus clear.  The vast majority of customers that purchase S/4HANA with HANA pursuant to a runtime license might replace another *transactional* database—*i.e.*, their Oracle, IBM, or Microsoft OLTP database—with HANA, but they would not replace Teradata. (Ex. 37 at 212:1-16; Mehrotra Decl. Ex. ¶¶ 127-129; Ex. 69 (RFAs 281-288).)  The relevant market for HANA sold with S/4HANA thus is a market for *transactional* databases, not EDW products.  But Teradata has not properly defined that tied market, or presented any evidence of anticompetitive harm within it.  (Murphy Decl. Ex. ¶ 18.)

### (b) Teradata Lacks Standing to Challenge Any Tie in a Properly-Defined Tied Market.

Even assuming the alleged tie between S/4HANA and HANA harms competition in a transactional database market, Teradata, as the vendor of an analytical database, lacks standing to challenge SAP's conduct.[6]  *See Am. Ad Mgmt., Inc. v. Gen. Tele. Co. of Cal.*, 190 F.3d 1051, 1057 (9th Cir. 1999).  Because "only those that are participants in the defendants' market can be said to have suffered antitrust injury," Teradata has no standing to challenge any alleged tie of S/4HANA to HANA.  *In re Aluminum Warehousing Antitrust Litig.*, 833 F.3d 151, 158 (2d Cir. 2016).  It is uncontested that ██████████████████████████████████████

████████████████████████    (Ex. 69 (RFA 292).)  Therefore, Teradata's products lack the

---

[6] Teradata's lack of standing dooms its tying claim under both the *per se* and rule of reason frameworks.  *See In re ATM Fee Antitrust Litig.*, 686 F.3d 741, 744 (9th Cir. 2012).

functionality to replace HANA for SAP's S/4HANA customers.  In other words, even if S/4HANA had been designed to work on databases other than HANA, Teradata's EDW products could never have been one of those databases.  And if Teradata's products cannot substitute for HANA for S/4HANA customers, then the two products are not in the same product market.  *See Golden Gate Pharmacy Services, Inc. v. Pfizer, Inc.,* 433 Fed. Appx. 598, 598–99 (9th Cir. 2011) ("The products alleged in a relevant market must be 'reasonably interchangeable by consumers for the *same purposes*.'").

**(c)    Teradata Cannot Show Harm to Competition Given SAP's Low and Declining Share of Databases.**

Even if Teradata's definition of the tied market was supported by evidence, summary judgment still would be warranted because Teradata cannot show that SAP has caused actual injury to competition in a market for ██████████████████████████████████ ████████

To establish an unreasonable restraint of trade under the rule of reason, the plaintiff bears the burden of proving the defendant's conduct "actually harmed competition," not merely a competitor.  *Am. Ad Mgmt., Inc. v. GTE Corp.*, 92 F.3d 781, 789 (9th Cir. 1996).  Teradata's expert does not purport to offer any direct evidence of actual anticompetitive effects in the relevant tied market, "such as reduced output, increased prices, or decreased quality" as a result of the alleged tie.  *Am. Express*, 138 S. Ct. at 2284.  Although Dr. Asker claims that ████████ ████████████████████████████████ (Ex. 64 ¶ 150), he does not opine that prices are higher than they would be in a competitive market.  *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 237 (1993) ("a jury may not infer competitive injury from price and output data absent some evidence that tends to prove that output was restricted or prices were above a competitive level").  Nor has Dr. Asker analyzed whether any competitors in his defined tied market other than Teradata have reduced their output as a result of the alleged tie.  Dr. Asker concedes that ████████████████████████████████████████ ████████████████████████████████████ (Ex. 64 ¶ 87; Ex. 1 at 144:25-146:12.)  Yet ████████████████████████████████

DEFS.' MOTION FOR SUMMARY JUDGMENT
Case No. 3:18-cv-3670-WHO (JCS))

1         ███████ (Ex. 65 ¶ 61; Ex. 1 at 174:19-182:18.)

2         Given the absence of any direct evidence of actual harm to competition, Teradata must

3 rely on indirect evidence, which requires "proof of market power plus some evidence that the

4 challenged restraint harms competition." *Am. Express*, 138 S. Ct. at 2284. But Teradata's claim

5 fails under this approach as well. Unlawful market power can be demonstrated circumstantially

6 by "show[ing] that the defendant owns a dominant share of [the relevant] market." *Rebel Oil*, 51

7 F.3d at 1434. Teradata cannot make such a showing because there is no genuine issue of fact

8 concerning whether SAP's share of the alleged tied market is "dominant." To the contrary, it is

9 undisputed that Teradata's expert lacks any evidence about SAP's market share in the market for

10 ████████████████████████████████████ (Ex. 1 at

11 149:2-19.) The only relevant evidence in Dr. Asker's report is that ███████████████

12 ███████████████[7] (Ex. 64 ¶ 168.) Such low shares preclude a finding of

13 market power as a matter of law. *See, e.g., Rebel Oil*, 51 F.3d at 1438 ("[A] market share of less

14 than 50 percent is presumptively insufficient to establish market power."); *Image Tech. Servs.,*

15 *Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1206 (9th Cir. 1997) ("Courts generally require a 65%

16 market share to establish a prima facie case of market power."); *Town Sound & Custom Tops, Inc.*

17 *v. Chrysler Motors Corp.*, 959 F.2d 468, 494 (3d Cir. 1992) (no triable issue of fact when

18 defendant controlled only 10% of tied market).

19                  **4.**    **Teradata's Tying Claim Fails Also Because SAP Lacks Market Power**
**in the Tying Market.**

20         If all of that was not enough, Teradata's tying claim (under either the *per se* or rule of

21 reason frameworks) fails also because SAP lacks market power in the tying market. "[I]n all

22 cases involving a tying arrangement, the plaintiff must prove that the defendant has market power

23 in the tying product." *Illinois Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28, 46 (2006). If SAP

24 lacks market power in the tying market, Teradata's claim must fail because, "in that case, [SAP]

25 has no power to force, exploit, or coerce a" customer into purchasing the tied product. *Rick-Mik*

26

27       [7] At his deposition, Dr. Asker also testified that ████████████████████████

28 (Ex. 1 at 160:11-17, 162:17-25, Murphy Decl. Ex. at Exhibit 21.)

1    *Enters., Inc. v. Equilon Enters. LLC*, 532 F.3d 963, 972 (9th Cir. 2008).  Teradata has no proof of

2    SAP's market power in the tying market.  Teradata's expert concludes otherwise only by

3    gerrymandering the tying market, artificially limiting it to a subset of "large" customers and just

4    two competitors:  Oracle and SAP.

5            Teradata, as the plaintiff, bears the burden of proving the relevant product market.  *See*

6    *United States v. Bazaarvoice, Inc.*, 2014 WL 203966, at *22 (N.D. Cal. Jan. 8, 2014).  Dr. Asker

7    opines that ██████████████████████████████████████████████████████████████

8    ████████████ (Ex. 64 ¶ 46.)  Asker's market thus includes two significant limitations.  First, █

9    ████████████████████████████████████████████████████████████████████████

10   ████████████████████████████ (*Id.* ¶ 48.)  Second, Dr. Asker opines that the relevant market

11   includes only ██████████████████████████████████████████████████████████████

12   ██████████████████████████ *Id.* ¶ 50.)  Working from this artificial market definition, Asker

13   concludes that ████████████████████████████████████████████████████████████

14   ████████████████████████████████████████████████████████████████████████

15   ██████ (*Id.* ¶ 109.)

16           In *United States v. Oracle Corp.*, 331 F. Supp. 2d 1098, 1125 (N.D. Cal. 2004), Judge

17   Walker rejected a virtually-identical product market definition, and Teradata's attempt to reassert

18   such a market here fails for the same reasons.  *Oracle*, like this case, involved competition among

19   vendors of ERP software.  The key issue was how to define the market for such software.  The

20   DOJ, as plaintiff, claimed that there was a market limited to "core" ERP software for human

21   relations management and financial management systems, and that this market was further limited

22   to those core ERP products "able to meet the needs of large and complex enterprises."  *Id.* at

23   1102.  And like Teradata, the DOJ claimed the only competitors in this market were Oracle,

24   PeopleSoft (which Oracle acquired), and SAP.  *Id.* at 1107.  The court rejected this "very

25   restricted" market definition, *id.* at 1125, finding that it excluded numerous sources of

26   competition—including "mid-market vendors"—that served as substitutes for the finance ERP

27   products offered to large enterprises by Oracle and SAP.  *Id.* at 1159-61.  For the same reasons,

28   no reasonable juror here could conclude that the same market definition that Judge Walker

DEFS.' MOTION FOR SUMMARY JUDGMENT
Case No. 3:18-cv-3670-WHO (JCS))

1    rejected is a valid one.

2          As in *Oracle*, Dr. Asker "presents no reliable economic basis to limit the alleged market to

3    large enterprises only." (Stiroh Decl. Ex. ¶ 28.) As explained in SAP's concurrently-filed

4    *Daubert* motion, a product market must include economic substitutes, *i.e.*, products that would

5    see increased demand in response to a price increase in another product. Dr. Asker concedes,

6    however, that ███████████████████████████████████████████████████

7    ██████ (Ex. 1 at 49:15-19.) Instead, much like plaintiffs in *Oracle*, Teradata, "in reaching

8    this strange product market, clearly worked backwards from their desired result: finding a group

9    of customers all of which had purchased SAP, Oracle or PeopleSoft ERP, then claiming that those

10   customers were 'similarly situated' and defined the market." 331 F. Supp. 2d at 1154. The

11   evidence that Teradata's expert relies upon to substantiate his market definition, moreover, is

12   "circumstantial and highly qualitative," *id.* at 1158, and none of it creates a genuine issue of

13   material fact. For example, ██████████████████████████████████

14   ██████ (Ex. 64 ¶ 62), which, by his own admission, ██████████████████████

15   ███████████████████████ (*Id.* ¶ 59; Stiroh Decl. Ex. ¶ 90.) ████████████

16   ███████████████████████████████████████████████████████████

17   ███████████████████████████ (Ex. 64 ¶ 62.)

18      ███████████████████████████████████████████

19   ███████████████████████████ (Ex. 64 ¶ 66.) But that data does not reflect

20   actual purchase decisions; nor do the number of times competitors are mentioned in such data

21   indicate what customers would do in response to a change in price. (Ex. 64 ¶ 65; Ex. 1 at 68:23-

22   69:5.) Dr. Asker's aggregate diversion analysis is not a price-based analysis, and therefore is not

23   a substitute for cross-elasticity of demand. (Stiroh Decl. Ex. ¶ 36.) In short, Teradata has failed

24   to produce evidence of cross-elasticity of demand sufficient to establish core ERP products for

25   large enterprises as a relevant antitrust market. While Teradata and its experts insist there must

26   be "something different" about the ERP products sold by SAP and Oracle, this is not enough to

27   support a relevant product market definition as a matter of law. *Oracle*, 331 F. Supp. 2d at 1159.

28

DEFS.' MOTION FOR SUMMARY JUDGMENT
Case No. 3:18-cv-3670-WHO (JCS))

1    **V.**    <u>**CONCLUSION**</u>

2         For these reasons, the Court should grant summary judgment to SAP on trade secret

3    numbers 24-31 and 58-59, and on Teradata's antitrust claims.  The Court should also grant

4    summary judgment to SAP on Teradata's DTSA claim based on trade secret numbers 54-56.

5     Dated:  August 25, 2021                          JONES DAY

6                                                      By: *s/ Tharan Gregory Lanier*
                                                          Tharan Gregory Lanier
7
                                                      Counsel for Defendant/Counterclaim-
8                                                     Plaintiff SAP SE and Defendants SAP
                                                      AMERICA, INC. and SAP LABS, LLC
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFS.' MOTION FOR SUMMARY JUDGMENT
Case No. 3:18-cv-3670-WHO (JCS))